# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 7, 2011

Lyle W. Cayce
Clerk

No. 09-10560

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MOHAMMAD EL-MEZAIN; GHASSAN ELASHI; SHUKRI ABU BAKER; MUFID ABDULQADER; ABDULRAHMAN ODEH; HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, also known as HLF,

Defendants - Appellants

Consolidated with
08-10664

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SHUKRI ABU BAKER; MOHAMMAD EL-MEZAIN; GHASSAN ELASHI; MUFID ABDULQADER; ABULRAHMAN ODEH,

Defendants - Appellants

Consolidated with
08-10774

No. 09-10560

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MOHAMMAD EL-MEZAIN,

Defendant - Appellant

_____

Consolidated with
10-10590
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee - Cross-Appellant

v.

HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, also known as HLF,

Defendant - Appellant - Cross-Appellee

_____

Consolidated with
10-10586
_____

UNITED STATES OF AMERICA,

Plaintiff

v.

SHUKRI ABU BAKER,

No. 09-10560

Defendant

NANCY HOLLANDER,

Appellant

———————————

Appeals from the United States District Court
for the Northern District of Texas

———————————

Before KING, GARZA, and GRAVES, Circuit Judges.

KING, Circuit Judge:

In this consolidated case, we address the appeals of five individuals and one corporate defendant convicted of conspiracy and substantive offenses for providing material aid and support to a designated terrorist organization. The terrorist organization at issue is Hamas, which in 1995 was named a Specially Designated Terrorist by Presidential Executive Order pursuant to authority granted by the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* Hamas was further designated as a Foreign Terrorist Organization in 1997, as contemplated by 18 U.S.C. § 2339B.

Although this case is related to terrorism, it does not involve charges of specific terrorist acts. Instead, it focuses on the defendants' financial support for terrorism and a terrorist ideology. The defendants were charged with aiding Hamas by raising funds through the corporate entity Holy Land Foundation for Relief and Development, a Texas-based, pro-Palestinian charity that the Government charged was created for the sole purpose of acting as a financing arm for Hamas. Although the charged conspiracy began in 1995 when Hamas was first designated as a terrorist organization, the defendants' connection to Hamas arose much earlier.

No. 09-10560

Established in the late 1980s, the Holy Land Foundation held itself out as the largest Muslim charitable organization in the United States. It raised millions of dollars over the course of its existence that were then funneled to Hamas through various charitable entities in the West Bank and Gaza. Although these entities performed some legitimate charitable functions, they were actually Hamas social institutions. By supporting such entities, the defendants facilitated Hamas's activity by furthering its popularity among Palestinians and by providing a funding resource. This, in turn, allowed Hamas to concentrate its efforts on violent activity.

The trial, which followed an earlier mistrial and lasted approximately six weeks, produced a massive record on appeal. The Government produced voluminous evidence obtained from covert surveillance, searches, and testimony showing a web of complex relationships connecting the defendants to Hamas and its various sub-groups. The financial link between the Holy Land Foundation and Hamas was established at the Foundation's genesis and continued until it was severed by the Government's intervention in 2001.

The defendants raise a host of issues challenging both their convictions and their sentences, including numerous errors that they claim deprived them of a fair trial. While no trial is perfect, this one included, we conclude from our review of the record, briefs, and oral argument, that the defendants were fairly convicted. For the reasons explained below, therefore, we AFFIRM the district court's judgments of conviction of the individual defendants. We DISMISS the appeal of the Holy Land Foundation for Relief and Development.

No. 09-10560

# TABLE OF CONTENTS

I.  Factual and Procedural Background.................................................................7

II. Discussion.......................................................................................................16

    A.  Testimony of witnesses using pseudonyms...........................................16

    B.  Hearsay evidence..................................................................................22

        1.  Mohamed Shorbagi...........................................................................23

        2.  Documents seized from the Palestinian Authority.........................27

        3.  Elbarasse and Ashqar documents....................................................34

    C.  Prejudicial evidence under Rule 403......................................................46

    D.  Expert and lay opinion testimony.........................................................52

        1.  John McBrien....................................................................................52

        2.  FBI Agents Lara Burns and Robert Miranda..................................56

        3.  Matthew Levitt.................................................................................59

        4.  Steven Simon....................................................................................60

    E.  Letter rogatory.......................................................................................62

    F.  Production of the defendants' intercepted statements...........................65

    G.  Harmless and cumulative error.............................................................77

        1.  Harmless error..................................................................................78

            a.  HLF's connection to Hamas..........................................................80

            b.  Hamas's control of the zakat committees.....................................88

        2.  Cumulative error...............................................................................94

    H.  Jury charge.............................................................................................94

    I.  The search of HLF's offices.....................................................................101

    J.  Defendant Elashi's double jeopardy issue.............................................111

        1.  Time...................................................................................................113

        2.  Co-conspirators..................................................................................114

        3.  Statutory offenses.............................................................................115

        4.  Overt acts..........................................................................................117

5. Place...................................................................................120

K. Defendant El-Mezain's collateral estoppel issue...................................121

    1. Collateral estoppel as a bar to the instant conviction.................122

    2. Collateral estoppel and the exclusion of evidence.......................132

L. Mistrial and double jeopardy...............................................................134

M. Challenge to FISA applications and intercepts....................................142

    1. Disclosure of FISA applications and orders...............................143

    2. Suppression of FISA intercepts..................................................151

N. Sentencing..........................................................................................154

    1. Terrorism adjustment................................................................154

    2. Value of laundered funds..........................................................156

O. Appeals of HLF and Nancy Hollander.................................................158

    1. Background..............................................................................158

    2. HLF's appeal...........................................................................165

    3. Hollander's appeal...................................................................169

III. Conclusion............................................................................................170

No. 09-10560

## I. FACTUAL & PROCEDURAL BACKGROUND

The instant prosecution began with an indictment of the defendants in 2004 that ended in a mistrial in 2007 but with a partial verdict. The defendants were re-tried and convicted in 2008. The indictment, as superseded, charged the defendants with conspiracy to provide material support to a foreign terrorist organization (i.e., Hamas), in violation of 18 U.S.C. § 2339B(a)(1) (Count 1); providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1) (Counts 2–10); conspiracy to provide funds, goods, and services to a Specially Designated Terrorist (i.e., Hamas), in violation of 50 U.S.C. §§ 1701–1706 (Count 11); providing funds, goods, and services to a Specially Designated Terrorist, in violation of 50 U.S.C. §§ 1701–1706 (Counts 12–21); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 22); substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 23–32); forfeiture of assets; and certain tax offenses not relevant to this appeal.

The charges arose after many years of widespread surveillance conducted pursuant to the Foreign Intelligence Surveillance Act ("FISA") of several individuals and of the Holy Land Foundation for Relief and Development ("HLF"). Until it was closed by the Government in 2001, HLF was a pro-Palestinian charitable organization based in Richardson, Texas. Individual defendants Shukri Abu Baker, Ghassan Elashi, and Mohammad El-Mezain served as officers and directors for HLF. Defendant Abdulrahman Odeh managed HLF's New Jersey office, and Defendant Mufid Abdulqader was a speaker and performer who appeared at HLF fundraising events.

HLF held itself out to be the largest Muslim charity in the United States, ostensibly with the mission of providing humanitarian assistance to needy Palestinians living in the Israeli-occupied territory of the West Bank and Gaza. The Government charged that in reality HLF's mission was to act as a

fundraising arm for Hamas, also known as the Islamic Resistance Movement, and to assist Hamas's social wing in support of Hamas's goal to secure a Palestinian Islamic state in what is now Israel. The indictment charged the defendants with assisting Hamas by funneling money to certain "zakat" committees located in the West Bank. Zakat committees are charitable organizations to which practicing Muslims may donate a portion of their income pursuant to their religious beliefs, but the Government charged that the committees to which the defendants gave money were part of Hamas's social network.

According to the evidence at trial, which we view in the light most favorable to the verdict, Hamas operates political, military, and social branches to serve its overall goal to destroy Israel. Its charter advocates violent jihad as the only solution for the conflict between Palestinians and Israelis, and it considers it the duty of all Muslims to participate in this objective either through direct action or through financial support. Hamas's social wing serves this purpose in multiple ways. It provides social services like education and medical care to the needy through the operations of schools and hospitals. But it also builds grassroots support for Hamas and its violent activities through these same means. The social wing is crucial to Hamas's success because, through its operation of schools, hospitals, and sporting facilities, it helps Hamas win the "hearts and minds" of Palestinians while promoting its anti-Israel agenda and indoctrinating the populace in its ideology. The social wing also supports the families of Hamas prisoners and suicide bombers, thereby providing incentives for bombing, and it launders money for all of Hamas's activities. Therefore, aid to Hamas's social wing critically assists Hamas's goals while also freeing resources for Hamas to devote to its military and political activities.

The evidence showed that HLF and Hamas were created along similar time lines. In 1987, a Palestinian revolt in Israel, known as the Intifada,

spurred the founding of Hamas by Sheikh Ahmed Yassin as a representative organization for Palestine. Hamas considered itself to be the Palestinian branch of the Muslim Brotherhood, a much older Islamic organization created in the 1920s and to which Yassin belonged. After Hamas's formation, the Muslim Brotherhood directed its world-wide chapters to establish so-called "Palestine Committees" to support Hamas from abroad.

In the United States, Defendants Baker, El-Mezain, and Elashi were members of a Palestine Committee headed by unindicted co-conspirator Mousa Abu Marzook. The Government established that Marzook was the leader of Hamas's political wing in the 1990s. According to the prosecution's case, the Palestine Committee also created other organizations in the United States to support Hamas. The Committee created not only HLF but also the Islamic Association for Palestine ("IAP"), which was a media entity, and the United Association for Studies and Research ("UASR"), which published papers and books about Hamas. Defendant Baker was also an IAP board member.

In 1988, Baker founded the Occupied Land Fund as a Muslim charity in Indiana. He, Elashi, and El-Mezain later incorporated the organization in California before renaming it as HLF in 1991. In 1992, HLF moved to Texas, where it was located across the street from Elashi's computer company, Infocom Corporation. HLF stored many of its records and documents at Infocom, which were later seized by the FBI.

The defendants raised money through HLF by conducting nationwide fundraising events, conferences, and seminars where HLF sponsored speakers and solicited donations. Some of the events featured songs, performances, and skits glorifying Hamas. Defendant Abdulqader was part of a band that performed at many of these events. He also traveled around the country on HLF's behalf to speak and raise funds. HLF also conducted teleconferences where participants could listen to featured speakers and donate money. Prior

to 1995, the individual defendants and HLF more or less openly supported Hamas. Then, after Hamas was designated as a terrorist organization, the defendants' support became less obvious. Speakers and performers at HLF fundraising events no longer openly referred to Hamas even though HLF continued to support the same zakat committees that Hamas controlled.

From 1992 to 2001, HLF raised approximately $56 million in donations. The Government charged that from 1995 to 2001, HLF sent approximately $12.4 million outside of the United States with the intent to willfully contribute funds, goods, and services to Hamas.[1]

During the period from the late 1980s to the early 1990s when HLF was raising funds for the Palestinian cause, and prior to Hamas's designation as a terrorist organization, there were ongoing peace talks between Israel and the Palestinians, of which the defendants took notice. In September 1993, Yasser Arafat, the leader of the Palestine Liberation Organization ("PLO"), and Israeli Prime Minister Yitzhak Rabin signed what became known as the Oslo Accords. These accords established mutual recognition between the Israeli government and the Palestinians. They also created a limited governing body for Palestinians, known as the Palestinian Authority ("PA"). As a political rival of Arafat and his Fatah political party, Hamas opposed the Oslo Accords.

One month after the Oslo Accords were signed, Defendants Baker and Elashi, and possibly Abdulqader, participated in a meeting at a Philadelphia hotel ("the Philadelphia meeting") that was secretly recorded by the FBI.[2] The

---

[1] The evidence showed that HLF provided the following amounts to zakat committees controlled by Hamas: $366,585 to the Tulkarem Zakat Committee; $1,674,954 to the Islamic Charitable Society of Hebron ("ICS Hebron"); $475,715 to the Nablus Zakat Committee; $554,500 to the Jenin Zakat Committee; $494,252 to the Ramallah Zakat Committee; and $295,187 to the Qalqilia Zakat Committee. In addition, HLF sent $485,468 to the Islamic Science and Culture Committee from May 1991 until the committee was closed in 1996.

[2] Hotel records from the meeting's location contained Abdulqader's signature, suggesting that he was present, but the record was also marked as having been voided.

meeting participants, which included many of the members of the Palestine Committee, discussed their opposition to the Oslo Accords, their desire to derail the peace process, and their continued support of Hamas. Statements from Baker suggested an aura of deception and an intent to hide a connection to Hamas. At one point, Baker instructed that if anyone should inquire about the purpose of the meeting, participants should explain that it was a "joint workshop" between HLF and the IAP. He also indicated that the participants should not mention "samah" in an explicit manner and should refer at the session only to "Sister Samah," which is Hamas spelled backwards.

Beginning in approximately 1994, Government surveillance on the defendants included wiretaps on the telephones and facsimile machines of HLF, Baker, El-Mezain, and Abdulqader. In addition to the wiretaps, the Government conducted searches at the homes of two unindicted co-conspirators, Ismail Elbarasse and Abdelhaleen Masan Ashqar, who had also participated in the Philadelphia meeting. The searches yielded numerous documents corroborating the creation of the Palestine Committee and its oversight of HLF as a fundraising arm for Hamas. The documents included organizational flow charts, bylaws, and meeting minutes. The amended bylaws identified HLF under its previous name, the Occupied Land Fund, as the "official organization which represents the financial and charitable aspect to support the homeland people in the occupied territories." The bylaws further showed that the Muslim Brotherhood had directed the collection "of donations for the Islamic Resistance Movement."

In January 1995 the President issued Executive Order 12947, designating Hamas as a Specially Designated Terrorist ("SDT"). The designation prohibited financial transactions with or for the benefit of Hamas and authorized the Treasury Department to block assets within the jurisdiction of the United States in which Hamas had an interest. The Executive Order determined, in part, that

"grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Hamas was further designated as a foreign terrorist organization ("FTO") by the State Department in 1997 pursuant to Section 219 of the Immigration and Nationality Act, as added by the Antiterrorism and Effective Death Penalty Act of 1996.

On December 3, 2001, pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("IEEPA"), the United States designated HLF as a SDT. The next day, the Treasury Department's Office of Foreign Assets Control ("OFAC") issued a blocking order on HLF's assets. On that same day, OFAC entered HLF's offices in Texas, New Jersey, Illinois, and California, and seized physical property. The seizure was conducted pursuant to the authority of IEEPA; no judicial warrant was obtained. In April 2002 the FBI sought, and was granted, a warrant from a magistrate judge to search the property that OFAC had seized. Evidence obtained from that search was used at trial. A search was also conducted at Infocom, where the FBI seized more of HLF's documents and records.

At trial, the Government's evidence was voluminous and came from a variety of sources, including the above seizures, wiretaps, and financial documents. It also included evidence seized by the Israeli military from the zakat committees and from the PA's headquarters in Ramallah. The key issues addressed by the evidence were the connection between the defendants and Hamas, and Hamas's control of the zakat committees. The evidence also covered two general time periods: the time before Hamas was designated as a terrorist organization and the time following the designation.

Evidence demonstrating the defendants' support of Hamas before the designation included numerous video recordings showing several individual defendants appearing at HLF fundraising events attended by Hamas leaders,

such as Marzook and Khalid Mishal, who is the current leader of Hamas's political wing. The speakers and performers praised Hamas at many of these events, where donations were encouraged and solicited by HLF. Some of the videos were seized from HLF offices, while others were found buried in the backyard of a residence formerly occupied by Fawaz Mushtaha, who was associated with the Palestine Committee and also played in the same band with Defendant Abdulqader.

The Government also presented evidence of numerous financial transactions between HLF and Hamas leader Marzook and Marzook's wife Nadia.[3] Marzook further had personal connections to the defendants as shown through numerous telephone calls to El-Mezain and Baker, and the listing of contact information for El-Mezain, Baker, and Elashi in his personal telephone book.

Mohamed Shorbagi, a former HLF representative who pleaded guilty in a separate case, testified that HLF's purpose was to support Hamas. He testified about attending closed meetings with the individual defendants and Hamas leaders. He described one meeting in 1994 where Marzook introduced Mishal, who spoke about the emergence of Hamas and the participants' roles in supporting the Hamas movement. According to Shorbagi, El-Mezain led a sub-group from that meeting in discussions on fundraising.

Shorbagi's testimony that HLF supported Hamas was consistent with testimony from an Israeli Security Agency employee who provided expert testimony about Hamas financing. Using the pseudonym "Avi" for security reasons, the witness testified that most of the zakat committees that received funds from HLF had come under the control of Hamas by 1991. This testimony was also consistent with conversations captured from the Philadelphia meeting

---

[3] Nadia is also the cousin of Defendant Elashi. Marzook was himself named a Specially Designated Terrorist in 1995.

in 1993, wherein Muin Shabib, who was later identified at trial as a Hamas leader, discussed the zakat committees and the extent to which they were "ours," meaning Hamas. It was also consistent with a 1991 letter addressed to Baker found in Elbarasse's home that discussed various zakat committees and used the same language to indicate which committees were controlled by Hamas.

Prior to 1995 it was not illegal for HLF to have a relationship with or to provide support for Hamas. The above evidence was therefore important to establish the defendants' relationship with Hamas figures and to demonstrate their intent when viewed in conjunction with other evidence of their post-1995 conduct. The Government presented evidence through video recordings, letters, and other documents found in HLF's possession demonstrating that the defendants continued to support Hamas. For example, in a 1996 video from a fundraising event, Abdulqader sent greetings to Hamas leaders. In 1997 HLF sponsored a teleconference featuring two prominent Hamas speakers. Indeed, HLF maintained a computerized list of featured speakers, last modified in 1999, that included numerous individuals who were identified through testimony as Hamas members. But perhaps the strongest evidence that the defendants' provided support to Hamas after Hamas was designated as a terrorist organization came through testimony and financial documents showing that HLF provided funds to the same Hamas-controlled zakat committees that it had supported before the designation.

The evidence of Hamas control of the zakat committees was substantial. For example, the Government offered testimony from Dr. Matthew Levitt, an expert on the subject of Hamas, who testified based on his research that Hamas controls many of the zakat committees in the West Bank and Gaza. Avi also testified from his personal study of Hamas that all of the zakat committees named in the indictment were Hamas institutions. In addition, the Israeli military seized a voluminous amount of evidence related to Hamas from the

No. 09-10560

zakat committees. This evidence included Hamas posters and paraphernalia, as well as internal Hamas documents and communications. The evidence also included video recordings seized from the zakat committees showing school ceremonies and other events consistent with Hamas ideology and Hamas's use of its social wing to promote its agenda. Furthermore, numerous individuals connected to the various zakat committees were identified as prominent Hamas leaders.

The defendants' theory at trial largely was that they did not support Hamas or terrorism, but rather shared a sympathy for the plight of the Palestinian people through support of the zakat committees and the charitable work the committees performed. Their view was that the Government never designated as a terrorist organization any of the zakat committees or anyone connected to the committees. They argued that the Treasury Department had to designate a zakat committee before contributions to it would be unlawful, suggesting that non-designated committees were not controlled by Hamas.

The jury rejected the defense's theories and credited the Government's evidence by finding each defendant guilty of all applicable charges. The district court imposed sentences ranging from 65 years in prison for Baker and Elashi, to 20 years for Abdulqader, and 15 years for Odeh and El-Mezain. HLF was sentenced to one year of probation.

The defendants now appeal, raising multiple claims of error before, during, and after trial. Despite raising a myriad of issues, including numerous claims of erroneous evidentiary rulings, the defendants do not challenge the sufficiency of the evidence to support their convictions. We first address the defendants' various claims of trial error and their challenge to the jury charge. We then address a challenge on Fourth Amendment grounds to the search conducted in HLF's offices in December 2001, and then turn to three separate Double Jeopardy issues. Next, we will address the defendants' issues concerning

15

classified information, and then we will consider two separate sentencing challenges. After considering the issues raised by the individual defendants, we turn to the separate appeal by HLF as a corporate defendant. Finally, we consider a separate appeal filed by defense attorney Nancy Hollander.

## II.  DISCUSSION

### A.  Testimony of witnesses using pseudonyms

The defendants' first claim of trial error involves the district court's allowance of two witnesses to testify using pseudonyms. One of the witnesses, who used the name "Avi," was a legal advisor for the Israeli Security Agency ("ISA") and testified as an expert witness about Hamas financing and control of the zakat committees. The other witness, "Major Lior," was employed by the Israeli Defense Forces ("IDF") and testified as a fact witness to authenticate documents that IDF had seized during a military operation known as Operation Defensive Shield. The district court ruled that the witnesses could use pseudonyms because revealing their true names "would jeopardize national security and pose a danger to the safety of the witnesses and their families."

The defendants argue that the use of pseudonyms by Avi and Major Lior violated the defendants' Fifth Amendment due process right and their Sixth Amendment right to confront witnesses.[4] The defendants contend that they could not verify Avi's and Major Lior's credentials or investigate them for prior acts undermining their veracity; they could not present opinion and reputation evidence about their character for untruthfulness, and they could not develop other impeachment evidence. They further complain that the district court ignored procedures under the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. 3, § 6, designed to protect a defendant's right to present his

---

[4] Although the defendants mention the Fifth Amendment, their brief addresses only confrontation and does not distinguish the Due Process Clause from the Sixth Amendment's Confrontation Clause. Therefore, we address this issue as a confrontation claim.

defense when classified information is involved. They further note that besides Avi the Government could have called another witness it had noticed as an expert, whose identity was not classified, to testify about Hamas's control of the zakat committees, and they posit that their constitutional rights would not have been violated had the Government done so.

Ordinarily, a district court's limitation on the scope of the defendant's cross-examination of government witnesses is reviewed for abuse of discretion. *See United States v. Bryant*, 991 F.2d 171, 175 (5th Cir. 1993). Alleged violations of the Confrontation Clause of the Sixth Amendment during cross-examination are reviewed *de novo*, applying a harmless error standard. *United States v. Diaz*, 637 F.3d 592, 597 (5th Cir. 2011). "Where there is no constitutional violation, we will not find an abuse of the trial court's discretion absent 'a showing that the limitations were clearly prejudicial.'" *Id.* (citation omitted).

Although the Confrontation Clause guarantees the right of a defendant to confront his accusers, that "right is not unlimited." *Id.* The district court has discretion "to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . the witness' safety . . . ." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "What is required is that defense counsel be 'permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" *Diaz*, 637 F.3d at 597 (citation omitted).

In *Smith v. Illinois*, 390 U.S. 129 (1968), the Supreme Court found error in allowing a witness, who testified about purchasing drugs from the defendant, to use a pseudonym. The Court held that "the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives." *Id.* at 131 (footnote and citation omitted). The Court recognized that disclosing the witness's true identity "open[s] countless avenues of in-court examination and

out-of-court investigation," and that closing that avenue "effectively . . . emasculate[s] the right of cross-examination itself." *Id.* The defendants urge that *Smith*'s reasoning required disclosure of the witnesses' true names in this case. We are not persuaded that *Smith* dictates that result.

There is "no fixed rule with respect to disclosure." *Roviaro v. United States*, 353 U.S. 53, 62 (1957). Instead, there must be a "balancing [of] the public interest in protecting the flow of information against the individual's right to prepare his defense," which depends on "the particular circumstances of each case." *Id.* This balancing required disclosure of the witness's name in *Smith* because the "only real question at trial" was the credibility of the single, principal witness, who was the only person, other than the defendant, who testified about the crucial events at issue. *Smith*, 390 U.S. at 130. But *Smith*, unlike the instant case, did not involve classified information or issues of witness safety. *See id.* at 133–34 (White, J., concurring) (recognizing as beyond the proper bounds of cross-examination "those inquiries which tend to endanger the personal safety of the witness"). We must account for these considerations in the analysis.

Witness safety was a factor in another case involving balancing in *United States v. Celis*, 608 F.3d 818, 830–32 (D.C. Cir. 2010), where the District of Columbia Circuit affirmed the use of pseudonyms by Government witnesses from Colombia in a prosecution for a drug conspiracy. The defendants and witnesses were connected to Colombian revolutionaries who had threatened to kill cooperating witnesses, which justified the concealment of the witnesses' identities at trial. *Id.* at 833. Because the Government planned to have the witnesses testify about their involvement with the defendants and drug trafficking, however, it was necessary to allow the defendants an opportunity to attack their credibility. *Id.* To enable such confrontation, the district court issued a protective order allowing defense counsel to learn the true names of the

witnesses for investigative purposes only days before the testimony was to be given at trial. *Id.* The court of appeals held that this approach was "an appropriate balancing of interests in the relevant case-specific context." *Id.*

In the instant case, the district court conducted a similar balancing of interests but concluded that there should be no disclosure of the witnesses' true names. It held that "defendants' interest in obtaining the names of the witnesses is outweighed by the Government's need to keep the information secret." We agree. First, we conclude that there was a serious and clear need to protect the true identities of Avi and Major Lior because of concerns for their safety. The Government showed that Hamas and other terrorist organizations seek out the true identities of ISA agents and their families and publish descriptions of ISA officers on websites so that they can be targeted. The witnesses' names are thus classified under both Israeli law and American law, and, as noted by the district court, the true identities of the witnesses were provided to United States authorities with the expectation that they would be closely guarded and kept secret.

Second, when the national security and safety concerns are balanced against the defendants' ability to conduct meaningful cross-examination, the scale tips in favor of maintaining the secrecy of the witnesses' names. The Government disclosed to the defense over twenty volumes of material that Avi used to formulate his expert opinion about Hamas financing. Moreover, the Government agreed in pretrial filings that the defense would be permitted to ask Avi about his background, his training and experience with the ISA, his legal education, and his potential bias in favor of Israelis in the West Bank. The defense was therefore well-armed with information upon which to confront and cross-examine both Avi and Major Lior, and a review of the trial record in fact shows that the defense was able to conduct effective cross-examination. *See Van Arsdall*, 475 U.S. at 679 ("'[T]he Confrontation Clause guarantees an *opportunity*

19

for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'") (citation omitted).

As evidence of possible bias, the defense highlighted both witnesses' close connection to the Israeli military. With respect to Major Lior, the defense focused on the military nature of the Israelis' seizure of evidence from the zakat committees, and the fact that the military also entered mosques, schools, and orphanages, thereby casting negative light on both the witness and the military operation. The defense also elicited from Major Lior the fact that he did not personally seize the evidence at issue, that he did not know precisely where inside the zakat committees the various items in evidence were found, and that he did not know if any items were left behind in the committees. These questions suggested a lack of knowledge and familiarity with the subject matter, and also suggested that exculpatory evidence may have been overlooked.

With respect to the cross-examination of Avi, the defense also was able to ask questions designed to cast doubt on the witness as a biased Israeli security agent. The defense highlighted for the jury the fact that Avi was testifying under an assumed name and that defense counsel could not research him or verify certain opinions. Defense counsel elicited from Avi the fact that he had never been to a zakat committee or spoken to people who had received assistance from the committees, he had not been involved in the seizure of evidence from the committees, and he had not polled Palestinians about the zakat committees. The defense also asked about Avi's work product and the materials he relied upon in reaching his opinions. The defense challenged Avi's credibility on the subject of Hamas control of the zakat committees, as well as the basis for his knowledge, by (1) eliciting the fact that no Hamas materials were found in the offices of certain zakat committees that Avi claimed were controlled by Hamas, (2) asking whether he knew that the United States Agency for International

Development ("USAID"), a government organization, had given money to and visited a committee that Avi testified was allegedly controlled by Hamas, (3) showing him statements in Government exhibits that indicated a lack of Hamas presence in zakat committees that he said were controlled by Hamas, and (4) asking him questions to demonstrate a lack of knowledge about the internal election proceedings of the zakat committees.

We conclude from the above that, although the defense could not verify the witnesses' credentials, the district court correctly observed that the defendants had access to significant information regarding the witnesses' employment, nationalities, and backgrounds in order to conduct meaningful cross-examination. They also had access to substantial material that formed the basis for Avi's expert opinion. With all of this information, the defense was able to probe for bias and test the basis of the witnesses' knowledge. Because "the jury had sufficient information to appraise the bias and motives of the witness," there was no Sixth Amendment violation. *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993).

The defendants complain, however, that they were unable to conduct a *focused* attack on Avi's and Major Lior's credibility, and they argue that the witnesses' true identities could have been disclosed for investigative purposes only to defense counsel under a protective order similar to the order in *Celis*. We consider this point as part of a prejudice analysis. *See Diaz,* 637 F.3d at 599 (when there is no Sixth Amendment violation, we "examine whether the trial court's restrictions on cross-examination were so prejudicial as to result in an abuse of discretion"). We agree with the district court that disclosure of the witnesses' true names to defense counsel for a limited investigation was unlikely to yield useful information. Because the names of the witnesses were classified, unlike in *Celis*, it is unlikely that anyone who knew the witnesses' true names could or would discuss them with defense counsel. The defendants therefore

cannot show a reasonable probability that the jury might have assessed the witnesses' testimony any differently had they been allowed to learn the witnesses' true identities. *See United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004) (holding that to demonstrate prejudice the defendant "must show that a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning"). In light of the danger to Avi's and Major Lior's personal safety that could have been caused by disclosure of their true names, and the unlikelihood that the jury would have assessed credibility any differently, the district court's decision to preclude disclosure of the witnesses' names was not an abuse of discretion.

Under all the circumstances, the defendants had a more than adequate "opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *Smith*, 390 U.S. at 132; *see also Diaz,* 637 F.3d at 597; *United States v. Abu Marzook*, 412 F. Supp. 2d 913, 923–24 (N.D. Ill. 2006) (holding, in a prosecution for materially supporting Hamas, that ISA agents could testify using pseudonyms because of the classified nature of their true identities, and that doing so did not violate the defendant's Sixth Amendment confrontation rights because the defendant was free to cross-examine the agents "on the basis of their direct testimony or any other proper basis"). Moreover, the district court instructed the jury that it could consider the witnesses' use of assumed names when assessing the credibility and weight of the testimony. We therefore hold that the district court did not violate the defendants' confrontation rights by allowing Avi and Major Lior to testify using pseudonyms.

### B. Hearsay evidence

The defendants contend that the district court improperly admitted the following three categories of hearsay evidence that linked the defendants to

Hamas or that linked Hamas to the zakat committees: (1) the testimony of Mohamed Shorbagi, (2) documents seized by the Israeli military from the headquarters of the Palestinian Authority during Operation Defensive Shield, and (3) documents seized from the homes of unindicted co-conspirators Elbarasse and Ashqar. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011).

Before addressing the defendants' specific evidentiary challenges, we pause to note that the hearsay issue, like the defendants' other evidentiary issues raised on appeal, is subject to a harmless error analysis if we find there was an error. *See id.* A reversal will not be warranted unless the defendant shows "that the district court's ruling caused him substantial prejudice." *United States v. Bishop*, 264 F.3d 535, 546 (5th Cir. 2001); *see* FED. R. EVID. 103(a). Because the defendants have raised on appeal multiple claims of evidentiary error at trial, we first address the evidentiary claims to decide if an error occurred. Except for certain issues related to testimony from John McBrien and Steven Simon, which we will explain below, we then consider in a combined discussion whether any errors we identify may be considered harmless.

### 1. Mohamed Shorbagi

Mohamed Shorbagi was a representative of HLF in Georgia who helped raise funds for the organization. He pleaded guilty in a separate case to providing material support to Hamas through HLF, and he testified in the instant case as part of a plea agreement. Shorbagi testified that Hamas controlled several zakat committees in the West Bank and Gaza to which HLF donated money. He also identified several people associated with the committees as Hamas leaders, and he stated that HLF was a part of Hamas. The defendants challenge this testimony as improper hearsay, contending that Shorbagi merely repeated what he had read in newspapers and what he had learned from friends. At one point during his testimony, the Government asked

Shorbagi the basis for his knowledge, and he responded: "It came from newspapers, it came from leaflets, it came from Hamas–the internet later on in '98, '99, the website of Hamas, and from also talking among friends." The defendants base their argument on appeal in large part on this exchange.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). If Shorbagi was merely repeating what he had read or what someone had told him, it would be hearsay and inadmissible. *See, e.g., Roberts v. City of Shreveport*, 397 F.2d 287, 295 (5th Cir. 2005) (newspaper articles are "classic inadmissible hearsay"); *see* FED. R. EVID. 802. However, Shorbagi's testimony is more complicated than that, as a review of the record shows that he possessed personal knowledge of some of the facts to which he testified.

A witness's testimony must be based on personal knowledge. *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 508 (5th Cir. 2008); *see* FED. R. EVID. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The personal knowledge requirement and the hearsay rule "are cut at least in part from the same cloth," as Rule 602 prevents a witness from testifying about a hearsay statement upon which he has no personal knowledge. *United States v. Quezada*, 754 F.2d 1190, 1195 (5th Cir. 1985). It is axiomatic that a witness may not merely repeat the subject matter of a hearsay statement, nor may he rely on inadmissible hearsay as a substitute for his own knowledge. *Id.* If the evidence supports a finding that the witness does possess personal knowledge, however, he may testify on that basis. *Id.* In the instant case, we conclude that Shorbagi's testimony revealed a close association with and knowledge of HLF and the individual defendants, as well as HLF's fundraising activity, that demonstrated personal knowledge and made

his testimony about HLF's connection with Hamas admissible. His testimony about Hamas's control of specific zakat committees is more problematic.

After coming to the United States from Gaza to attend college, Shorbagi became a volunteer for several Muslim organizations and attended various conferences sponsored by those organizations around the country. He also helped raise money first for the Occupied Land Fund and then for HLF. He continued to raise funds for HLF when he moved to Rome, Georgia, where he collected donations for HLF as the emam at the mosque and helped coordinate appearances by HLF speakers. Shorbagi testified about attending closed meetings at conferences with some of the individual defendants, as well as with Hamas leaders, such as Marzook and Mishal.

He personally attended a 1994 meeting with Baker, Elashi, and El-Mezain, where Hamas leader Mishal spoke about Hamas and the role of the attendees in supporting Hamas. Shorbagi explained that a financial sub-committee then met in a break-out session headed by defendant El-Mezain. Shorbagi testified that his personal understanding of the committee's purpose was to raise money to donate "[t]o organizations controlled or founded by Hamas in the occupied territories." Similarly, Shorbagi was personally present when El-Mezain came to Rome on a fundraising trip accompanied by Mohamed Siam, who was shown by other witnesses to be connected to Hamas. Although Shorbagi's testimony concerned events that occurred before it became illegal to donate to Hamas, the testimony demonstrated that he had inside knowledge and personally knew that HLF's fundraising aimed to assist Hamas. *See United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999) ("Personal knowledge can include inferences and opinions, so long as they are grounded in personal observation and experience.") (internal quotation marks and citation omitted).

Shorbagi also had personal knowledge about HLF's activity after Hamas was designated as a terrorist organization. He testified, for example, that HLF

No. 09-10560

provided money to the same organizations in the West Bank after Hamas was designated as a terrorist organization as before the designation, although he stated that HLF changed its manner of distribution after it opened an office in Gaza. He explained that Baker had stated that money would be sent to the Gaza office for further distribution rather than to specific individuals.

Furthermore, Shorbagi testified that the conferences and festivals at which HLF participated changed after Hamas was designated as a terrorist organization insofar as Hamas was no longer mentioned in the songs or speeches. Shorbagi's testimony was based on personal knowledge, as he continued to represent HLF at fundraising events during this time. He testified, for example, that he personally participated in fundraising events in Rome and Atlanta in 1999.

It is clear from the above testimony that Shorbagi had an adequate basis to testify about HLF's purpose in raising money to support Hamas. *See Quezada*, 754 F.2d at 1195 ("[E]ven if testimony is based in part on inadmissible hearsay, Rule 602 will be satisfied if evidence is introduced sufficient to support a finding that [the witness] has personal knowledge of the matter.") (internal quotation marks omitted). Whether Shorbagi had knowledge that Hamas controlled certain zakat committees is not as clear.

Shorbagi expressly testified that Hamas controlled the zakat committees in Nablus, Jenin, Ramallah, and Hebron, all of which were charged in the indictment as receiving funds from HLF. Shorbagi may very well have personally known that these committees were controlled by Hamas from his activity in raising money for HLF, from attending conferences with the individual defendants, and from meeting various Hamas leaders at the conferences. However, when asked the crucial question as to the basis for this specific knowledge, Shorbagi gave as examples "newspapers," "leaflets," the "internet," and "friends." These sources constitute classic hearsay rather than

26

personal knowledge. *See, e.g., Roberts*, 397 F.2d at 295 (newspapers are hearsay); *United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) (web postings from the Internet were inadmissible hearsay). In an effort to rehabilitate Shorbagi's answer, the Government asked if the "friends" to which Shorbagi referred were persons who were involved with him in supporting Hamas and organizations like HLF. But Shorbagi's affirmative response did not transform his apparent reliance on the statements of others, whether they were similarly situated to him or not, into personal knowledge. We therefore conclude that Shorbagi's testimony that Hamas controlled the zakat committees was hearsay, and it was error for the district court to allow it.[5] We consider below whether the error was harmless.

### 2. Documents seized from the Palestinian Authority

The defendants next challenge on hearsay grounds the admission of three documents ("the PA documents") seized by the Israeli military in 2002 from the PA headquarters in Ramallah. They are: (1) Government exhibit PA 2, an undated document entitled, "Who is financing Hamas," that lists HLF as a financial resource for Hamas; (2) Government exhibit PA 8, entitled "Palestinian National Authority General Intelligence Ramallah and al-Bireh Government, Security Work Plan," a 30-page report indicating that the Ramallah Zakat Committee "has relations with the Islamic Movement" in Israel, which is affiliated with Hamas, and that its leaders and members "are Hamas;" and (3) Government exhibit PA 9, a one-page document dated December 22, 2001,

---

[5] The defendants also complain that Shorbagi impermissibly identified the following individuals as Hamas leaders: Fuad Abu Zeid from the Jenin Zakat Committee, Abdel Khaleq Natshe from the zakat committee in Hebron, and Jamil Hamami, who Shorbagi stated was from an Islamic center in Jerusalem. The basis for Shorbagi's knowledge about Zeid and Natshe is not clear from the transcript. Shorbagi testified, however, that he met Hamami on separate occasions in 1990 and 1994 when Hamami came to the United States to raise money, which was collected by HLF. He therefore had personal knowledge of Hamami. The effect of any error in Shorbagi's identification of Zeid and Natshe is considered below.

No. 09-10560

purportedly from Major Khalid Abu-Yaman, Director of Operations, on PA General Security letterhead concerning the Ramallah Zakat Committee and asserting that "Officials and members of this committee are associated with the Hamas Movement and some of them are activists in the Movement."

The PA documents were excluded from the first trial but admitted at the second trial over defense objection under FED. R. EVID. 807, the residual exception to the hearsay rule. The Government argued that the documents had sufficient indicia of trustworthiness because the Israeli military had seized them from the PA headquarters and they were therefore akin to public records. The district court agreed, noting that the documents were not prepared in advance for litigation purposes and that two of them "appear to have some kind of letterhead." We conclude that the Government's justification for admitting the documents was insufficient to prove their trustworthiness, and they should have been excluded from the second trial.

Rule 807's residual hearsay exception allows the admission of hearsay statements that are not covered by another exception if the statements have "equivalent circumstantial guarantees of trustworthiness" and the district court determines that they are material, probative, and in the interests of justice.[6] *See*

---

[6] The full text of the rule provides as follows:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

FED. R. EVID. 807. Rule 807 was formerly embodied in the residual exceptions of former Rules

28

No. 09-10560

FED. R. EVID. 807; *United States v. Ismoila*, 100 F.3d 380, 393 (5th Cir. 1996). The district court is given wide latitude in admitting evidence under the rule, and we "will not disturb the district court's application of the exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." *United States v. Phillips*, 219 F.3d 404, 419 n.23 (5th Cir. 2000) (internal quotation marks and citation omitted). Nevertheless, the "exception is to be 'used only rarely, in truly exceptional cases.'" *Id.* (citation omitted). Moreover, "[t]he proponent of the statement bears a heavy burden to come forward with indicia of both trustworthiness and probative force. In order to find a statement trustworthy, a court must find that the declarant of the . . . statement 'was particularly likely to be telling the truth when the statement was made.'" *Id.* (internal quotation marks and citations omitted).

We therefore focus on the "equivalent circumstantial guarantees of trustworthiness" requirement, which is the "lodestar of the residual hearsay exception analysis." *United States v. Walker*, 410 F.3d 754, 758 (5th Cir. 2005). The determination of trustworthiness is "drawn from the totality of the circumstances surrounding the making of the statement, but [it] cannot stem from other corroborating evidence." *Ismoila*, 100 F.3d at 393 (citing *Idaho v. Wright*, 497 U.S. 805, 820–22 (1990)). "[E]vidence possessing 'particularized guarantees of trustworthiness' must be at least as reliable as evidence admitted under a firmly rooted hearsay exception . . . [and] must similarly be so trustworthy that adversarial testing would add little to its reliability." *Wright*, 497 U.S. at 821 (citations omitted).

---

803(24) and 804(b)(5), which were consolidated into Rule 807 in 1997 with no intended change in meaning. *See United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005) (citing FED. R. EVID. 803 advisory committee's note).

No. 09-10560

As it argued to the district court, the Government maintains on appeal that the PA documents are reliable and trustworthy because they are essentially public records, which ordinarily are admissible under Rule 803(8).[7]   It is therefore proper to measure the PA documents against the requirements of the public records exception.  *See* 2 KENNETH S. BROUN, MCCORMICK ON EVID. § 324 (6th ed.) (noting that for purposes of Rule 807 "courts frequently compare the circumstances surrounding the statement to the closest hearsay exception"); *see also United States v. Wilson*, 249 F.3d 366, 375–76 (5th Cir. 2001) (holding that, although foreign bank records were not admissible under the business records exception because there was no custodian available to testify, the district court properly admitted the documents under Rule 807 because "bank documents, like other business records, provide circumstantial guarantees of trustworthiness because the banks and their customers rely on their accuracy in the course of business"), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005).

The public records exception to the hearsay rule "is designed to permit the admission into evidence of public records prepared for purposes independent of specific litigation."  *Quezada*, 754 F.2d at 1194.  It is based on the notion that public records are reliable because there is a "lack of . . . motivation on the part

---

[7] The rule provides that the following evidence is admissible:

Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

FED. R. EVID. 803(8).

of the recording official to do other than mechanically register an unambiguous factual matter." *Id.*; *see also Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1308 (5th Cir. 1991) (explaining that the public records hearsay exception is premised on "public officials doing their legal duties," such that the usual "distrust" of statements made by out-of-court declarants does not apply). The Government contends that the PA documents have sufficient circumstantial guarantees of trustworthiness as public documents under Rule 803(8)(A) and 803(8)(B) because the facts in the documents merely represent "activities of the office" or "matters observed pursuant to duty."[8]

The matters reported in the PA documents have nothing to do with the PA's own activity, but rather describe the activities and financing of Hamas. Therefore, the guarantee of trustworthiness associated with a public agency merely recording its own actions is not present. *See* Rule 803(8)(A). Moreover, the conclusions stated in the PA documents are not the kind of objective factual matters we have found to be reliable under Rule 803(8)(B) when reported as a matter of course. *See, e.g., Quezada*, 754 F.2d at 1194 (holding that deportation record containing date and location of deportation was reliable under Rule 803(8)(B) because the document contained a "routine, objective observation[], made as part of the everyday function of the preparing official"); *United States*

---

[8] The defendants contend that if the documents are public records, they fall under subsection (C) and are inadmissible because public records under that subsection may not be used against a defendant in a criminal case. *See* FED. R. EVID. 803(8)(C). We do not resolve this issue because the question is not whether the documents are *admissible* under Rule 803(8), but rather whether they have sufficient indicia of trustworthiness that would permit admission under Rule 807. *See Wilson*, 249 F.3d at 374 n.5 (Rule "807 'is not limited in availability as to types of evidence not addressed in other exceptions . . . 807 is also available when the proponent fails to meet the standards set forth in the other exceptions.'") (citation omitted); 2 KENNETH S. BROUN, MCCORMICK ON EVID. § 324 (6th ed.) ("The almost unanimous opinion of the courts is that failing to qualify under an enumerated exception does not disqualify admission under the residual exception."). The Government promotes Rule 803(8)(A) and (8)(B) as providing circumstantial guarantees of trustworthiness to the PA documents, but as we explain, we are not persuaded by this argument.

*v. Dancy*, 861 F.2d 77, 79–80 (5th Cir. 1988) (finding that fingerprint card containing defendant's fingerprints, physical description, sentence, and prison reporting date admissible under Rule 803(8)(B)); *United States v. Puente*, 826 F.2d 1415, 1417 (5th Cir. 1987) (holding that computer printouts showing that vehicle crossed the border at a specific time were reliable under Rule 803(8)(B) because license plate number was observed and recorded by customs officer complying with agency directives and procedures that were adopted to carry out its legal duty to protect the border). Instead, the PA documents contain conclusions about Hamas control of the Ramallah Zakat Committee and the sources of Hamas financing that were reached through unknown evaluative means.

This leads to a larger problem with the documents: there is nothing known about the circumstances under which the documents were created, the duty of the authors to prepare such documents, the procedures and methods used to reach the stated conclusions, and, in the case of two of the documents, the identities of the authors. *See, e.g., United States v. Vidacak*, 553 F.3d 344, 351 (4th Cir. 2009) (holding that records seized from a brigade headquarters showing that the defendant had served in the Serbian army were admissible as public records where a witness testified about the documents' seizure and explained how the army maintained and organized its records pursuant to specific procedures); *United States v. Dumeisi*, 424 F.3d 566, 575–77 (7th Cir. 2005) (holding Iraqi intelligence documents admissible under Rule 807 where witnesses positively identified the documents, as well as handwriting, symbols, codes, abbreviations, and signatures on them, and also testified that the officers had a duty to accurately record their activities and information received from other sources).

We know only that the PA documents were found in the possession of the PA. Although Avi testified that the PA had an interest in monitoring Hamas

and the zakat committees, there is nothing in the documents or the record that reveals whether the declarants had firsthand knowledge of the information reported, where or how they obtained the information, and whether there was a legal duty to report the matter. *See United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 626 & n.10 (5th Cir. 1992) (holding that for evidence to be admissible under public records hearsay exception, person making report must have observed matters first hand and acted pursuant to a legal duty); *United States v. Perlmuter*, 693 F.2d 1290, 1293–94 (9th Cir. 1982) (same); *see also* 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FED. EVID. § 8:88 (3d ed.) (for public records falling under Rule 803(8)(B) "the source of the recorded information must have personal knowledge, as the phrase 'matters observed' implies").

For example, nothing is known or can be inferred about the author of PA 2, which is not on official letterhead and contains an illegible signature. The document also contains apparent double hearsay because it refers vaguely to unnamed "Western Sources," "security experts," and "western security organizations." PA 8 is on plain paper with a spiral binding and contains no certifications, signatures, letterhead, official seals, or other indicia of official record keeping, except for a notation that vaguely reads, "Prepared by: The Operation Room." It contains nothing further about where the reported information was obtained. PA 9 is on letterhead and identifies the declarant, but it contains only conclusory statements with no explanation of how or why the document was created.

The Government argues that the PA had a "strong incentive" to report accurate information about Hamas. There is no doubt that may be true, but the Government points to nothing in the record about the PA's practice of record keeping. There is also nothing in the documents or the record showing that the declarants in these documents were especially likely to be telling the truth. *See*

*Phillips*, 219 F.3d at 419 n.23.  We therefore cannot say that there was little to gain from further adversarial testing.  Without further information about the circumstances under which the PA documents were created, we are faced with conclusory assertions amounting to classic hearsay and no facts from which to divine the documents' reliability.

We realize that when dealing with foreign documents, it may not be possible for the Government to learn every detail about the evidence, especially when it has been seized in a military operation. We do not foreclose the possibility that obtaining documents in such a manner from an adversary may have some probative value and could, at least under some circumstances, be indicative of trustworthiness.  But the instant documents were not offered merely for their probative value, and their seizure from the PA, without more, does not impart sufficient indicia of trustworthiness in this case to permit their admission.  We do not even know, for example, if the PA created PA 2 and PA 8, or whether the documents were created by some third person or agency and were merely collected by the PA as intelligence.  *See, e.g., United States v. Doyle*, 130 F.3d 523, 547 (2d Cir. 1997) (questioning reliability of "privately-generated, business records without further foundation, even though the records were found in the possession of a foreign government agency").  We therefore conclude that the district court erred in finding that the PA documents contained sufficient indicia of trustworthiness pursuant to Rule 807's residual hearsay exception.

### 3.  **Elbarasse and Ashqar documents**

Finally, the defendants raise a hearsay challenge to the admission of documents discovered in the homes of unindicted co-conspirators Ismail Elbarasse and Abdelhaleen Masan Ashqar (together "the Elbarasse and Ashqar documents").  The documents, which dated from the late 1980s and early 1990s, were discovered by the FBI pursuant to search warrants.  They included annual reports, meeting agendas and minutes, financial records, work papers, and

telephone directories that documented the activities of the Palestine Committee and demonstrated the defendants' participation with the Committee. Many of the documents referenced defendants Elashi, El-Mezain, and Baker by name, as well as HLF. Viewed in the light most favorable to the Government, the Elbarasse and Ashqar documents showed that HLF was a fundraising arm for the Palestine Committee in support of Hamas.

For example, one of the documents, Elbarasse exhibit 13, was a 1989–90 "annual report" for the "Palestine Committee." It reported the "achievement" of raising over $728,000 by the Occupied Land Fund, the former name of HLF, for "people on the inside." It also asked the United States Muslim Brotherhood for "moral support" for the committee's work in "support for the emerging movement, the Hamas Movement." Elbarasse exhibit 7 was another Palestine Committee document. It contained proposed amendments to the Committee's by-laws, and it expressly recognized HLF as "the official organization which represents the financial and charitable aspect to support the homeland people in the occupied territories." The document further noted that the Muslim Brotherhood had issued instructions to collect donations "for the Islamic Resistance Movement." Still another document, Elbarasse exhibit 11, was a meeting agenda for the "Financial Committee." Referencing HLF as "the Fund," the agenda set forth work assignments for Elashi, Baker, and El-Mezain. An organizational chart for the "Palestine Committee," Elbarasse exhibit 10, showed Hamas leader Marzook as the Chairman. It also showed the Committee functions served by HLF, Baker, El-Mezain, Elashi, and Elbarasse.

The defendants objected to the Elbarasse and Ashqar documents as hearsay, arguing that many of them were unsigned and pre-dated Hamas's designation as a terrorist organization. The district court admitted them as non-hearsay statements of co-conspirators pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence. The defendants argue on appeal that the district

court abused its discretion in admitting the documents because Rule 801(d)(2)(E) applies only to statements made in furtherance of conspiracies, and the Elbarasse and Ashqar documents could not have been made in furtherance of a conspiracy to support Hamas since they were created before 1995 when such support became illegal.  The defendants further argue that the Government failed to show that there was an agreement between the declarants and the defendants, or that the documents were made in furtherance of that agreement.  The defendants insist that the documents are therefore inadmissible hearsay.

"A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  FED. R. EVID. 801(d)(2)(E).  "Under our precedent, '[t]he proponent of admittance under Rule 801(d)(2)(E) must prove by a preponderance of the evidence (1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy.'"  *United States v. Solis*, 299 F.3d 420, 443 (5th Cir. 2002) (quoting *Phillips*, 219 F.3d at 418 n. 21).  The content of the statement may be considered as part of the analysis, but there must also be independent evidence establishing the factual predicates for Rule 801(d)(2)(E).  *See United States v. Sudeen*, 434 F.3d 384, 390 (5th Cir. 2005).

Although the rule speaks of statements made in furtherance of a "conspiracy," we have recognized that admissibility under Rule 801(d)(2)(E) does not turn on the criminal nature of the endeavor.  *See United States v. Postal*, 589 F.2d 862, 886 n.41 (5th Cir. 1979).  Instead, a statement may be admissible under Rule 801(d)(2)(E) if it is made in furtherance of a lawful joint undertaking.  "One can qualify as a 'joint venturer' for the purposes of Rule 801(d)(2)(E) merely by engaging in a joint plan–distinct from the criminal conspiracy charged–that was non-criminal in nature."  *United States v. Holy Land Found. for Relief &*

No. 09-10560

*Dev.*, 624 F.3d 685, 694 (5th Cir. 2010); *see also United States v. Saimiento-Rozo*, 676 F.2d 146, 149 (5th Cir. 1982) (noting that under Rule 801(d)(2)(E) there is no "need [for] the conspiracy or agreement [to] be criminal in nature; it may be in the form of a joint venture"). Pursuant to this "joint venture" theory, a statement is not hearsay if it was made during the course and in furtherance of a common plan or endeavor with a party, regardless of the non-criminal nature of that endeavor.

For example, in *Postal* we held that a ship's logbook was admissible under Rule 801(d)(2)(E) as a co-conspirator statement in a drug conspiracy prosecution because "it is not necessary that the conspiracy upon which admissibility of the statement is predicated be that charged. Moreover, the agreement need not be criminal in nature." *Postal*, 589 F.2d at 886 n.41. We concluded that the ship's crew were engaged in the voyage of the ship, which "was a 'joint venture' in and of itself apart from the illegality of its purpose," and the logbook was created in furtherance of the voyage. *Id.* In support of the conclusion that an agreement between co-conspirators need not be unlawful to support admission under Rule 801(d)(2)(E), we quoted the legislative history of the rule:

> "While (this) rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged."

*Id.* (quoting S. Rep. No. 93-1277, 93d Cong., 2d Sess. 24, Reprinted in (1974) U.S. Code Cong. & Admin. News, pp. 7051, 7073).

In light of our precedent, it is of no moment for purposes of Rule 801(d)(2)(E) that the Elbarasse and Ashqar documents were created before Hamas was designated as a terrorist organization if the statements were made as part of a joint plan with the defendants, and as long as the other requirements of the rule are satisfied. The defendants argue that *Postal*

misread the legislative history of Rule 801(d)(2)(E), and they urge us to reject the so-called "lawful joint venture theory." However, our circuit has embraced the theory in precedent that we may not ignore. *See United States v. Castro-Guevarra*, 575 F.3d 550, 552 (5th Cir. 2009) ("[O]ne panel of this court may not overrule another panel's earlier decision.").

Moreover, we are not alone in our construction of Rule 801(d)(2)(E), as our sister circuits have also held that statements made in furtherance of a lawful common enterprise are admissible. *See, e.g., United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) (holding that "the rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, 'embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are . . . admissible against the others, if made in furtherance of the common goal'"); *United States v. Layton*, 855 F.2d 1388, 1400 (9th Cir. 1988) ("Rule 801(d)(2)(E) applies to statements made during the course and in furtherance of any enterprise, whether legal or illegal, in which the declarant and the defendant jointly participated."), *overruled on other grounds as recognized by Guam v. Ignacio*, 10 F.3d 608, 612 n.2 (9th Cir. 1993); *United States v. Regilio*, 669 F.2d 1169, 1174 n.4 (7th Cir. 1981) ("The co-conspirator hearsay exception applies with equal force to joint ventures."); *see also* 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FED. EVID. § 8:59 (3d ed.) ("[T]he exception can apply if people act together by mutual understanding in pursuit of a common purpose . . . . The exception can apply even if the proponent does not show that the venture is unlawful . . . .").

As the Seventh Circuit has explained, "[c]onspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law." *United States v. Coe*, 718

F.2d 830, 835 (7th Cir. 1983). Just as coconspirators are generally considered partners in crime and therefore agents of each other, joint venturers may be considered partners in the joint undertaking. *See id.* Indeed, Rule 801(d)(2)(E) has been recognized to apply not only in criminal cases but also in civil cases where "there may be no criminal conspiracy or unlawful actions involved." *Id.* at 836 n.3. Under this rationale, the Government need not show that the defendant and the declarant were engaged in an illegal conspiracy but rather must show only "that there was a combination between them." *Id.* at 835 (internal quotation marks and citation omitted). We therefore reaffirm our precedent that Rule 801(d)(2)(E) does not require that a statement be made in furtherance of a criminal undertaking in order to be admissible as non-hearsay.

Turning to the application of the joint venture theory to the Elbarasse and Ashqar documents, we conclude that a preponderance of the evidence proved that the documents were created as part of a common enterprise, of which the defendants and declarants were members. The documents were therefore admissible. The documents themselves outline the Palestine Committee's activities and goals, and in some instances they specifically refer to the functions of HLF and the individual defendants in support of those goals. The Government's theory of the case was that the defendants supported Hamas by coordinating activities of the Palestine Committee and HLF. The documents themselves are consistent with this theory.

We are satisfied that independent evidence also established the existence of a joint venture or combination among the declarants and the defendants to support Hamas through HLF and the zakat committees. For example, participants at the Philadelphia meeting discussed Hamas and its control of the zakat committees. The participants referenced the importance of HLF in the Committee's goals, and they identified as "ours" various zakat committees to which HLF donated funds. The Government also introduced evidence of

numerous financial transactions and personal contact between the defendants and Hamas leader Marzook, who was listed in the Elbarasse and Ashqar documents as chairman of the Palestine Committee. Marzook also had in his personal phone book the contact information for Baker, Elashi, El-Mezain, and Elbarasse. Further, Hamas leader Mishal spoke at a meeting attended by Baker, Elashi, El-Mezain, and Ashqar about supporting Hamas. According to Shorbagi, who was present, El-Mezain led a break-out group at that meeting to discuss the financial issue of raising money. Moreover, Shorbagi specifically testified from personal knowledge that HLF was part of Hamas.

The evidence also showed a relationship between the defendants and Elbarasse and Ashqar. For example, Elbarasse shared a bank account with Hamas leader Marzook, from which $100,000 was paid to HLF in 1992. Elbarasse and Ashqar also attended the Philadelphia meeting. When a dispute arose between HLF and Ashqar about the proceeds generated from a Hamas leader's speaking appearances, Marzook and other Palestine Committee members intervened and directed that the proceeds be administered by HLF. We conclude that the evidence at trial was more than sufficient to demonstrate the existence of a joint enterprise to support Hamas through HLF and the zakat committees, as well as concert of action toward that common goal through the Palestine Committee. We also find that the Elbarasse and Ashqar documents were made "in furtherance" of the common goal, as the documents outlined and facilitated the Committee's objectives. *See United States v. Snyder*, 930 F.2d 1090, 1095 (5th Cir. 1991) (the "in furtherance" requirement is not to be applied too strictly and is satisfied if a statement "advances the ultimate objectives of the conspiracy").

In support of their argument against admissibility of the Elbarasse and Ashqar documents, the defendants rely on *United States v. Al-Moayad*, 545 F.3d 139, 172–76 (2d Cir. 2008), where the Second Circuit held that the district court

erroneously admitted three pieces of evidence under Rule 801(d)(2)(E). In that case, the defendant Al-Moayad was prosecuted for providing material aid and support to Hamas and Al-Qaeda. The evidence at issue was offered to show the defendant's connection to terrorists and his predisposition to terrorist activity. It consisted of (1) an application form for admittance to a mujahidin training camp that listed the defendant as the applicant's sponsor; (2) a video of a wedding hosted by the defendant where a Hamas leader gave a speech referring to a suicide bombing; and (3) the last will and testament of a mujahidin fighter whose address book included the defendant's name. *Id.* The Second Circuit held that the application form, the video, and the will were not admissible as co-conspirator statements because they provided evidence of only vague relationships rather than joint involvement in a conspiracy. *Id.* The court noted that there was no evidence the defendant knew the applicant who submitted the mujahidin form, that the wedding video showed only a "general tie[]" to Hamas, and that the last will and testament did not show any shared criminal activity between the defendant and the testator. *Id.*

The defendants argue that *Al-Moayad* is analogous to the instant case. We are not convinced. Unlike *Al-Moayad*, the evidence in this case does show a relationship between the defendants and Elbarasse and Ashqar, as well as their connections to Hamas leaders. The documents further show shared activity by the defendants and the declarants in the Palestine Committee, and they indicate that HLF was the principal fundraising apparatus for the Committee's goal of supporting Hamas. The record here, unlike *Al-Moayad*, showed the defendants' joint participation in a shared undertaking involving the Committee, and the documents were properly admitted under Rule 801(d)(2)(E).

The defendants further complain that many of the Elbarasse and Ashqar documents are anonymous, and therefore there could be no showing of an agreement between the declarants and the defendants. The failure of a

document to identify the declarant is not fatal to admissibility under Rule 801(d)(2)(E), however, if the facts and circumstances surrounding the making of the statement indicate that the speaker is a member of the conspiracy or joint venture.  For instance, in *Postal*, we stated that even though the author of the ship's logbook was unknown, the statements in the logbook were still admissible pursuant to Rule 801(d)(2)(E).  *Postal*, 589 F.2d at 886 n.41.  We reasoned that circumstantial evidence made it "inescapable" that the logbook belonged to the ship and that one or more of the ship's crew made the statements.  *Id.* We noted, for example, that the log was the "only such book found," its notations corresponded with charts that were also found on board, and the log's final entry corresponded closely to the time and course of the ship that was recorded while the ship had been under surveillance.  *Id.*

We applied similar reasoning in *United States v. Fierro*, 38 F.3d 761 (5th Cir. 1994), where two of the defendants argued that drug ledgers were improperly admitted as statements of co-conspirators under Rule 801(d)(2)(E) because the Government did not prove who authored the ledgers.  We held  that "identification of the declarant–such as the author of a drug ledger–is not always necessary for the admission of a co-conspirator statement."  *Id.* at 773.  Other evidence in *Fierro* connected the defendants to the ledgers, including the fact that both of the defendants "lived in the house where the ledgers were found, and there was other evidence of their involvement in the cocaine conspiracy, including [the two defendants'] connections and activities with the other defendants."  *Id.*; *cf. Davis v. Mobil Oil Exploration & Producing Se., Inc.*, 864 F.2d 1171, 1174 (5th Cir. 1989) (holding that anonymous statement was admissible as a statement by a party's agent under Rule 801(d)(2)(D), and noting that "a district court should be presented with sufficient evidence to conclude that the person who is alleged to have made the damaging statement is in fact a party or an agent of that party").

Our conclusions in the above cases are consistent with those of our sister circuits, which have also held that anonymous statements may be admissible under Rule 801(d)(2)(E) if sufficient evidence is presented to connect the declarant with the conspiracy at issue. For example, in *United States v. Martinez*, 430 F.3d 317 (6th Cir. 2005), the defendant argued that the Government failed to prove "that the anonymous declarant was a member of the conspiracy." *Id.* at 326. The Sixth Circuit held that "[a]n anonymous statement may be admissible under Rule 801(d)(2)(E) if circumstantial evidence permits a finding by a preponderance of the evidence that there was a conspiracy involving the author and the defendant . . . ." *Id.* The court stated that the essential requirement is that "the government show that the unknown declarant was more likely than not a conspirator." *Id.* (internal quotation marks and citation omitted). In applying this standard, the court reasoned that the Government had established that an unsigned letter was more likely than not written by a member of the conspiracy, because "[t]he letter was found in a place connected to one of the conspirators and purports to be from someone knowledgeable about and involved in the conspiracy . . . ." *Id.*; *see also United States v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000) (holding that an anonymous list was admissible under Rule 801(d)(2)(E) because "[t]he details contained in 'The List' were such that it could only have been written by a member of the [street gang] or by someone sufficiently involved with the business to be intimately familiar with it–in other words, by a co-conspirator"); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1582 (11th Cir. 1988) (holding that statements made by an unidentified telephone caller were properly admitted under Rule 801(d)(2)(E) because "it is clear from the testimony and the context that the caller was associated" with members of the alleged conspiracy); *United States v. Zuniga-Perez*, 69 F. App'x 906, 913 (10th Cir. 2003) (holding that the identity of the declarant need not be established as a predicate for Rule 801(d)(2)(E) "so

long as the district court determines that the declarant was a member of a conspiracy with the defendant and that the statement was made in the course of and in furtherance of the conspiracy"); 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FED. EVID. § 8:59 (3d ed.) ("[A]n inability to attribute the statement to any particular person does not necessarily get in the way" of admissibility under Rule 801(d)(2)(E) because "[c]ircumstantial proof that the person making the statement was involved in the conspiracy can suffice to support use of the exception.").

As the above cases demonstrate, the defendants here "are wrong to suggest that it is necessary to know the precise identity of" the declarants in the Elbarasse and Ashqar documents. *Smith*, 223 F.3d at 570. We conclude that the circumstantial evidence in this case made it "inescapable" that the declarants in the documents were joint venturers with the defendants in support of Hamas through the Palestine Committee. For example, as noted above, the participants at the Philadelphia meeting referred to various zakat committees, including Ramallah and ICS Hebron, as "ours." The same language appears in Elbarasse exhibit 22, a letter addressed to Baker that also referred to the committees as "ours." The letter further identified many of the same committee members whose names appeared in other evidence the Government introduced to establish the composition of the committees.

Another of the documents, Elbarasse Search 15, was a "Resolution relating to the Occupied Land Fund." The resolution was from the head of the "Central Committee" and reported on issues decided at a board of directors meeting, including the salaries for Baker, Elashi, and El-Mezain. The board of directors meeting referenced in the document was also corroborated by records later found at HLF. The similarity between the Elbarasse and Ashqar documents and other independent evidence is striking and strongly supports the conclusion that the declarants were involved in the same undertaking as the defendants.

The documents were also found in the homes of Elbarasse and Ashqar, whose relationship to the defendants and the Palestine Committee was established by the evidence. We also think that many of the documents–which included internal records such annual reports, by-laws, organizational charts, and meeting agendas–were of a kind unlikely to be found in the hands of persons outside the enterprise. The documents discussed internal activities, including the relationship and goals of the participants in the endeavor, HLF's financial matters, and even the change in the name of HLF from the Occupied Land Fund. A declarant who was not involved with activities of the defendants and HLF would be unlikely to know about these issues. We are therefore satisfied that the documents were drafted by insiders participating in the venture and were designed to be in furtherance of the common goals of the Palestine Committee. The documents were therefore admissible under Rule 801(d)(2)(E).

The defendants also suggest in their brief that the Elbarasse and Ashqar documents should not have been admitted because there was no evidence that they had ever seen the documents or knew of their contents. In order to admit a co-conspirator's statement under Rule 801(d)(2)(E), however, it is not necessary that another co-conspirator know about the statement. This is consistent with the principle that a co-conspirator's statements are admissible under a general agency rationale insofar as one conspirator may be held responsible for the statements of another conspirator in furtherance of that conspiracy whether or not he was present when the statement was made. *See Lutwak v. United States*, 344 U.S. 604, 617 (1953) ("Declarations of one conspirator may be used against the other conspirator *not present* on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statement of a party.") (emphasis added). Even assuming *arguendo* that the defendants here were unaware of the contents of the

45

Elbarrasse and Ashqar documents, which may be doubtful given that certain documents refer to some of the defendants by name, admissibility under Rule 801(d)(2)(E) was not precluded. *See* 5-801 WEINSTEIN'S FED. EVID. § 801.34 ("A defendant need not have been aware of particular transactions within the conspiracy for statements in furtherance of those transactions to be admissible against him or her.").

In sum, we conclude that the lawful joint venture theory is a viable theory of admissibility under Rule 801(d)(2)(E) and the anonymity of the documents here did not bar their admission because the evidence was sufficient to show the documents were created as part of a joint undertaking between the declarants and the defendants. The district court did not abuse its discretion in admitting the Elbarasse and Ashqar documents pursuant to Rule 801(d)(2)(E).

## C. Prejudicial evidence under Rule 403

The defendants next contend that the district court erred by admitting evidence that they argue was unfairly more prejudicial than probative. They specifically challenge evidence related to Hamas violence, including: testimony about Hamas suicide bombings, including an explanation of how suicide bombers choose their targets, carry out their plans, and prepare bombs to make them more lethal; testimony regarding Hamas's killing of collaborators with Israel; videotapes of demonstrators destroying American flags; and violent images of the aftermath of Hamas suicide bombings found in temporary files on HLF computers. Other evidence that they argue was improper and prejudicial included: videos of Palestinian children playing the role of terrorists in school ceremonies; Avi's testimony about PA parliamentary elections and the political maneuverings of Hamas; a video found in HLF's possession depicting the opening of a library in the West Bank but also containing an allegedly unrelated fragment showing the burning of an American flag; several questions about Iraq, Sadam Hussein, and the Muslim Legal Defense Fund; videos, photographs, and

posters of suicide bombers that the Israeli military seized from West Bank zakat committees after HLF had closed; and the Elbarasse and Ashqar documents.

Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." The scope of Rule 403 is narrow. Because virtually all evidence is prejudicial, the danger of unfair prejudice must *substantially* outweigh the probative value of the evidence to warrant exclusion. *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007). Accordingly, our review is especially deferential to the district court, and the appellant must show "a clear abuse of discretion." *United States v. Curtis*, 635 F.3d 704, 716 (5th Cir. 2011) (internal quotation marks and citation omitted). We have previously cautioned that "[r]are is the appellant who can make that showing," and that "district courts should exclude evidence under Rule 403 in very few circumstances." *Id.* We conclude that the defendants have not shown such circumstances in the instant case.

Although the defendants correctly observe that they were not charged with planning or carrying out terrorist activity or with directly supporting such activity, evidence of Hamas violence, some of which was found in the zakat committees or on HLF computers, served the probative purpose of providing context and explanation in the case, and to rebut defensive theories that the defendants intended to support only charitable endeavors. For example, testimony about suicide bombings from Dr. Levitt came as explanation of Hamas's operations, specifically showing how Hamas operates not only a social wing but also a military wing that carries out such bomb attacks. This was relevant to show that HLF's purportedly charitable donations also indirectly aided Hamas's violent activities.[9] *See Holder v. Humanitarian Law Project*, 130

---

[9] Similarly, Dr. Levitt also testified that Hamas operates schools as part of its social wing, where it teaches Hamas ideology. To assist the jury in evaluating this testimony, the

No. 09-10560

S. Ct. 2705, 2725–26 & n.6 (2010) (recognizing that "[m]oney is fungible" and that "material support of a terrorist group's lawful activities facilitates the group's ability to attract 'funds,' 'financing,' and 'goods' that will further its terrorist acts").

Avi also testified about two suicide bombings, testimony that the defendants challenge as improper under Rule 403. Avi explained that the first attack, at a discotheque, was carried out by a person whose photograph was found at one of the zakat committees. This testimony therefore connected the committee with Hamas activity. The second suicide attack about which Avi testified occurred at a hotel and precipitated the Israeli military's raid on the zakat committees. This testimony served two functions. First, it provided helpful context by explaining the reason for the Israeli military operation, which was the source of much of the evidence introduced at trial. *See, e.g., United States v. Rodriguez*, 525 F.3d 85, 99 (1st Cir. 2008) (holding, under plain error review, that testimony about defendant's fugitive status provided helpful context to the jury and clarified reasons for a search and was not unduly prejudicial under Rule 403).

But second, and more important, the testimony came on re-direct examination and rebutted the defense's questioning on cross-examination. The defense elicited from Avi information about the military operation and the fact

---

Government presented a video showing Palestinian children pretending to be suicide bombers at a kindergarten ceremony. The defendants argue that the video was inadmissible under both Rule 403 and Rule 703, but we find that in addition to explaining Levitt's testimony, the video provided rebuttal evidence. The defense spent a good deal of time at trial discussing HLF's charitable support of schools and students by providing backpacks and school supplies. Dr. Levitt testified that school supplies help build goodwill and that the Hamas schools also focus on political ideology. His testimony, along with the video, provided a connection between Hamas and school children and rebutted the defense's efforts. We disagree with the defendants that the probative value of the video in assisting the jury to understand Dr. Levitt's testimony was substantially outweighed by its prejudicial effect. *See* FED. R. EVID. 403, 703.

that Israeli military clashes with civilians in Jenin had resulted in civilian casualties. The defense emphasized that the USAID group provided humanitarian aid to the Palestinians as a result of those clashes. The defense thereby painted the Israelis as unprovoked aggressors, or, at best, the more culpable party in the dispute. On re-direct, therefore, it was permissible for Avi to explain that the military operation was a result of the hotel bombing and the Israeli government's decision to target the terrorist cells responsible for the bombing. Any prejudicial effect of this testimony was slight in comparison with the probative goal of rebutting the cross-examination. *See United States v. Walker*, 613 F.2d 1349, 1353 n.5 (5th Cir. 1980) ("Because the prejudicial impact of the evidence elicited by the government was slight, the probative value of the re-direct examination in rebutting a possible defense clearly outweighs any prejudicial impact. Accordingly, the testimony was properly admitted."); *see also United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir. 1985) ("[A] party cannot be permitted on the one hand to introduce evidence that appears favorable to his argument and then complain, after the circumstances are fully developed, because the evidence becomes detrimental to his cause.").

Other evidence challenged by the defendants also came on re-direct examination. For example, Shorbagi testified that he did not want to return to Hamas-controlled Gaza because he feared being killed. The defendants argue that this testimony was prejudicial, but the defense brought out on cross-examination the fact that the Government had promised to help Shorbagi remain in the United States after he is released from prison. Shorbagi's fear therefore helped explain his testimony about remaining in this country.

Still other evidence rebutted the defendants' defense that HLF and the zakat committees were charitable organizations independent of Hamas. Evidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial. *See United States v. Duncan*, 919 F.2d 981, 987–88 (5th

Cir. 1990) (holding in prosecution for mail fraud that testimony of forged signature on disability statement, which tended to rebut the claim that defendants had innocently filed insurance claims for genuine medical reasons, was not unduly prejudicial). Here, we agree with the Government that evidence seized from HLF and the zakat committees, including images of violence and videos glorifying Hamas and depicting Hamas leaders, was probative of the motive or intent of the committees and HLF to support Hamas. *See United States v. Hammoud*, 381 F.3d 316, 342 (4th Cir. 2004) (holding that videotapes found in defendant's apartment depicting violence and anti-American sentiment were not unduly prejudicial under Rule 403 in a prosecution for providing material support for a terrorist organization because they were probative of defendant's knowledge, "provided evidence of [his] motive in raising funds for Hizballah[,] and tended to contradict [his] claim that he sympathized only with the humanitarian goals of the organization"), *overruled on other grounds by Hammoud v. United States*, 543 U.S. 1097 (2005).

The defendants make much of the fact that images seized from HLF computers were not downloaded but rather were found in temporary files that are automatically saved by the computer when a web page is browsed. This objection goes to the weight of the evidence rather than its admissibility. *Cf. United States v. Garcia Abrego*, 141 F.3d 142, 176 (5th Cir. 1998) (objection under Rule 403 that evidence of violent acts committed in furtherance of conspiracy consisted of mere out-of-court statements rather than direct evidence went to the weight of the evidence and not admissibility). The presence of images on the computer indicates that someone at HLF browsed a page where the images were located. If the images was pro-Hamas or approved of violence, one logical inference is that HLF, which was a separate defendant, had the same

view.[10]   The same is true of Hamas-related materials found in the zakat committees.   The presence of the material at the committees suggests a connection between the committees and Hamas and permits an inference that the zakat committees supported Hamas.[11]

The defendants rely on *United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008), for their argument that the evidence of Hamas violence was inadmissible here.  In *Al-Moayad*, the Second Circuit held that the district court improperly admitted testimony from a victim of a Hamas bomb attack on a bus, as well as images of the aftermath of the attack, where the defendants were charged with conspiracy and attempting to provide material support to Hamas but were not charged with planning or carrying out that attack.  *Id.* at 160–61.   The Government in that case argued that the evidence was relevant to  show the defendants' knowledge that Hamas engaged in terrorist activity.  *Id.*  at 160. The court held, however, that such probative value was diminished because the defendants never denied such knowledge and they had offered to stipulate to that fact.  *Id.*  Therefore, the evidence served very little probative purpose.  The instant case is different from *Al-Moayad* because evidence of Hamas violence found on the premises of HLF or in the zakat committees tended to rebut the

---

[10] The defendants also contend that the videotape with a fragment at the beginning showing demonstrators burning American flags was prejudicial because it showed merely that a videographer hired by HLF recorded over a tape of the demonstration.  We are not persuaded.  The defendants point to no evidence establishing that an unnamed videographer was responsible for the tape's contents rather than HLF.  The testimony at trial showed that the tape was presented exactly as it was found among HLF records and documents, including an attached note that requested two copies of the video and that stated, "There is a demonstration at the beginning.  I don't want it."  The jury could determine how much weight the note and the video fragment should receive.

[11] Similarly, the defendants complain about questions eliciting the fact that some of the orphans and families that HLF supported had separately received support from Iraq or Saddam Hussein.  This information was contained within HLF's own records, however.  It was also consistent with the Government's theory that HLF's support was intended to aid the families of martyrs.

defendants' denial that they supported Hamas and that Hamas controlled the committees. Additionally, other evidence of violence provided meaningful context and explanation. To the extent it demonstrated the defendants' knowledge of Hamas and support for it, or Hamas's connection to the zakat committees, the evidence had probative value and was not unduly prejudicial.

From our review of the entire record, we are convinced that the district court did not clearly abuse its discretion under Rule 403 by refusing to exclude the challenged evidence. Because this was a case about supporting terrorists, it is inescapable, we believe, that there would be some evidence about violence and terrorist activity. It cannot be denied that the evidence at issue was unfavorable to the defendants, but we cannot conclude that it was *unduly* prejudicial. *See, e.g., Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 427 (5th Cir. 2006) ("'Unfair prejudice' as used in rule 403 is not to be equated with testimony that is merely adverse to the opposing party."*).* "Here was no parade of horrors" under all the circumstances. *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979). Given the significant deference this court shows to the district court in Rule 403 matters, the district court's rulings will not be disturbed. *See Fields*, 483 F.3d at 354 ("The governing law and our limited standard of review bear emphasis.").

### D. Expert and lay opinion testimony

Next, the defendants argue that five witnesses were allowed to provide either improper lay opinion or improper expert opinion testimony under Rules 701 and 702 of the Federal Rules of Evidence. We review the district court's rulings on the admission of lay and expert testimony for an abuse of discretion. *United States v. Griffin*, 324 F.3d 330, 347 (5th Cir. 2003).

### 1. John McBrien

John McBrien was the associate director of OFAC. He testified about the Treasury Department's failure to designate the zakat committees as terrorist

organizations.  He also opined about whether one may donate to the committees if they are not designated.  The defendants argue that McBrien was not noticed as an expert witness, that his testimony was improper lay opinion, and that he gave an improper legal conclusion.  We agree with the defendants.

"Under FED. R. EVID. 701, a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury." *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997) (internal quotation marks and citation omitted).  A lay witness may not give an opinion that requires "scientific, technical, or other specialized knowledge within the scope of Rule 702."  FED. R. EVID. 701.  It is also generally prohibited for a lay witness to interpret statutes and to give legal opinions.  *See Griffin*, 324 F.3d at 347–48.  In *Riddle*, we held that it was improper for a lay witness in a bank fraud prosecution to explain provisions of the banking regulations, to express his opinion on "prudent" banking practices, and to "draw on his specialized knowledge as a bank examiner" in giving his opinions about the defendant's actions. *Riddle*, 103 F.3d at 428–29; *see also Huff v. United States*, 273 F.2d 56, 61 (5th Cir. 1959) (where issue was whether jewelry was exempt from duty, a customs inspector was improperly allowed to testify about his own construction of the customs laws, rules, and regulations, and to opine that the jewelry found in defendant's possession was commercial in nature rather than a personal effect).

In the instant case, McBrien explained that the Treasury Department typically does not designate every sub-group or component of a designated terrorist organization because it focuses its limited resources on designating the key parts of the organization.  He also read from Treasury regulations.  He then testified that a person donating money must ensure that the donation is not going to a sub-entity or front for the designated organization.  He answered a hypothetical question about a specific group with Hamas ties, known as the al-

Salah Society, explaining that if one lacked knowledge about the Hamas connection, a donation to al-Salah would not be illegal but that if one did have knowledge, donating to the group would be prohibited.

McBrien's testimony was helpful to the jury and was relevant because it addressed the defendants' complaints that none of the zakat committees to which HLF provided funds was designated as a terrorist organization. But McBrien's testimony about the Treasury Department's practice in designating or not designating sub-groups of terrorist organizations is not within the realm of an ordinary lay witness. The Government argues that McBrien's testimony was based on his personal knowledge and served to rebut the defense theory that because the zakat committees were not on the designation list they were not controlled by Hamas. McBrien's opinions and explanations were the product of specialized knowledge, however. It is true that lay witnesses may sometimes give opinions that require specialized knowledge, but the witness must draw "straightforward conclusions from observations informed by his own experience." *Riddle*, 103 F.3d at 429. Rather than make straightforward conclusions from his observations, McBrien explained the procedures of OFAC.

We are also troubled by McBrien's testimony about the "test" for whether a donation may be made to an entity that is not on the designation list. McBrien explained, in part, that the "basic test is, is the entity or the individual owned or controlled by or acting for or on behalf of the designated entity or the designated organization. . . . [I]t means are you acting as an intermediary for them, are you acting as their front organization, are you their straw man, are you their go between. " This testimony stated a legal test and was improper under our precedent. *See Griffin*, 324 F.3d at 347–48 (improper to allow Government witness to read from state statutes and to give her own interpretation of the law); *Riddle,* 103 F.3d at 428–29 (explanation of banking regulations held to be improper lay testimony).

Nevertheless, any error that occurred in the admission of McBrien's testimony was harmless because the testimony was cumulative to other testimony before the jury. *See Griffin*, 324 F.3d at 348. Dr. Levitt, a Government expert witness, also testified that the Treasury Department does not include every component of a terrorist organization on the designation list because doing so would be impossible. Levitt explained that the omission of a sub-group from the designation list does not mean that the group is not part of Hamas or that American citizens may donate money to the sub-group. Levitt further explained that the Treasury Department does not provide so-called "white lists" of approved organizations. Thus, McBrien's testimony was cumulative to Levitt's testimony. *See id.* ("Where objected to testimony is cumulative of other testimony that has not been objected to, the error that occurred is harmless.").[12]

Furthermore, although McBrien gave an improper legal opinion and provided testimony based on specialized knowledge, he did not express any opinions as to the defendants' specific conduct in the case. This is unlike other instances where we have found error in the admission of improper expert testimony. *See, e.g., Riddle*, 103 F.3d at 429 (lay witness gave improper opinion that bank operated "imprudently," which required witness's expert understanding of the banking industry); *Huff*, 273 F.2d at 61 (lay witness opined on specific legal nature of the goods at issue). We think that fact plus the cumulative nature of the evidence militates toward the harmless error conclusion. We therefore hold that McBrien's testimony was harmless and was not reversible error.

---

[12] The defendants objected at trial only to the question about whether the fact that a zakat committee was not designated as a terrorist organization meant that American citizens could donate to the committee; however, they have not argued on appeal that Levitt, who was an expert witness, could not answer the question.

## 2. FBI Agents Lara Burns and Robert Miranda

The defendants argue that FBI Agents Lara Burns and Robert Miranda, who were not noticed as expert witnesses, testified beyond their capacity as lay witnesses and gave improper expert opinions. The defendants object to specific testimony from Agent Burns that: (1) defined the term "Islamist" as used by Baker in the recording of the Philadelphia meeting; (2) explained why it was not relevant for her investigation whether the defendants received a salary from HLF, and why it was necessary to examine HLF's transactions before Hamas was designated as a terrorist organization; (3) connected Hamas to a flag burning demonstration seen in a videotape seized from HLF records; (4) identified the speaker on an audio tape as a leader in the Muslim Brotherhood; (5) explained the difference between "inside" and "outside" the Palestinian territories as used in some exhibits; (6) gave her understanding of why participants in the Philadelphia meeting continued to operate in America; and (6) identified various individuals as leaders of the zakat committees. The defendants further complain about Agent Miranda's testimony that (1) explained his understanding of recorded telephone calls between Baker and Baker's brother, and (2) stated that Baker's brother used a Hamas name. The defendants contend that the above testimony was not based on the witnesses' perception, was not helpful to the jury, and required specialized knowledge. We conclude that no reversible error occurred.

We agree that some of the facts presented by the agents would not be known to an average lay person. The district court did not err by admitting the testimony, however, because the agents' opinions were limited to their personal perceptions from their investigation of this case. *See United States v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010). By explaining the meaning of terms as used in the conversations and documents, as well as the relationships between the people they were investigating, the agents provided the jury with relevant

factual information about the investigation. *See id.* (lay witnesses who investigated an HMO's financial health were permitted to testify about accounting rules, define certain terms, and report impressions of HMO's accounting records because testimony "provided factual information about the circumstances of the case" and concerned the witnesses' investigation and "perceptions in the case").

Testimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation. For example, in *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001), we held that an FBI agent could testify under Rule 701 about the meaning and use of certain code words in the drug trade. We emphasized that the agent's "extensive participation in the investigation of *this conspiracy*" allowed the agent to "form opinions" about the code words "based on his personal perceptions." *Id.* (emphasis added). Similarly, in *United States v. Rollins*, 544 F.3d 820, 831–32 (7th Cir. 2008), the Seventh Circuit found no error in a law enforcement officer's "impression" testimony about recorded telephone calls where it was "based on his first-hand perception of the intercepted phone calls . . . as well as his personal, extensive experience with this particular drug investigation," rather than on his law enforcement experience as a whole. The officer was permitted to testify about his familiarity with the voices in the calls and about the meaning that the callers gave to certain words and terms. *Id.*; *see also United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008) (a witness may testify "as a lay witness drawing from his 'past experiences formed from firsthand observation' as an investigative agent").

Agents Burns and Miranda were extensively involved in the investigation of HLF, and we conclude that their testimony was either descriptive or based on their participation in, and understanding of, the events in *this* case. *See United*

*States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) (a law enforcement officer does not provide expert testimony if it is "merely descriptive," or if it is based on "common sense or the officer's past experience formed from firsthand observation"). For example, Agent Burns testified that her identification of certain individuals as leaders in the zakat committees was based on other records reviewed in the investigation. Agent Miranda interpreted a phone call between the Baker brothers as referring to Hamas leader Khalid Mishal because of other evidence present in the investigation.[13] The opinions were not based on the agents' training and experience as law enforcement officers in general. *See Rollins*, 544 F.3d at 831–32.

The defendants also overstate the effect of the agents' testimony in several instances. For example, they complain that Agent Burns "opined that the flag-burning demonstration" seen in the video found among HLF's records "involved Hamas." Actually, Agent Burns testified that the headbands worn by the demonstrators in the video had also been present *in other videos* that were associated with Hamas. To the extent that this was an improper expert opinion on the headbands, which we doubt, it was cumulative of other testimony and was therefore harmless. *See Griffin*, 324 F.3d at 348; *cf. United States v. Hall*, 500 F.3d 439, 444 (5th Cir. 2007) (erroneous introduction of cumulative evidence was harmless error). Dr. Levitt and Avi both testified that the headbands were associated with Hamas. Similarly, Agent Burns' explanation of the terms "inside" and "outside" the Palestinian territories was cumulative of similar

---

[13] In the call at issue, Baker's brother referred to someone becoming "sick" shortly before the call, and defendant Baker described subsequently speaking to that individual's father. Miranda testified that at the time of the call there had been an assassination attempt on Mishal, and the evidence showed that Baker had then phoned Mishal's father. Miranda's interpretation of the call as referring to Mishal was therefore a straightforward conclusion based on his observations in the case. *See Riddle*, 103 F.3d at 429.

testimony from Dr. Levitt.  We conclude that the district court did not abuse its discretion by admitting the testimony of Agents Burns and Miranda.

### 3. Matthew Levitt

As noted above, Levitt was the Government's expert witness on Hamas, and he testified twice at trial.  First, he gave an overview of the rise of Hamas and the role that Hamas's social wing played in the accomplishment of its goals.  That testimony has not been challenged.  Second, the Government re-called Levitt to provide testimony about evidence that had already been admitted through other witnesses.  The evidence had shown telephone calls and financial transactions between the defendants and Hamas leaders between 1989 and 1993.  It had also shown the presence of the defendants' names in the telephone book of Hamas leader Marzook.  Levitt was re-called to testify about the relative inaccessibility of the Hamas leadership to the general public, which highlighted the significance of this evidence.

For example, Levitt testified that the presence of the defendants' names in Marzook's book was "significant" because "[t]his is personal and direct evidence of a relationship."  He also testified that someone calling the public number for Hamas was "not likely to get the senior leaders of an organization, any organization, Hamas or some other organization."  He further gave the opinion that "[t]he fact that there are connections with so many Hamas leaders is not coincidental, cannot be coincidental."

The defendants argue that Levitt's testimony about the significance of the contacts between them and Hamas prior to Hamas's designation as a terrorist organization was improper expert testimony under Rule 702 because the jury was capable of determining for itself what inferences to draw from the evidence.  The Government argues that Levitt's testimony was necessary in order to prevent the jury from assuming that Hamas leaders were available to anyone,

or that those leaders engaged in a wide range of arms-length business deals with third-parties. We find no reversible error.

First, the evidence refuted specific testimony elicited by the defense on cross-examination. During its case in chief, the Government introduced evidence that in 1995, following the detention of Hamas leader Marzook by U.S. authorities, Hamas had sent an arguably ominous letter to United States Senator Orrin Hatch. On cross-examination of the senator's aide, counsel for El-Mezain pointed out that the letter contained a public address, telephone number, and facsimile number for Hamas. Counsel then asked the witness to agree that "if a person wanted to contact Hamas they could call that phone number." Levitt's testimony rebutted the defense suggestion that Hamas leaders could be readily contacted. Second, even assuming *arguendo* that Levitt's testimony was unnecessary, it likely did not add to anything that the jury already knew. It seems to us that a reasonable juror was more likely than not able to assume that Hamas leaders would tend to limit their contacts and transactions to trusted persons who supported Hamas. Therefore, even if an error occurred, which we do not find, we are convinced that the challenged testimony did not affect the verdict. *See United States v. Lowery*, 135 F.3d 957, 959 (5th Cir. 1998) ("A nonconstitutional trial error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'") (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

### 4. Steven Simon

Steven Simon was a former staff member of the National Security Council under President Clinton, but he was not noticed as an expert and did not testify under Rule 702. The defendants challenge testimony he gave about the dangers posed by Hamas violence to the United States' strategic interests in the Middle East and to American support of the Oslo peace accords. Simon testified that the violence interferes with the peace process and affects the United States' vital

interests in maintaining stability in the region and easing Arab resentment toward America.  At one point, when asked why the United States should care about Hamas and other terrorist organizations, Simon testified that "to the extent that the United States can remove one cause of resentment against America, we reduce the threat against the United States correspondingly.  It is hard to do, but it is very important work."

The defendants argue that Simon's opinion that Hamas violence threatens American interests was irrelevant and improperly appealed to the jurors' fears that support for Hamas could lead to more 9/11-style attacks on the United States.  The Government argues that Simon's testimony provided relevant context for the case and that it was not unfairly prejudicial for Simon to explain that one reason for U.S. support of the peace process is to remove a source of Arab resentment and thereby reduce the threat of future violence.

We agree with the defendants that Simon's testimony was not relevant and should have been excluded.  The Government was required to prove that the defendants provided material support to Hamas, and it therefore had to show a connection between Hamas and the defendants.  The reason why the American Government wants peace in the Middle East, and whether terrorist violence disrupts the peace process, does little to establish that connection.  Nevertheless, any error was harmless.  Simon's direct testimony was not extensive, comprising only fifteen pages out of several thousand pages of the trial transcript.  In a trial lasting approximately six weeks, Simon's momentary testimony was fleeting.  The testimony also provided the jury with the unremarkable lesson that the United States has a vital interest in Middle Eastern oil, and therefore it is in the U.S. interests to avoid Arab resentment and to keep the region free from violence and instability.  The defendants' argument that the testimony was a blatant appeal to jurors' fears is overstated when the testimony is read in full.

Moreover, much of Simon's testimony is cumulative of other evidence. The Middle Eastern peace process and the Oslo Accords, the involvement of President Clinton, the opposition by Hamas, and the threat to the American economy, foreign policy, and national security, were all evident from other testimonial and documentary evidence, such as the testimony of Levitt and Presidential Executive Order Number 12947. To the extent that admission of Simon's testimony was improper under Rule 701, it was therefore harmless. *See, e.g., Griffin*, 324 F.3d at 348.

### E.  Letter rogatory

The defendants next challenge the district court's failure to grant their request for a letter rogatory to the government of Israel.  A federal court may issue a letter rogatory, also known as a letter of request, to a court in a foreign country seeking assistance in the production of evidence located in the foreign country.  *See* 28 U.S.C. 1781(b)(2); *see also United States v. Reagan*, 453 F.2d 165, 171–72 (6th Cir. 1971).  The letter rogatory process "has been described as 'complicated, dilatory, and expensive.'" *United States v. Rosen*, 240 F.R.D. 204, 215 (E.D. Va. 2007) (quoting *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 531 (1987)).  The decision to issue a letter rogatory is therefore entrusted to the sound discretion of the district court, and we review such decisions only for an abuse of discretion. *United States v. Liner*, 435 F.3d 920, 924 (8th Cir. 2006).

The defendants sought a letter rogatory to the appropriate Israeli authority five months before trial in order to review approximately 2000 boxes of material seized by the Israeli military from the zakat committees.  The defendants sought this access because they believed that Avi had cherry-picked pro-Hamas evidence from the seized material to form his opinions about the committees.  They therefore wanted to search for exculpatory evidence.  The district court apparently overlooked the pendency of the request and never

formally ruled on the defendants' motion. During the course of trial, however, the district court indicated that authorizing any further inquiry into the seized materials would be a fishing expedition. We do not think the court's assessment was an abuse of discretion.

The issuance of a letter rogatory is a discovery issue. We will not order a new trial based on alleged discovery violations unless the defendant shows that a denial of access to evidence was prejudicial to his substantial rights. *United States v. Dukes*, 139 F.3d 469, 476 (5th Cir. 1998). This requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . [A] reasonable probability is shown where the nondisclosure could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict." *United States v. Webster*, 162 F.3d 308, 336 (5th Cir. 1998) (internal quotation marks and citation omitted).

The defendants believe that non-Hamas materials, such as documents and posters related to the Fatah party or pictures of Yasser Arafat, may have been present in the zakat committees, and if so, the material would have undermined Avi's opinion that the committees were controlled by Hamas. In a footnote, the defendants suggest that such material existed because defense witness Ed Abbington testified that he had visited zakat committees in the West Bank and had seen a mixture of Hamas and Fatah posters. The defendants' argument is unpersuasive.

The record shows that the Government turned over to the defense twenty volumes of material that Avi used to form his expert opinions. In testimony that the district court credited, Avi testified that he produced all the seized material that was relevant to the zakat committees, regardless whether or not it was favorable to the Government. The defendants' hope that combing through all 2000 boxes of the seized material might have produced exculpatory evidence is

purely speculative. *See Liner*, 435 F.3d at 924 (affirming denial of letter rogatory to depose a witness where defendant offered no evidence that witness's testimony would be material); *see also United States v. Marshall*, 526 F.2d 1349, 1355 (9th Cir. 1975) (holding that district court did not abuse its discretion in denying massive discovery request by defendant claiming prosecutorial misconduct where claimed infringement of constitutional rights was tenuous and speculative).

The defendants' reliance on Abbington's testimony does not alter the result. Abbington provided no details about the Fatah and Arafat pictures he had purportedly seen. For example, he was not asked when he allegedly saw these pro-Fatah materials or where. He testified that he visited various zakat committees, but he was not asked which zakat committees he was visiting when he allegedly saw this material. Because there is also no indication in the record that the Israeli military had actually seized such material, it is also not clear that the letter rogatory would have led to evidence favorable to the defense. *See* 8 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2005.1 at 70 (3d ed. 2010) (district court should issue letters rogatory "whenever it is determined on a case-by-case basis that their use will facilitate discovery"). We therefore cannot say that there is a reasonable probability that disclosure of the material would have cast the case in a different light, thereby undermining confidence in the verdict. *See Webster*, 162 F.3d at 336; *see also Rosen*, 240 F.R.D. at 215 (letter rogatory denied where testimony sought was not necessary to ensure a fair trial).

Given the voluminous amount of material that the Israelis seized, Avi's testimony that he produced all material that was relevant to the committees, and the absence of proof that pro-Fatah materials were present and seized from the specific zakat committees that the Government alleged were controlled by Hamas, the district court did not abuse its discretion by failing to issue a letter

rogatory to the Israeli government five months before trial on the basis that doing so would enable only a fishing expedition.

### F. Production of the defendants' intercepted statements

The defendants next contend that the district court erred by refusing to compel the Government pursuant to the Rules of Criminal Procedure to disclose the defendants' own intercepted statements to them. This issue implicates the Government's privilege in a criminal case to prevent discovery of classified information in order to protect national security. The defendants contend that the Government failed to invoke properly its privilege to withhold classified information and also failed to show that national security would be jeopardized by disclosure of their own statements. We review the district court's alleged discovery error for an abuse of discretion. *United States v. Garcia*, 567 F.3d 721, 734 (5th Cir. 2009).

We start by reviewing additional background information. During the course of its investigation in this case, the Government intercepted tens of thousands of telephone calls and facsimile transmissions through 24-hour surveillance of the defendants, as authorized under FISA, 50 U.S.C. § 1801, *et seq*. Because most of the calls were in Arabic, FBI translators identified which calls were pertinent to the intelligence investigation and prepared approximately 9600 English language summaries, as well as a smaller number of verbatim transcripts. Calls that were deemed not pertinent were neither translated nor summarized. Initially, all of the intercepted calls were classified by the Government.

Subsequently, the Government declassified the English summaries and the entire contents of intercepts for four of the eight FISA subjects. This declassified material was produced to the defense. Defense counsel, but not the defendants themselves, were also provided access to the remaining classified intercepts because counsel had the proper security clearances. Because the

classified materials were in Arabic, however, defense counsel could not understand them, nor could they discuss the material with their clients because the defendants did not have a security clearance.

The defendants moved to declassify the remaining FISA intercepts, or, in the alternative, for production of their own individual statements, so that counsel and their clients could review them together. The Government opposed the motion on the ground that the intercepts could not be declassified wholesale because the materials included information relevant to national security and the enormous volume of it made review of all the material impractical. The Government offered, however, to seek declassification of any specific FISA intercepts identified by counsel. The Government suggested that counsel could review with their clients the declassified summaries and then identify which calls they wanted to hear or time periods that might contain other relevant calls. The Government would then seek a declassification review of the identified calls.

The district court held that the Government's proposal was consistent with CIPA (the Classified Information Procedures Act, 18 U.S.C. app. 3 §§ 1–16), and refused to order disclosure of all the classified FISA intercepts. It ruled instead that counsel could seek declassification of specific intercepts. On appeal, the defendants contend that the district court erred because the plain language of the Rules of Criminal Procedure required personal disclosure of their own intercepted statements.

Discovery in a criminal case is governed by Rule 16 of the Federal Rules of Criminal Procedure, which specifies the type of information subject to disclosure by the Government. *See* FED. R. CRIM. P. 16 (a)(1). The rule generally requires the Government to disclose "to the defendant . . . any relevant written or recorded statement by the defendant" that is within the Government's possession. FED. R. CRIM. P. 16 (a)(1)(B)(i). The rule also grants the district court the power, however, to restrict or deny discovery in a criminal case for

No. 09-10560

"good cause." The advisory committee notes indicate that "good cause" includes "the protection of information vital to the national security." FED. R. CRIM. P. 16(d)(1) & advisory committee's note on 1966 amendments.

Congress passed CIPA to provide further guidance and protect against the unauthorized disclosure of classified information in the custody of the federal courts. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 121 (2d Cir. 2008). CIPA's purpose was to set forth procedures designed to "protect[] and restrict[] the discovery of classified information in a way that does not impair the defendant's right to a fair trial." *United States v. O'Hara*, 301 F.3d 563, 568 (7th Cir. 2002). Pursuant to Section 4 of CIPA, entitled "Discovery of classified information by defendants," a district court may authorize the Government "to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove."[14]  18 U.S.C. app. 3 § 4.

CIPA is procedural and neither creates nor limits a defendant's right of discovery. *See United States v. Mejia*, 448 F.3d 436, 455 (D.C. Cir. 2006); *see also United States v. Varca*, 896 F.2d 900, 905 (5th Cir. 1990) (CIPA does not expand traditional rules of criminal discovery). Instead, it clarifies the district court's existing power to restrict or deny discovery under the Federal Rules of Criminal Procedure. *Mejia*, 448 F.3d at 455; *United States v. Aref*, 533 F.3d 72, 78 (2d Cir. 2008). Both CIPA and Rule 16 leave "the precise conditions under which the

---

[14] "Classified information" is defined in relevant part as "any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security."  18 U.S.C. app. 3 § 1.

67

defense may obtain access to discoverable information to the informed discretion of the district court." *In re Terrorist Bombings*, 552 F.3d at 122.

We have not previously addressed the scope of the Government's privilege to prevent discovery of classified information under CIPA. Our sister circuits, guided generally by two Supreme Court decisions, have addressed the issue, however, and have adopted similar tests for application of the Government's privilege. *See, e.g., Aref*, 533 F.3d at 80; *United States v. Yunis*, 867 F.2d 617, 623–24 (D.C. Cir. 1989). The first Supreme Court decision that has guided our sister circuits is *United States v. Reynolds*, 345 U.S. 1 (1953), where plaintiffs in a civil case against the United States sought discovery of an Air Force investigative report about the crash of a bomber. The Court there recognized a governmental privilege to protect military and state secrets, and it held that a plaintiff could be denied evidence if "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id.* at 10.

The second case that has influenced our sister circuits' examination of the Government's classified information privilege is *Roviaro v. United States*, 353 U.S. 53 (1957), a criminal case involving the privilege to withhold a confidential informant's name. In that case, the Court recognized the Government's right to withhold the identity of an informer who provides police officers with information about violations of law, *id.* at 59, but it also held that "the privilege must give way" when the information "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60–61.

In *Aref*, the Second Circuit applied *Reynolds* and *Roviaro* in the context of the Government's withholding of discovery of classified information in a CIPA case. *See Aref*, 533 F.3d at 79–80. The court believed that the classified information privilege contemplated by CIPA is analogous to the common law state-secrets privilege recognized in *Reynolds*. It also adopted the test from

No. 09-10560

*Roviaro* as to when the privilege may yield to a defendant's need for the information. The court held that a governmental privilege claim in a CIPA case, like the state-secrets privilege, may prevent disclosure of otherwise discoverable information when (1) there is a reasonable danger that disclosure would expose matters that otherwise should not be disclosed in the interest of national security, and (2) the privilege claim has been lodged by an appropriate governmental agency head. *Id.* at 80. The court also held that the privilege nevertheless may yield when the information is helpful or material to the defense. *Id.*

Similarly, in *Yunis*, the District of Columbia Circuit also assessed discovery orders in a CIPA case. The court there recognized the similarity between the "sensitive considerations underl[ying] the classified information privilege" and the "informant's privilege identified in *Roviaro*." *Yunis*, 867 F.2d at 622–23. The court concluded, consistent with *Roviaro*, that when the Government invokes a classified information privilege, the district court must determine (1) whether the defendant has shown that the information sought is relevant, which it considered to be a "low hurdle," and (2) whether the Government's claim of privilege is "at least a colorable one." *Id.* at 623. The court further recognized that the defendant's relevance showing could overcome the Government's claim of privilege when the information sought is helpful to the defense, but the court required more than "a mere showing of theoretical relevance." *Id.*; *see also United States v. Smith*, 780 F.2d 1102, 1110 (4th Cir. 1985) (en banc) (equating classified material sought by the defendant with information about informers in *Roviaro*, and holding that the district court may order disclosure only when the information is necessary to the defense and is neither cumulative nor speculative).

Against this backdrop, we consider the defendants' claim in this case. As an initial matter, the defendants contend that the Government did not properly

69

No. 09-10560

invoke its privilege to withhold classified information because a privilege claim was not lodged by the responsible agency head, i.e. the Attorney General. In support of this proposition, the defendants rely primarily on the Second Circuit's decision in *Aref*, where the court held that the privilege to withhold classified information could be asserted only "'by the head of the department which has control over the matter, after actual personal consideration by that officer.'" *Aref*, 533 F.3d at 80 (quoting *Reynolds*, 345 U.S. at 8). We do not believe that the absence of the agency head's imprimatur in this case is fatal, however, for several reasons.

First, *Aref* relied on the Supreme Court's civil decision in *Reynolds* even though *Aref* was a criminal case. The Supreme Court in *Reynolds* appeared to distinguish between the rationale for the Government's evidentiary privilege in criminal and civil cases. *See Reynolds*, 345 U.S. at 12. We therefore join the Fourth Circuit in questioning whether *Aref* properly adopted and applied *Reynolds* in a criminal context. *See United States v. Rosen*, 557 F.3d 192, 198 (4th Cir. 2009).

Second, as the Fourth Circuit observed, there is no equivalent requirement in CIPA that the governmental privilege must be initiated by an agency head. *See id.* CIPA imposes upon district courts a mandatory duty to prevent the disclosure of any classified materials by issuing a protective order "[u]pon motion of the United States." 18 U.S.C. app. 3 § 3 ("Upon motion of the United States, the court *shall* issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case . . . .") (emphasis added); *see In re Terrorist Bombings*, 552 F.3d at 121. Some CIPA provisions do require the Attorney General's participation. *See, e.g.,* 18 U.S.C. app. 3 § 6(a) ("Any hearing held pursuant to this subsection (or any portion of such hearing specified in the request of the Attorney General) shall be held in camera if the Attorney General certifies to the court in such petition that

a public proceeding may result in the disclosure of classified information."); 18 U.S.C. app. 3 § 6(e)(1) ("Whenever the court denies a motion by the United States that it issue an order under subsection (c) and the United States files with the court an affidavit of the Attorney General objecting to disclosure of the classified information at issue, the court shall order that the defendant not disclose or cause the disclosure of such information."). However, the CIPA discovery provision does not similarly require the Attorney General to act. *See* 18 U.S.C. app. 3 § 4 (providing only that "upon a sufficient showing" the district court may authorize "the United States" to withhold classified information). The absence of a requirement in CIPA that the Attorney General assert the privilege suggests that the district court may order withholding of classified information from discovery without an explicit claim from the agency head as long as the United States otherwise makes a sufficient showing for the privilege. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original) (internal quotation marks and citation omitted).

Finally, the Second Circuit held in *Aref* that a "failure to comply with [the] formality" of an agency head's assertion of the privilege may be excused when there would be no benefit in remanding solely "for the purpose of having the department head agree that disclosure of the classified information would pose a risk to national security." *Aref*, 533 F.3d at 80. Even assuming *arguendo* that the privilege must be asserted by the agency head, we believe that a remand would be of no benefit here because we see no reason to think the Attorney General would disagree with the decision to assert the privilege.[15]

---

[15] The defendants offer only a conclusory and speculative argument that a "high Department of Justice" official would not assert the privilege because the classification of the

71

No. 09-10560

No one seriously disputes that the Government possesses an important privilege to withhold classified information, nor do we believe a contrary assertion could be sustained. *See Yunis*, 867 F.2d at 622–23 ("The Supreme Court has long recognized that a legitimate government privilege protects national security concerns.") (citing *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[The executive branch] has available intelligence services whose reports are not and ought not to be published to the world.")). Therefore, we conclude that the failure of a Government agency head to invoke the classified information privilege here does not constitute reversible error.

Next, the defendants contend that even if the Government properly invoked a privilege to withhold classified information, the Government failed to show that national security concerns required withholding their statements. This argument is premised on the defendants' belief that disclosing to them the contents of their own statements "could not possibly endanger national security." We do not agree. As the court recognized in *Yunis*, the Government may have an interest in protecting the source and means of surveillance that goes beyond protection of the actual contents of an intercepted conversation. *See Yunis*, 867 F.2d at 623 ("Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."). The Government persuasively argued, both here and in the district court, that because the defendants were not the only participants on the intercepted calls, disclosing the intercepts could thwart ongoing or future investigations if the calls were declassified en masse.

---

intercepts was "patently frivolous" and "calculated to give the government an unfair advantage." We see no evidence of bad faith by the Government, however.

72

No. 09-10560

The defendants contend that this case is not like *Yunis* because the Government chose to declassify and present at trial some of the intercepted communications, thereby revealing the fact and means of the surveillance obtained through FISA intercepts. But the fact that the Government determines that declassification of *some* of the communications will not harm national security does not *ipso facto* mean that declassification of *all* communications would have the same effect. Although the Government's claim of privilege may yield when the information is essential to fairly determine the issues at trial or when necessary for an important part of the defense, the defendants want us to second guess in the first instance the Government's determination of what is properly considered classified information. We decline to do so.[16] *See United States v. Abu Ali*, 528 F.3d 210, 253 (4th Cir. 2008) ("[W]e have no authority[] to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security.").

Having determined that the Government properly invoked its privilege to withhold classified information, we would ordinarily next consider whether the privilege nevertheless should have yielded to the defendants' need for the information, which requires a balancing of interests. *See Roviaro*, 353 U.S. at 60–61; *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (holding that when deciding discovery issues under CIPA § 4 the district court may balance a defendant's need for the information against national security concerns). The instant case is unusual, however, insofar as the Government

---

[16] The defendants contend that accepting the Government's rationale for asserting the privilege in this case will encourage the practice of routine classification of all wiretap evidence capturing a defendant's conversations, including Title III wiretaps in domestic cases. We foresee no such abusive practice, however, because the Government's interest in protecting classified information "cannot override the defendant's right to a fair trial." *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990). Thus, as noted above, the asserted privilege will not succeed when the information is helpful to the defense or essential to a fair determination of the cause, but that balancing question is different from whether information should be classified, a determination that is left to the Government. *See* 18 U.S.C. App. 3 § 1.

sought to withhold classified information from the defendants themselves, but it disclosed the untranslated intercepts to cleared defense counsel and agreed to further consider specific requests for declassification of other calls.

Under these facts, we do not believe that the district court's discovery rulings were erroneous. The defendants were provided with a substantial amount of information that was deemed relevant. The defendants themselves had access to declassified summaries of thousands of the intercepted calls that were pertinent to the intelligence investigation, all of the calls that the Government intended to use at trial, and the entire contents of four of the FISA intercepts. The calls to which the defendants lacked access were available to defense counsel. Despite arguing that they could not understand the Arabic calls, counsel concede in their brief that they began the process of having the calls translated by cleared translators, first in Texas and later in Washington, D.C.[17] Given the circumstances, we question whether there was a discovery error at all, or whether the defendants have demonstrated prejudice. *See In re Terrorist Bombings*, 552 F.3d at 126 (holding that the district court was permitted to issue a protective order under CIPA limiting disclosure of classified information to persons with proper security clearance, and noting that "production of [classified] materials to a party's attorney alone falls within the common meaning of 'discovery,'" notwithstanding defendant's claim that counsel could not interpret evidence adequately); *see also United States v. Thai*, 29 F.3d 785, 804–05 (2d Cir. 1994) (holding that Government's failure to disclose translation of defendant's recorded statement prior to trial was not prejudicial

---

[17] According to the defendants, their Texas translator lost his clearance and was unable to continue, and the defense abandoned use of the Washington translators because "the process was unwieldly and produced little useful information." These circumstances were unfortunate, but they were not the fault of the Government. Moreover, the fact that little useful information was discovered when the defense counsel did attempt to use the procedures authorized by the district court tends to suggest a lack of harm to the defendants.

where *inter alia* defense counsel had the tapes of the conversation and had had a translator listen to them).

Assuming without deciding that the Government's production of the untranslated classified intercepts to the defendants' attorneys was insufficient under Rule 16, we nonetheless are satisfied that the district court did not abuse its discretion by refusing to compel the Government to produce the intercepts to the defendants themselves without further requests for declassification. Rule 16 requires that the Government disclose to the defendant "any *relevant*" statements made by the defendant. FED. R. CRIM. P. 16(a)(1)(A) & (B)(i) (emphasis added). This "necessarily implies the existence of irrelevant statements by the defendant" that are not covered by the rule. *Yunis*, 867 F.2d at 624 n.10. It bears emphasis that the defendants were not outright denied access to the classified intercepts; instead, they were required to identify intercepts that could be reviewed for a decision by the Government whether to declassify and produce them or, presumably, to maintain its privilege claim. If the Government chose to maintain its claim of privilege, the district court then would have had to engage in the balancing test to determine if the privilege should yield. But the proceedings never got that far because, as noted by the district court, the defendants failed to participate in this process. The issue, as we perceive it, is therefore whether the district court's procedures requiring the specific declassification requests denied the defendants access to information that was relevant or would have been helpful to their defense.

The defendants essentially contend that the district court should have made a wholesale determination whether their own statements on the intercepted calls would have been helpful to their defense, and they argue that we should remand the case for the district court to make that determination. We are not persuaded. An assessment of materiality by the district court of *all* the classified FISA intercepts *without some narrowing* by the parties was not

feasible in a case such as this involving tens of thousands of calls. Putting aside the fact that the calls were in Arabic and untranslated, to have the district court wade through the voluminous materials searching for scraps of conversation that might be helpful to the defendants would be a waste of precious judicial resources.

The defendants assert that they wanted access to their own FISA intercepts to search for exculpatory evidence, such as conversations showing their intent to comply with the law or their belief that contributions to zakat committees that had not been designated as terrorist organizations was lawful. They assert that these conversations would have shown their state of mind. But assuming such statements exist, the defendants themselves were in the best position to assist their counsel in identifying any exculpatory calls based on their own recollection and their ability to review the declassified summaries and other information provided to them. Counsel could then request that the statements be declassified by requesting them by date or by the name of the person on the call.

No doubt this would be a difficult task, but courts have required defendants to demonstrate materiality even though the task is difficult. For example, in *Yunis*, 867 F.2d at 624, the court recognized the "Catch-22" that defendants had to demonstrate the materiality of classified information without having access to the information and without knowing its nature. The court held that the task was difficult but not impossible. *Id.* It emphasized that the defendant "was present during all the relevant conversations" and therefore it was reasonable "to expect some specificity" as to what benefit he expected from the evidence. *Id.*

Similarly, it is reasonable to have the defendants specify which classified intercepts they wanted reviewed for declassification. Their argument that they wanted conversations showing their state of mind, without more, presents

merely the theoretical possibility that the materials were relevant and does not justify wholesale declassification of the intercepted calls. *See Yunis*, 867 F.2d at 623 (holding that "classified information is not discoverable on a mere showing of theoretical relevance in the face of the government's classified information privilege").

Review of the untranslated FISA intercepts, which numbered in the tens of thousands and monitored the defendants for 24 hours per day for several years, presented a daunting task to anyone who wanted to review them. In light of the evidence already disclosed to the defendants, permitting wholesale declassification, without some narrowing of the remaining calls, would have jeopardized the Government's interest in protecting national security merely to permit a fishing expedition by the defendants. Therefore, the district court's requirement that the defendants seek declassification of specific FISA intercepts was not an abuse of discretion under CIPA and properly balanced the defendants' need to mount a defense with the Government's need to protect classified information. We therefore reject the defendants' argument on this issue.

### G.  Harmless and Cumulative Error

Having reviewed the defendants' claims of trial error, and having identified erroneous rulings by the district court, we must next consider whether those errors require a new trial under the rubric of harmless error. To reiterate, we have found error in: (1) the admission of Shorbagi's hearsay testimony that Hamas controlled the West Bank zakat committees; (2) the admission of the three hearsay PA documents showing that HLF was a financial resource for Hamas and that Hamas had ties to the Ramallah Zakat Committee; (3) the admission of John McBrien's testimony giving a legal conclusion about donations to the zakat committees; and (4) the admission of opinion testimony from former National Security Council member Steven Simon about the United States's

interests in the Middle East. For the reasons stated above in Sections E.1 and E.4, we conclude that the errors in admitting McBrien's and Simon's testimony were harmless. We therefore consider the errors related to Shorbagi's testimony and the PA documents. We will then consider the defendants' claim of cumulative error.

### 1. Harmless error

If a district court errs in the admission or exclusion of evidence at trial, "such error can be excused if it was harmless error." *Lowery*, 135 F.3d at 959; *see* FED. R. CRIM. P. 52(A). "A nonconstitutional trial error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Lowery*, 135 F.3d at 959 (quoting *Kotteakos*, 328 U.S. at 776). Under this standard, we ask "whether the error itself had substantial influence" on the jury in light of all that happened at trial; if we are "left in grave doubt, the conviction cannot stand." *Kotteakos*, 328 U.S. at 765; *see also United States v. Williams*, 957 F.2d 1238, 1244 (5th Cir. 1992) ("[W]e must view the error, not in isolation, but in relation to the entire proceedings.") (internal quotation marks and citation omitted).

The harmless error examination is thus fact-specific and record-intensive, requiring a close review of the entire trial proceedings. For this reason, comparing the harmless error analysis in one case to the analysis in another is not necessarily helpful. *See United States v. Ong*, 541 F.2d 331, 338 (2d Cir. 1976) ("Harmlessness is a relative term that requires specific definition in each case by determining the effect on the jury's verdict of the error's absence."); *see also United States v. Jennings*, 527 F.2d 862, 868 (5th Cir. 1976); *Benham v. United States*, 215 F.2d 472, 474 (5th Cir. 1954) ("Each case stands upon its own peculiar facts and circumstances as to whether a defendant has been afforded a fair trial."). Therefore, we must judge the likely effect of any error in the case before us based on the totality of the circumstances in this trial. "'[U]nless there

is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required.'" *Williams*, 957 F.2d at 1242 (quoting *Schneble v. Florida*, 405 U.S. 427, 432 (1972)). Put another way, we will not reverse a conviction "if 'beyond a reasonable doubt the error complained of did not contribute to the verdict obtained.'" *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007) (quoting *United States v. Cornett*, 195 F.3d 776, 785 (5th Cir. 1999)).

After a full review of the record, we are left with the firm conviction that the trial errors we have identified do not require reversal. In light of the volume of evidence against the defendants showing HLF's connection to Hamas and Hamas's control of the zakat committees, the admission of Shorbagi's testimony and the PA documents was merely cumulative. It is well established that error in admitting evidence will be found harmless when the evidence is cumulative, meaning that substantial evidence supports the same facts and inferences as those in the erroneously admitted evidence. *See, e.g., Hall*, 500 F.3d at 444 (determining that the admission of disputed testimony was harmless because "[t]he challenged portion of [the] testimony was merely cumulative of other evidence introduced without objection. A number of other witnesses testified–in much greater detail–that [the defendant] purchased illegal drugs from McCallom."); *United States v. Okoronkwo*, 46 F.3d 426, 435 (5th Cir. 1995) (holding that "Agent Taylor's testimony was merely cumulative of substantial evidence establishing the various defendants' participation in the conspiracy," and the admission of the testimony was harmless); *United States v. Allie*, 978 F.2d 1401, 1408–09 (5th Cir. 1992) (concluding that, because the Government had introduced admissible testimony regarding the presence of aliens living in defendant's home, "the videotape was merely cumulative evidence and its introduction constitutes harmless error"); *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987) (holding that hearsay testimony about defendant's

competency was harmless error in light of "voluminous" testimony on the subject from three expert witnesses); *see also* 3B CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE: CRIMINAL § 854 (3d ed.) ("Error in the admission of evidence is harmless if the facts shown by that evidence are already before the jury through other properly admitted evidence.").

In this case, the erroneously admitted evidence from Shorbagi and the PA documents showed that HLF financed Hamas and that Hamas controlled the West Bank zakat committees to which HLF provided funds. We find from our review of the evidence that these facts were before the jury from a plethora of evidence.[18] The Government introduced evidence showing a close connection between the defendants and Hamas, which in turn supports the inference that HLF's fundraising was designed to support Hamas. The Government also introduced evidence that the zakat committees to which HLF provided funds were controlled by Hamas.

### a. HLF's connection to Hamas

Much of the Government's evidence at trial pre-dated Hamas's designation as a terrorist organization. However, the evidence served the important function of establishing the defendants' relationship with Hamas and the intent of their later actions. The evidence showed that the long-standing connection between HLF and Hamas began in the late 1980s when HLF arose as a fundraising arm for the Palestine Committee. This fact was notably evident from the Elbarasse and Ashqar documents, which showed that HLF was created along with the IAP

---

[18] Because one would not expect a purported charitable organization like HLF or one of the zakat committees to openly acknowledge its ties to a terrorist group, much of the Government's evidence was circumstantial and required the jury to make logical inferences. Our discussion here is not meant to be an exhaustive list of all the evidence that the Government introduced pertaining to HLF or the zakat committees and their members. Our review of the evidence, however, convinces us of the overwhelming nature of the connection between HLF, the zakat committees, and Hamas. We endeavor here to outline only some of the persuasive evidence of these connections.

No. 09-10560

(the Islamic Association for Palestine) and UASR (the United Association for Studies and Research) under the Palestine Committee's umbrella. The Palestine Committee's by-laws specifically recognized HLF as "the official organization" for fundraising. The testimony of Avi and Levitt established that Palestine Committees around the world served to support Hamas.

The chairman of the Palestine Committee in the United States, Hamas leader Marzook, maintained contact information for Baker, El-Mezain, and Elashi in his personal telephone book. Although El-Mezain told the FBI that he had no relationship with Marzook other than occasional holiday telephone calls, telephone records showed that Marzook called El-Mezain 52 times from 1989 to 1993. After Marzook was designated as a SDT and was taken into custody, Baker explained to a newspaper reporter that his name was likely in Marzook's phone book because Marzook had made a large donation to HLF. That conversation was captured in a wiretap. Baker claimed that Marzook had written one check and HLF did not hear from him again. He also stated under oath in a deposition in a separate civil suit that HLF had no relationship with Marzook other than that single donation. Baker's statements were untrue. The evidence showed that the donation to which Baker referred was made in three installments and occurred in 1992, but it was far from the only contact that Marzook had with HLF and the individual defendants. Phone records showed that Marzook called Baker 25 times from January 1989 to January 1990.

There were also numerous financial transactions between the defendants and Marzook. Contrary to Baker's denial of a relationship with Marzook, HLF made three payments of ten thousand dollars to Marzook and his wife in 1988 and 1989. During the late 1980s and early 1990s, Marzook made payments of hundreds of thousands of dollars to the IAP and the UASR, as well as smaller payments to El-Mezain and Elashi. These and other pre-1995 financial transactions cast suspicion on HLF as a conduit for Hamas funding.

81

For example, in 1988 HLF made payments of over $250,000 to an entity known as K&A Trading. It sent this money to a Switzerland bank account held by Khari H. al-Agha. Levitt testified at trial that al-Agha was a Hamas financier. The evidence showed that al-Agha was connected to Marzook and was listed in Marzook's personal telephone book. His name also appeared in a document found in Ashqar's home, Ashqar Search 1, under "Important phone and fax numbers. Palestine Section/Outside America." Three months after HLF's last payment to K&A Trading, Al-Agha sent approximately $1.3 million to Marzook. Investigating agents found no explanation in HLF's records for the payments to K&A Trading, which is not a charitable organization. Furthermore, from 1989 to 1994, HLF sent over $700,000 to the Islamic Center of Gaza, which was founded by Sheikh Yassin, the same person who founded Hamas.

The Government also introduced into evidence numerous donation checks from the early 1990s that were made payable to the IAP but deposited into HLF's bank account and on which the donors had written in the memo line "for Palestinian Mujahideen only." One donor wrote a letter to Baker in 1991 asking for books about Hamas and praising the "Islamic Uprising in Palestine." Indicating HLF's connection to Hamas, Baker wrote back to inform the woman that the IAP would send her the books and to "assure" her that HLF was a "trustworthy organization" for people to "look up to, hoping and taking advantage of the historic opportunity to support the resistance of a nation and the jihad of a people."

HLF's role as an early financial resource for Hamas was also evident from the Palestine Committee's influence on HLF. For example, in 1994, a dispute arose between HLF and Ashqar about who should receive the proceeds raised from speaking appearances in the United States by Hamas leader Jamil Hamami. Ashqar had arranged for Hamami to come to the United States and wanted to keep the proceeds for a separate organization that Ashqar had

founded. Wiretaps captured conversations among Baker, El-Mezain, and several others discussing the situation. Marzook and other Palestine Committee members intervened to resolve the dispute. One of the wiretaps, Ashqar Wiretap 4, captured a conversation between Ashqar, Hamami, and Hamas leader Mohamed Siam. Siam informed Ashqar that the Palestine Committee had decided that all funds raised by Hamami's appearances would be administered by HLF.

Further evidence that HLF's fundraising was intended to benefit Hamas came from the activities of HLF and the individual defendants. Numerous video recordings found in HLF's possession showed the defendants participating at festivals, conferences, and fundraising events with known Hamas leaders, such as Marzook and Mishal. The Hamas flag was visible at some of these events, and many of the videos showed Abdulqader's band performing songs that praised Hamas.[19] Moreover, HLF advertised in pro-Hamas magazines published by the IAP that also contained articles praising Hamas and urging readers to donate money to HLF in order to support the Intifada. One such magazine contained a poem written by Baker stating, in part, that "we will not accept other than Hamas." Baker also traveled to Gaza in 1991 to meet with Hamas leader Mahmoud Zahar about "establish[ing] a central zakat committee for the Gaza sector."

The defendants' support for Hamas was also evident in suspicious statements intercepted in wiretaps and documents found in HLF's records. For example, at the Philadelphia meeting Baker made statements suggesting that participants should refer to Hamas only in code, and he instructed the

---

[19] One video from 1991, HLF Search No. 71, flashed Hamas logos on the screen while the band sang lyrics that included the following: "Long live Hamas, our Islamic Torch. O, Mother, Hamas called for jihad over mosques' loudspeakers, with freedom. Every day it resists with stones and daggers. Tomorrow, with God's help, it will be with a machine gun and a rifle."

participants how to respond if anyone asked about the purpose of the meeting. His statements suggested that deceptive practices were necessary to conceal the intent of the Palestine Committee. They were also consistent with security "guidelines" found among HLF's materials stored at Infocom, which directed that there should be cover stories agreed upon to explain things like meetings and travel.[20] Another wiretap, just two days before Hamas was designated as a terrorist organization, captured a conversation in which El-Mezain and Odeh spoke approvingly about a Hamas suicide bomb attack. Odeh referred to the attack as a "beautiful operation," and El-Mezain responded, "May it be good."

Although there was nothing illegal about the defendants' actions described thus far, the evidence of the defendants' early connection to Hamas and support for its cause informed the inferences to be drawn by the jury from evidence that came later, including the evidence of funds that were sent to the West Bank zakat committees after the 1995 designation of Hamas as a terrorist organization. For example, Shorbagi testified from personal knowledge that HLF continued to provide funds to the same purportedly charitable organizations as before Hamas's designation. This testimony was based in part on a conversation with El-Mezain. Indeed, there was ample evidence of financial records and wire transfers showing that HLF provided funds to the same zakat committees named in the indictment both before and after Hamas was designated as a terrorist organization. Because the evidence strongly supported the inference that the defendants were connected to Hamas before the

---

[20] The document, which was labeled "The Foundation's Policies & Guidelines," included comprehensive policies for ensuring the secrecy of the organization's activity. For example, the policies directed that documents should be arranged at meetings so that they could be easily gotten rid of in an emergency; that measures should be taken before a meeting to be sure there is no hidden surveillance equipment; that an alert signal should be given if the location is monitored or if a member of the committee is followed; and that documents should be hidden when traveling and a pretext should be devised in case they are discovered in a search. The possession of such a document by a purportedly charitable organization was clearly suspicious.

designation, it was logical for the jury to conclude that the defendants' intent in financing the same committees after the designation was to support Hamas. But there is additional evidence linking HLF to Hamas after Hamas's designation.

One organization that received over $75,000 from HLF after Hamas was designated as a terrorist organization was the Islamic Relief Agency. Avi identified the Islamic Relief Agency as a Hamas intermediary organization that received money and sent it to zakat committees controlled by Hamas in Gaza and the West Bank. HLF's continued support of Hamas was also shown in a 2001 letter on HLF letterhead addressed to Kamal al-Tamimi that directed a $5,000 grant to the Young Muslim Youth Association. Testimony showed that the Association was a subsidiary of ICS Hebron and that al-Tamimi was both a member of ICS Hebron and of Hamas.

Still other evidence demonstrated that HLF's function as a fundraising entity for Hamas continued after Hamas was designated as a terrorist organization. A 1996 video seized from HLF offices showed Abdulqader on stage at a fundraising event sending a message of greeting to Hamas leaders Sheikh Yassin, Dr. Abdel Aziz al-Rantisi, and Marzook. A wiretap in February 1996 captured a teleconference that HLF sponsored where one of the featured speakers spoke of support in Pakistan for the "Palestinians under the leadership of Hamas," and the non-recognition of Israel, which was followed by a solicitation for donations to HLF. A report from HLF's "Special Events Department" found at Infocom noted another teleconference in February 1996 that featured Mohamed Siam, a Hamas leader, and noted that $18,500 was raised during the call.[21] A 1996 letter sent to HLF's New Jersey office along with a donation stated that the money was for "relief supplies and weapons to crush the hated enemy," and that "we must destroy Israel." HLF not only accepted the donation but

---

[21] Siam's name was spelled "Seyam" in the report.

continued to solicit funds from the letter's author, who continued to donate money to HLF through 1998. A June 1996 letter from defendant Odeh to an HLF officer showed that HLF had provided funds used to support the orphaned children of Yehia Ayyash, who was identified as a Hamas engineer and inventor of suicide bombs. An audio tape from 1996 that was seized from HLF's offices contained songs praising Hamas and discussions of suicide bombers as heroes. In a wiretap of El-Mezain's phone, also in 1996, El-Mezain received a phone call about a suicide bombing on a bus in Jerusalem and stated, "It is good, by God."

In 1997 HLF promoted a teleconference in a flier that advertised the call as featuring Hamed Bitawi and Mohamed Siam. Levitt and Avi identified both men as senior Hamas leaders. The flier was written in English on one side and in Arabic on the other side. However, only the Arabic side referred to Bitawi and Siam.

Wiretap evidence from 1999 further supported an inference that the Palestine Committee was intimately involved in the activities of HLF. For example, two 1999 conversations were intercepted involving Omar Ahmad, who was a member of the Palestine Committee and was also associated with the IAP. Ahmad was neither an employee nor a board member of HLF but he was heard influencing HLF business. In Baker Wiretap No. 33, Ahmad instructed HLF employee Haitham Maghawri, over Maghawri's protest, to send money to Lebanon because Baker had promised to give Ahmad $50,000 for a project there. In another conversation, Ahmad instructed Baker on the compensation to be paid to El-Mezain for his fundraising work. The two men also joked about the telephone being bugged. Because Ahmad had no relationship to HLF other than his connection to the Palestine Committee, his conversations about HLF business and projects suggest that the Palestine Committee controlled HLF even after the designation of Hamas as a terrorist organization.

Material seized from HLF's offices and computers also demonstrated a continuing connection between HLF and Hamas. For example, HLF maintained a list of overseas speakers, modified as late as 1999, that contained the names of several people identified as Hamas leaders, such as Fuad Abu Zeid, Hamed Bitawi, and Dr. Yousef Karadawi. More than twenty of the speakers on the list were also found in Marzook's personal telephone book seized in July 1995. At least eight of the listed speakers also shared the same phone number identified at trial as being present on Hamas letterhead. The HLF speakers list contradicted a statement by Baker to a reporter denying that HLF used Hamas members as speakers.

Furthermore, numerous photographs of various Hamas leaders were found on HLF's computers in 2001. Some of the material found in HLF's offices that related to Hamas pre-dated Hamas's designation as a terrorist organization, but the fact that HLF maintained the material many years later was probative of HLF's support for Hamas. For example, a picture from 1990 was found in Odeh's New Jersey office in 2001 celebrating the one-year anniversary of the imprisonment of Hamas founder Sheikh Yassin. A book was also found in Odeh's office that chronicled the life of the martyr Izz El-Din al-Qassam, who served as the namesake of Hamas's military wing. A list of "important addresses" printed by the publisher in the back of the book included HLF's previous address in Indiana.

We believe that a jury could not help but infer from the above evidence that the defendants had a close association with Hamas and that HLF acted to fund Hamas both before and after Hamas's designation as a terrorist organization. Therefore, to the extent Shorbagi and the PA documents suggested that HLF was a financial resource for Hamas, the erroneously admitted evidence was cumulative. The same is true to the extent that Shorbagi

and the PA documents indicated that Hamas controlled the zakat committees, as we explain in the next section.

### b. Hamas's control of the zakat committees

The Government introduced extensive evidence documenting HLF's financial support of the zakat committees, both before and after Hamas's designation as a terrorist organization. Therefore, evidence of Hamas's ties to those committees was also strong evidence that the defendants provided material support to Hamas as charged in the indictment. There was abundant evidence, in addition to Shorbagi's testimony and the PA documents, showing Hamas's influence on the zakat committees and demonstrating that many of the people with whom the defendants interacted from those committees were Hamas leaders and members.

As already noted above, Levitt and Avi both testified about Hamas's control of the zakat committees. Levitt based his opinion on interviews with Palestinian, Israeli, and American authorities, on the Hamas leadership of the zakat committees, and on the Hamas-related materials found in the committees. He specifically identified individuals associated with the Ramallah and Jenin committees as being Hamas members, and he indicated that one such individual had participated in a suicide bomb attack in 1997. Avi also gave his expert opinion that Hamas controlled the zakat committees. In testimony cumulative of Shorbagi's testimony, Levitt and Avi both identified Hamed Bitawi, from the Nablus Zakat Committee, as a Hamas member.

There was also other evidence connecting the Nablus Zakat Committee and Bitawi to Hamas. For instance, Bitawi's name was listed on the Nablus committee's bank records obtained by the FBI. His picture was found on HLF computers wherein he was seen holding a gun and a Quran, with the word "Hamas" in the background. Hamas leader Mishal specifically praised Bitawi in a 1992 video recording. Another video, found in HLF's possession and known

as the "tent video," showed Bitawi participating in a meeting along with approximately a dozen other individuals who had been deported from Israel.[22] Bitawi introduced himself in the video as being from the Nablus Zakat Committee.  Other participants, including Dr. al-Rantisi, actually introduced themselves as founders of Hamas, while Avi identified still others in the video as Hamas members.  The Hamas logo flashed on the screen several times.  One of the participants at the meeting specifically mentioned Baker and El-Mezain, as well as HLF, which was providing support for the deportees.

Bitawi was further mentioned in the 1991 letter to Baker that was seized from Elbarasse's home, Elbarasse No. 22.  Bitawi was listed in that letter as part of "[o]ur presence" on the al-Tadamoun Society, a sub-group of the Nablus committee.

Further evidence related to Hamas that was seized from the Nablus committee included a postcard depicting two Hamas suicide bombers that praised a suicide attack by one of them in 2001, as well as a key chain with the picture of Hamas founder Sheikh Yassin.  Numerous Hamas posters and postcards with pictures of suicide bombers and Hamas leaders and symbols were seized from the Nablus, Tulkarem, Hebron, and Jenin committees.

Other documents seized from the zakat committees by the Israelis also showed Hamas's influence on the committees.  A few examples demonstrate this point.  An April 2001 "political statement" was seized from ICS Hebron.  The statement supported Hamas and jihad and advocated "infliction upon the enemy [of] heavy casualties."  A 1999 letter from a group of prisoners was also found in ICS Hebron.  In the letter, the prisoners asked that the Young Muslim

---

[22] In 1992, Israel deported to Lebanon over 400 Palestinians who were thought to be associated with Hamas.  The action was condemned by the international community, and the deportees were eventually allowed to return to Palestine.  The tent video found in HLF's possession documented remarks by some of the individuals who were deported while they were in Lebanon.

Society, a sub-group of ICS Hebron, continue to support them. Avi testified that the letter was consistent with Hamas's support for prisoners.

Avi also testified that the head of ICS Hebron, Abdel Khaleq al-Natsheh, was a Hamas leader. His testimony was corroborated by a 2001 video seized from the zakat committee wherein al-Natsheh was described as the head of Hamas in Hebron. Furthermore, al-Natsheh was also listed in Marzook's personal phone book.[23]

Israeli authorities also seized internal Hamas communications from the zakat committees. For example, a document from January 2001 was found folded very small and concealed in al-Natsheh's office at ICS Hebron. The document reported the results of Hamas's internal election and discussed the significance of providing support for martyrs and prisoners. The secretive nature of the document was evident from instructions directing readers to call a telephone number in Switzerland for "emergency matters" and to give a code phrase. Avi testified that these instructions were a common security precaution for Hamas. He also opined that the presence of the document at the zakat committee was significant because it showed that the committee's focus included Hamas's internal affairs.[24]

Other evidence also showed connections between Hamas and the zakat committees that was cumulative of the Shorbagi testimony and the PA documents. For example, Shorbagi identified Mohamed Fuad Abu Zeid and the

---

[23] HLF documents found in the search of Infocom showed that HLF had been dealing with al-Natsheh since the early 1990s. In a 1994 fax, HLF directed that al-Natsheh be notified about a donation and instructed that funds be delivered to his committee. Other HLF documents showed that al-Natsheh reported back to HLF about the use of grants to the Hebron committee. This evidence further showed HLF's connection to Hamas.

[24] Another internal Hamas document was found in the Jenin Zakat Committee in 2004, after HLF was closed. Nevertheless, the document, which mentioned Hamas founder Sheikh Yassin and discussed Hamas's internal contingency plans for responding to an Israeli withdrawal from Gaza, is similar in nature to other political documents found in the committees and demonstrates a connection with Hamas.

Jenin Zakat Committee as being connected to Hamas. Abu Zeid identified himself as being from the Jenin committee in the tent video. Avi also identified Abu Zeid as a Hamas figure. His testimony was further supported by a video of a conference sponsored by the Muslim Arab Youth Association ("MAYA") in 1992. Baker was a MAYA board member, and Hamas leader Mishal referred to Abu Zeid at the conference as an important person in the Palestinian struggle. Abu Zeid was further listed as a ranking Hamas figure in a book about Hamas published by the UASR. The book, entitled *The Palestinian Intifada in the Hebrew Press: A study about the Islamic Resistance Movement "Hamas,"* was found among HLF's records in the office of Defendant Odeh in 2001. Abu Zeid's name also appeared in Marzook's personal phone book, as well as on HLF's speakers list. Moreover, in Elbarasse No. 22, the letter addressed to Baker, the declarant asserted that the Jenin Zakat Committee was "Guaranteed . . . [b]y virtue of Mr. Mohamed Fouad Abu Zeid's position."

Levitt further identified still another member of the Jenin Zakat Committee, Fawaz Hamad, as a Hamas member. According to testimony from Levitt and Agent Burns, Hamad not only worked for the Jenin Zakat Committee but also became an HLF representative in Jenin after serving time in an Israeli prison for aiding Hamas. Hamad operated a hospital that was controlled by the Jenin committee, and he wrote a letter to defendant El-Mezain, Infocom Search No. 30, that discussed the hospital operation. The letter identified various hospital board members and others as "Islamist," "deportee," "brother," "semi-brother," or "Fatah." This letter was among the HLF documents found at Infocom and was consistent with other evidence associating the term "Islamists" with Hamas. Notably, at the Philadelphia meeting in 1993, Muin Shabib referred to the Jenin committee's building of the hospital, stating that it "is really ours, for the Islamists either in management or the teams working in it." A document found in Ashqar's home, Ashqar Search 5, also referred to the

"Islamist" presence in various charitable organizations, including ICS Hebron, Nablus, Tulkarem, and Jenin.

Shorbagi also identified Jamil Hamami as a Hamas member, but there was ample evidence of this fact. Hamami was associated with the Islamic Science and Culture Center in the West Bank, to which HLF donated almost half a million dollars before the center was closed in 1996. Levitt and Avi both identified Hamami as a Hamas leader, although he apparently had a falling out with Hamas in the mid-1990s. Hamami was the speaker at the center of the dispute between HLF and Ashqar in 1994 when Marzook and the Palestine Committee intervened. He was further identified as a ranking Hamas leader in the UASR book about Hamas found in Odeh's office. Furthermore, the search of HLF offices uncovered a UASR publication that referred to Hamami as a Hamas leader. The publication, *The Middle East Affairs Journal*, HLF Search No. 108, was published in 1998 and stated that Sheikh Yassin assigned Hamami to establish a Hamas branch in the West Bank. It also reported that Hamami became the liaison between the Hamas command in the West Bank and the leadership in Gaza. Hamami was also videotaped with Baker and El-Mezain at a 1990 fundraising event. On the video, Mushtaha exhibit 1, Baker specifically thanked Hamami for his presence. On another video, Infocom No. 67, Hamami was seen at a school construction site thanking Baker, El-Mezain, and HLF for their support. This evidence contradicted a sworn declaration from Baker wherein he had denied that he and other HLF board members had any connection with Hamas.

With regard to the Ramallah Zakat Committee, which the PA documents linked to Hamas, both Levitt and Avi also testified that Hamas controlled it.[25]

---

[25] The defendants argue that Avi relied on the improperly admitted PA documents in his testimony. They are incorrect. Although Avi was questioned about the PA documents, he indicated that he had reviewed "many reports" about the Ramallah Zakat Committee. He also

No. 09-10560

Furthermore, the 1991 Elbarasse No. 22 letter to Baker, and statements at the Philadelphia meeting in 1993, also indicated that Hamas controlled the zakat committee. The letter stated that "all of [Ramallah] is ours," while Shabib stated at the Philadelphia meeting, "We could say that the zakat committee is ours, including its management and officers." Evidence seized from HLF included a letter from Baker addressed to the Ramallah Zakat Committee's director, Dr. Mahmoud Al-Rumhi, whose name and telephone number also appeared along with several other people identified as Hamas members on a list seized from Elbarrasse's home. Elbarasse Search 24. The UASR journal found in HLF's records identified still another member of the Ramallah Zakat Committee, Mahmoud Mosleh, as having been arrested by the PA along with several leaders of Hamas.[26] Similarly, the book about Hamas found in Odeh's office also identified Ramallah Zakat Committee member Fadel Saleh Hamdan as one of the ranking Hamas members who had previously been arrested.

In light of the above evidence, Shorbagi's testimony and the PA documents were cumulative of a large amount of evidence connecting Hamas to both HLF and the zakat committees. We acknowledge that during questioning and in its closing argument the Government highlighted some of the evidence that we have found to be erroneously admitted, but we believe that the other evidence was "formidable." *United States v. Steinkoenig*, 487 F.2d 225, 229 (5th Cir. 1973).

said that the PA documents were "additional to my analysis."

[26] Mosleh also appeared in a video seized from HLF where a young boy in kindergarten is interviewed at an HLF-sponsored event. The boy is questioned about the death of his father, and Mosleh prompts him to answer. The boy is told not to forget when he grows up that his father was killed by the Jews. Multiple video recordings were also seized from the zakat committees and introduced at trial showing kindergarten ceremonies where children pretended to be suicide bombers and sang songs praising Hamas. These videos were consistent with testimony from Levitt and Avi about Hamas's social wing and its indoctrination of children. The presence of these videos at the zakat committees and the participation of committee members like Mosleh in the ceremonies is further evidence of Hamas influence over the purportedly charitable zakat committees.

No. 09-10560

Rather than be left with grave doubt about the verdict, we conclude that the weight and cumulative nature of the other evidence at trial precludes a finding that the errors complained of had a substantial influence on the jury. *See Kotteakos*, 328 U.S. at 765.

### 2. Cumulative error

For similar reasons, we also reject the defendants' argument that the trial errors constituted cumulative error. "[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). On claims of cumulative error, we "review the record as a whole to determine whether the errors more likely than not caused a suspect verdict." *Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir. 1992) (en banc). To be sure, this was not a perfect trial, and there were errors, as we have discussed. However, the Constitution does not guarantee a perfect trial, only one that it is fair. *See United States v. Lane*, 474 U.S. 438, 445 (1986). We are convinced from our review of the record that the defendants received a fair trial. The defendants' claim of cumulative error therefore fails.

### H. Jury charge

Defendant Abdulqader next challenges the district court's jury charge on the First Amendment.[27]    The Government's evidence against Abdulqader included approximately one dozen video recordings of his participation in

---

[27] Defendants Baker, El-Mezain, and Odeh have adopted the First Amendment argument in Abdulqader's brief. We conclude, however, that the issue is inadequately briefed as to them, and thus waived, because the brief discusses only Abdulqader's purportedly protected speech. *See United States v. Caldwell*, 302 F.3d 399, 421 n.19 (5th Cir. 2002) (refusing to consider issue as inadequately briefed where defendant provided no analysis); *cf. United States v. Solis*, 299 F.3d 420, 458 n.140 (5th Cir. 2002) (holding defendant's attempt to adopt by reference co-defendant's sentencing guidelines issue insufficient where issue was fact-specific).

musical and dramatic performances that referenced Hamas and contained Islamic or anti-Israel themes.  The performances occurred at various fund-raising events that HLF sponsored.  The Government's theory at trial was that one of Abdulqader's roles in the conspiracy was to motivate audiences to contribute funds to HLF by performing pro-Hamas songs and skits.  Most of the performances occurred before Hamas was designated as a terrorist organization, but three were recorded after the designation.  The recordings before the designation tended to be obvious in their support of Hamas, expressly referring to both Hamas and killing Israelis.  The recordings made after the designation were less overt in their support, and the Government argued to the jury that the defendants made this change intentionally in order to avoid directly showing support for a terrorist organization.  Abdulqader contends on appeal that his speech in the video recordings was protected under the First Amendment, and that the district court's jury charge misstated the law and allowed the jury to convict him based solely on protected speech or association.

"Because '[d]istrict courts enjoy substantial latitude in formulating a jury charge,' we review 'all challenges to, and refusals to give, jury instructions for abuse of discretion.'" *United States v. Davis*, 609 F.3d 663, 689 (5th Cir. 2010) (alteration in original) (citation omitted).  "We review a defendant's objection to the jury instruction by assessing whether the district court's charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Conner*, 537 F.3d 480, 486 (5th Cir. 2008).  We conclude that the charge, when read as a whole, properly guided the jury and correctly stated the law as it was to be applied to the facts of the case.

Abdulqader was charged with, *inter alia,* conspiracy to violate 18 U.S.C. § 2339B, which prohibits knowingly providing material support or resources to

a foreign terrorist organization.[28]  The statute also provides: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." § 2339(B)(i).  The district court read both § 2339(B)(i) and the text of the First Amendment[29] in its jury charge.  It then instructed the jury as follows:

> This amendment guarantees to all persons in the United States the right to freedom of speech, freedom of religion, and freedom of association.  Because of these constitutional guarantees, no one can be convicted of a crime simply on the basis of his beliefs, his expression of those beliefs, or his associations.  The First Amendment, however, does not provide a defense to a criminal charge simply because a person uses his associations, beliefs, or words to carry out an illegal activity.  *Stated another way, if a defendant's speech, expression, or associations were made with the intent to willfully provide funds, goods, or services to or for the benefit of Hamas, or to knowingly provide material support or resources to Hamas, as described in the indictment, then the First Amendment would not provide a defense to that conduct.*

(Emphasis added).

As he did in the district court, Abdulqader argues that the last sentence emphasized above incorrectly stated the law because, although speech may be used to establish a defendant's intent, the charge instructed that a defendant's speech, expression, or association are themselves crimes, provided that the defendant made them intending to provide support to Hamas.  Abdulqader asserts that most of his speech on the video recordings in evidence was protected and non-criminal because it pre-dated Hamas's designation as a terrorist

---

[28] The statute provides, in relevant part: "Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both . . . ."  18 U.S.C. § 2339B(a)(1).

[29] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

organization.  He further asserts that the speech on the few tapes that post-dated the designation was not criminal because it did not incite imminent lawless action.  *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (holding that the First Amendment does not protect speech that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action").

It is well established under First Amendment principles that there is no prohibition on "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see also United States v. Salameh*, 152 F.3d 88, 111–12 (2d Cir. 1998).  In addition, speech itself may be criminal under certain circumstances.  As relevant to the case at bar, for example, the Supreme Court recently upheld § 2339B in an as applied First Amendment challenge, holding that Congress could criminalize speech that provides material support to designated terrorists.  *See  Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2724 (2010) (stating that Congress could "prohibit what plaintiffs want to do—provide material support to [the designated terrorist organizations] in the form of speech").  The Court held that § 2339B is not limited to prohibiting monetary support of terrorists, and the statute is tailored to reach only material support "coordinated with or under the direction of a designated foreign terrorist organization."  *Id.* at 2726.

We recognize that the pre-1995 video recordings of Abdulqader's speech could not themselves be criminal under *Humanitarian Law Project* because it was not illegal at that time to support Hamas.[30]  Assuming *arguendo* that the language of the jury charge emphasized above could in isolation be read to allow the jury to consider that speech to be criminal, we conclude that the charge as

---

[30] As noted above, Hamas was designated as a specially designated terrorist organization in January 1995, and it was designated as a foreign terrorist organization in October 1997.

a whole did not permit the jury to convict Abdulqader based on protected speech. *See United States v. Klington*, 875 F.2d 1091, 1098 (5th Cir. 1989) ("[T]he presence of an imprecise or misleading statement within the jury instruction does not by itself entitle defendants to a reversal.").

First, the district court correctly charged the jury on the elements of the offense. *See id.* ("Reversible error exists only if the jury charge, considered as a whole, misled the jury as to the elements of the offense."). The court charged the jury that in order to convict the defendants, it had to find that (1) "two or more persons agreed to provide material support" to Hamas, (2) the defendant "knowingly became a member of the conspiracy with the intent to further its unlawful purpose," (3) "one of the conspirators knowingly committed at least one overt act," and (4) the conspiracy "existed on or after October 8, 1997" and the defendant "was a member of the conspiracy on or after that date." The defendants do not challenge this part of the charge, which accurately set the parameters for a conviction, including the existence of a conspiracy *after* Hamas was designated as a terrorist organization.

Second, the First Amendment portion of the charge specifically instructed the jury that the defendants could not be convicted "simply on the basis of his beliefs, [or] his expression of those beliefs." If we assume the jury followed its instructions, as we must, the jury would not have convicted Abdulqader of conspiracy for his pre-1995 conduct because it knew that Hamas had not been designated as a terrorist organization. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993) ("[J]uries are presumed to follow their instructions.") (internal quotation marks and citation omitted); *Davis*, 609 F.3d at 677.

Moreover, the charge specifically limited the jury's consideration of the defendant's speech to how it pertained to the elements of the offense as alleged in the indictment. The charge stated, in relevant part, that "if a defendant's speech . . . were made with the intent to . . . knowingly provide material support

or resources to Hamas, *as described in the indictment*," the First Amendment did not preclude a conviction. (Emphasis added). The indictment alleged that the § 2339B conspiracy began on or about October 8, 1997, the date that Hamas was designated as a foreign terrorist organization. It then charged as follows:

> In furtherance of the conspiracy, the defendants . . . participated in fundraising events at various forums, including conventions, services at mosques, seminars and other programs. The HLF sponsored speakers at these events whose mission was to raise funds for the HLF. ***Prior to the designation of HAMAS as a Foreign Terrorist Organization***, the speakers sponsored by the HLF often praised the efforts of HAMAS and its violent activities against Israel, and encouraged financial support for those efforts. ***After HAMAS' designation***, upon instruction by the HLF, the speakers changed tactics by using inflammatory language which was designed to support HAMAS and its violent activities without openly mentioning HAMAS. Some of the speakers sponsored by the HLF included founding HAMAS leaders, prominent HAMAS spokesmen and other speakers belonging to the Muslim Brotherhood. Furthermore, at some of the fund-raising events, the speakers, ***including the defendant Mufid Abdulqader***, performed skits and songs which advocated the destruction of the State of Israel and glorified the killing of Jewish people.

(Emphasis added).

The indictment thus described the kind of performances in which Abdulqader appeared and charged that the performances occurred at gatherings with the intent to raise money for HLF. It further described how the performances changed tactically after Hamas was designated as a terrorist organization, which is when the unlawful conspiracy began. The language in the First Amendment section of the charge cabined the jury's consideration of the speech to those circumstances. It thus directed consideration of the speech in the context of motive or intent. *See Mitchell*, 508 U.S. at 489.

*As a whole*, the charge provided that the First Amendment was not a defense to speech that was made with the intent to support Hamas in the

manner described in the indictment. The indictment included the change in tone after Hamas's designation in order to conceal a course of conduct that became criminal after the designation. In other words, Abdulqader's speech may have been protected prior to Hamas's designation as a terrorist organization, but it became relevant to proving whether he joined the conspiracy that began after the designation. By instructing the jury to consider the intent of the speech as alleged in the indictment, the charge merely permitted the jury to determine whether the Government's theory of the case was correct and did not permit conviction based solely on speech.

Finally, our conclusion that the district court's charge properly guided the jury's application of the law to the facts is supported by the way in which the Government argued its case to the jury in closing argument. The Government argued in closing that the video recordings of Abdulqader were evidence of his efforts to aid the fundraising for Hamas and were also evidence of how the defendants changed their fundraising message after Hamas's designation as a terrorist organization. Referring to the videos, the prosecutor stated:

> That person that Mufid Abdulqader pretended to kill wasn't dressed as an Israeli soldier. He was dressed as a civilian in a suit. And this is the message that they were sending, the Palestine Committee and the Holy Land Foundation was sending out to its audience before they toned it down after the Oslo Accords.

The Government then emphasized that the speech should be used in conjunction with determining the defendants' intent:

> Now, the Defense attorneys have talked about, and I am sure they are going to talk about this again with you, freedom of speech. And freedom of speech is an incredible right that we have here in the United States. But the Defendants aren't charged with what they said. They are charged for what they did, and that is sending money to Hamas.

* * * *

They are perfectly right to say, "I support Hamas." But when they start giving money to Hamas, then what they said can and will be used against them to determine their intent.

In sum, the court's charge on the First Amendment may not be read in a vacuum. The district court's charge on the elements of the offense, in conjunction with its express directive that speech alone cannot support a conviction and its limitation that the speech must be considered in relation to the indictment, rendered the charge a correct statement of the law to be applied to the issues confronting the jury.[31] The First Amendment challenge to the jury charge is therefore denied.[32]

### I. The search of HLF's offices

The defendants challenge on Fourth Amendment grounds the Government's seizure of property from HLF's offices without a warrant. The Treasury Department, through OFAC, seized the property immediately after designating HLF as a terrorist organization and issuing a blocking order pursuant to IEEPA. *See* 50 U.S.C. § 1702(a)(1)(B). The FBI later obtained a warrant from a magistrate judge to search the property. The defendants moved to suppress the evidence found in that subsequent search because OFAC lacked a warrant at the time of the initial seizure.

The district court denied the motion, holding that the search and seizure were permissible under an exception analogous to administrative searches of

---

[31] Abdulqader also argues that the Government introduced "certain associational evidence" concerning his familial relationship to Hamas leaders, and he asserts that being related to a terrorist leader is not a crime. We see nothing in the district court's jury charge, however, that instructed the jury it could consider familial relationships in its determination of guilt.

[32] An amicus brief filed by a diverse group of organizations challenges the district court's jury charge on the substantive violations of § 2339B based on the Fifth Amendment's Due Process Clause. Because none of the defendants has raised this issue, we agree with the Government that it is not properly before us. *See United States v. McMillan*, 600 F.3d 434, 455 n.68 (5th Cir. 2010).

closely regulated industries. The court further reasoned that the good faith exception to the exclusionary rule also precluded suppression because OFAC reasonably relied on IEEPA when it initially seized HLF's property, and the FBI reasonably relied on the warrant issued by the magistrate judge.

We hold that the district court correctly denied the suppression motion but for different reasons. The defendants do not challenge the blocking order under the Fourth Amendment. As we will explain, we conclude that the defendants' privacy interests were greatly reduced by the unchallenged blocking order, that the Government had a strong special need to act quickly to prevent asset flight, and that the Government's movement of HLF's property into storage until obtaining a warrant was a minimal intrusion into the defendants' diminished privacy interests. Under these circumstances, the Government's conduct did not violate the Fourth Amendment.

On appeal of a motion to suppress, "the district court's findings of facts are reviewed for clear error, viewing the evidence in the light most favorable to the government. The district court's conclusions of law are reviewed *de novo*." *United States v. Hernandez*, 647 F.3d 216, 218 (5th Cir. 2011) (internal quotation marks and citation omitted). We view the facts underlying the suppression decision in the light most favorable to the Government as the prevailing party. *United States v. Howard*, 106 F.3d 70, 73 (5th Cir. 1997). We may affirm the district court's ruling on any ground supported by the record. *Hernandez*, 647 F.3d at 218. The Government bears the burden of showing that a warrantless search or seizure was valid. *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007).

In this case OFAC initially acted under IEEPA and the blocking order to secure HLF's property. Pursuant to IEEPA, the President is authorized to declare a national emergency "to deal with any unusual and extraordinary threat" to the United States originating in substantial part in a foreign state.

No. 09-10560

*See* 50 U.S.C. § 1701(a). The President is empowered to "investigate, regulate, or prohibit" transactions in foreign exchange, banking transfers, and importing or exporting currency or securities. § 1702(a)(1)(A). In addition, the President may

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

§ 1702(a)(1)(B). The President is also authorized to issue necessary regulations to further IEEPA's purpose, which the President has delegated to the Treasury Department. *See* § 1704. OFAC is the office that is principally responsible for administering the Government's orders and regulations under IEEPA.

As relevant to this case, and as noted above, in 1995 the President issued Executive Order 12947 under IEEPA designating, *inter alia*, Hamas as a SDT. *See* 60 Fed. Reg. 5079 (Jan. 23, 1995). In 2001, in response to the terrorist attacks of September 11, the President issued Executive Order 13224 recognizing a continued threat to the national security, foreign policy, and economy of the United States and declaring a national emergency to deal with that threat. *See* 66 Fed. Reg. 49079 (Sept. 23, 2001). The Executive Order also found "that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists." *Id*. The Executive Order designated various individuals and organizations as specially designated global terrorists ("SDGTs").[33] It further provided for the

---

[33] The initial list of SDGTs has since been amended to include Hamas.

designation of additional SDGTs if organizations or persons are found to "act for or on behalf of" or are "owned or controlled by" designated terrorists, or if they "assist in, sponsor, or provide . . . support for," or are "otherwise associated" with them. *See id.* The Executive Order thereby authorized the Government to freeze or block the assets of organizations or persons that supported or were associated with designated terrorists.

The ramifications of being named a SDT subject to a blocking order are significant. Once assets have been blocked, they no longer may be used unless OFAC issues a license authorizing the SDT to engage in transactions involving the blocked assets. *See* 31 C.F.R. § 501.801. As cogently described by the Ninth Circuit, "[b]y design, a designation by OFAC completely shutters all domestic operations of an entity. All assets are frozen. No person or organization may conduct any business whatsoever with the entity, other than a very narrow category of actions such as legal defense." *Al Haramain Islamic Found. v. U.S. Dep't of the Treasury*, __ F.3d __, No. 10-35032, 2011 WL 4424934, at *10 (9th Cir. Sep. 23, 2011). A party subject to a designation may seek administrative reconsideration and limited judicial relief, but the "designation is indefinite" and the limited remedies "take considerable time." *Id.*; *see also* 31 C.F.R. § 501.807.

The Treasury Department designated HLF as a SDT and a SDGT on December 3, 2001. On the same day, OFAC issued a blocking notice to HLF stating in relevant part:

> [A]ll real and personal property of [HLF], including but not limited to all offices, furnishings, equipment and vehicles, as well as funds and accounts in which [HLF] has any interest, are blocked. All assets of [HLF], including but not limited to bank, charge and investment accounts, securities, and safe deposit boxes at any financial institution located in the United States or organized under the laws of the United States, including their overseas branches, are blocked. Blocked property may not be transferred, withdrawn, exported, paid, or otherwise dealt in without prior authorization from OFAC.

No. 09-10560

> All transactions involving property in which [HLF] has any interest, including any property of third parties in the possession or control of [HLF], are prohibited without specific authorization from OFAC. As a consequence of this action, activities in, use of, and occupation of [HLF] offices, including this facility and each [HLF] office subject to United States jurisdiction, are hereby prohibited. . . . No property may be removed from the premises other than property that is clearly the personal property of the individual requesting to remove the property from the premises. Persons who are unable to remove their personal belongings at this time must contact OFAC in writing . . . to make arrangements to secure their belongings at a later date. . . . Requests for specific licenses for payment of outstanding financial obligations owed by [HLF], such as salary, rent and utility payments, among others, must also be made in writing[.]

The notice also advised that if HLF wished to seek a license to engage in any transaction involving blocked property, or to challenge the designation as a SDGT, it should refer to specified regulations for the proper procedure.

In order to effectuate the blocking notice, OFAC personnel, accompanied by federal officers, went the next day (December 4, 2001) to the HLF offices in Richardson, Texas; Bridgeview, Illinois; San Diego, California; and Paterson, New Jersey. OFAC served the notices at each location on HLF representatives, who signed the notices and permitted entry into the offices. In Richardson, Defendant Baker signed the notice but initially denied permission to enter. Two hours later, after consulting with counsel and after a televised public announcement revealing HLF's designation, Baker allowed OFAC into the office. Defendant El-Mezain similarly permitted entry into the San Diego office after consulting with counsel. The record shows that at each location independent contractors acting on behalf of OFAC took possession of HLF's assets and moved them to storage. There is no indication that anyone from OFAC or the FBI examined the property at that time.

On appeal, the defendants contend that OFAC's warrantless entry into the HLF offices was unconstitutional because nothing in IEEPA allowed the

No. 09-10560

Government to enter private property to effectuate a seizure or search. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. The Supreme Court has recognized that the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* A "search," on the other hand, "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Id.* The defendants argue, consistent with these principles, that the Government's entry into the HLF offices interfered with HLF's possessory interests and infringed the privacy of HLF and its employees.

The Government responds, in part, that a warrant is not required before OFAC issues a blocking order under IEEPA. We need not resolve that question, however, because the defendants do not challenge under the Fourth Amendment OFAC's issuance of the blocking order, the scope of the order, or OFAC's ability to issue such an order without a warrant. *But see Al Haramain*, 2011 WL 4424934, at *20–25 (holding that a warrant was required before OFAC issued a blocking order under IEEPA, and the Government failed to show the applicability of an exception to the warrant requirement). We therefore presume that the blocking order was properly issued.

Because the defendants do not challenge the blocking order, OFAC's implementation of it must be assessed by comparing the order's effect on the defendants' privacy interests with any special needs of the Government under IEEPA. We think this balancing of interest does not support suppression of the evidence in this case.

106

"Warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002) (internal quotation marks and citation omitted). The Government contends here that the "special needs" exception to the warrant requirement justified the search and seizure. *See, e.g., Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (recognizing that a warrantless search may be justified "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable") (internal quotation marks and citation omitted). The Supreme Court has applied the special needs exception in a variety of circumstances when the Government performs functions beyond typical law enforcement or crime control and when the intrusion into the privacy interest at stake is minimal. *See, e.g., Illinois v. Lidster*, 540 U.S. 419, 427–28 (2004) (holding that a warrantless highway checkpoint to investigate fatal hit-and-run accident was valid where "stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect"); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 451 (1990) (upholding sobriety checkpoints where intrusion was "slight"); *O'Connor v. Ortega*, 480 U.S. 709, 725 (1987) (plurality) (permitting warrantless searches of government employee's work area for work-related purposes where employee's privacy interests in office "are far less than those found at home or in some other contexts"); *United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976) (upholding warrantless fixed Border Patrol checkpoint where stop caused "minor interference" with Fourth Amendment interests).

In *Al Haramain*, the Ninth Circuit held that the special needs exception did not apply in the context of the Government's issuance of a blocking order under IEEPA. The court noted that "[t]he exception requires a weighing of the nature and extent of the privacy interest at hand against the nature and immediacy of the government's concerns and the efficacy of the procedures

employed in meeting those concerns." *Al Haramain*, 2011 WL 4424934, at *20 (citing *Bd. of Educ. v. Earls*, 536 U.S. 822, 830–34 (2002)). The court there concluded that the private entity had a substantial privacy interest that was severely restricted by the blocking order because the order effectively shut down all business operations indefinitely, and that the Government failed to show why a warrant should not be required when balanced against that interest. *Id.* at *22–23.

We agree with the Ninth Circuit's assessment of the debilitating effect of a blocking order, but because the defendants have not challenged the order in this case, our analysis begins at a different point than *Al Haramain*, and the applicable balancing of interests yields a different result. Here, the unchallenged blocking order gave the Government complete control over both HLF's assets and the premises and reduced the defendants' interests to a minimum. As the Ninth Circuit recognized in *Al Haramain*, the significant effects of a blocking order are "*by design.*" *Id.* at * 22 ("[T]here is no limited scope or scale to the effect of the blocking order."). Indeed, a "designation [as a SDT] is not a mere inconvenience or burden on certain property interests; designation indefinitely renders a domestic organization financially defunct." *Id.* at *10. Further, "[a] blocking order effectively shuts down the private entity." *Id.* at *22.

The text of the blocking order in this case demonstrates the Government's control and the virtual elimination of any possessory and privacy interests held by the defendants in the assets and premises of HLF. The blocking order expressly directed all persons to leave the offices. It prohibited the defendants from engaging in any activity involving HLF's property, and it even prohibited the defendants from occupying the premises without OFAC's prior authorization. The warrantless imposition of these conditions has not been contested here. Unlike in *Al Haramain*, we are therefore faced with a presumptively valid order

that stripped the defendants of any possessory interests in the HLF offices and assets. Any remaining privacy interest that the defendants had was minimal, and, as we discuss below, was protected by the subsequent warrant obtained prior to the Government's search.

Balanced against the defendants' significantly diminished privacy interests is the Government's "extremely high" interest in preventing actions that could facilitate terrorism. *Al Haramain*, 2011 WL 4424934, at *23. An important purpose of a blocking order is to prevent asset flight, which was a genuine concern in this case. The evidence here showed that the defendants had been funneling millions of dollars to organizations associated with Hamas. They were capable of quickly transferring large sums of money by wire transfer to overseas bank accounts controlled by HLF and others. These accounts were in locations such as the West Bank and Gaza, where they were likely to be beyond the reach of a judicial warrant. The Government therefore had a strong interest in moving quickly to prevent the flight of assets that could be used to further terrorist activity. *See id.* at *23 (recognizing that "'asset flight' is a legitimate concern").

In addition to considering the competing interests of the defendants and the Government, we also consider the nature of the Government's intrusion into the defendants' interests. We address here an uncontested blocking order that has comprehensively restricted the defendants' privacy and possessory interests. Viewed objectively, therefore, we believe that the Government's mere transfer of HLF's property from the offices to a storage facility pursuant to the blocking order, without invading the contents of the material, did not intrude into the defendant's privacy or possessory rights any more than was reasonable under the initial blocking order. *See Jacobsen*, 466 U.S. at 115 ("The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred.").

No. 09-10560

We stress the importance of the fact that the Government took custody of the property without searching it and secured it to prevent unauthorized use, loss, or destruction. As we have said, the Government was already permitted by IEEPA and the blocking order to control the property and the premises, and its transfer of the assets to storage did not further circumscribe the defendants' interests. Had the Government actually examined the property before obtaining a warrant, this might be a different case.[34]

Furthermore, to the extent that the defendants retained any privacy interests in the materials seized by the Government, those interests were adequately protected by the warrant obtained before the Government actually searched the materials. That warrant separated the search of HLF's property from the initial seizure, which we think adds to the overall reasonableness of the Government's action and of the district court's denial of the defendants' suppression motion. The warrant affidavit submitted to the magistrate judge did not rely on, or refer to, evidence seized by OFAC from the HLF offices as a

_____

[34] Relying on *G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977), the defendants argue that merely because the Government has the power to block its assets does not mean that it may enter private property to seize the assets. In *G.M. Leasing*, the Supreme Court held that the Government's power to levy taxes and to seize property in satisfaction of tax liens did not give the Government power to enter private property without a warrant to seize the property. *Id.* at 354. The circumstances of the instant case are distinguishable. *G.M. Leasing* concerned "the normal enforcement of the tax laws." *Id.* The instant case, however, goes beyond the pale of normal law enforcement because IEEPA and the seizure here were designed to prevent the movement of assets that could be used to facilitate terrorist activity and came after a Presidential declaration of a national emergency. *See, e.g., Humanitarian Law Project*, 130 S. Ct. at 2724 ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order."); *Cassidy v. Chertoff*, 471 F.3d 67, 87 (2d Cir. 2006) (Sotomayor, J.) (upholding warrantless searches designed "to protect ferry passengers and crew from terrorist acts"); *MacWade v. Kelly*, 460 F.3d 260, 270–75 (2d Cir. 2006) (holding constitutional suspicionless searches of passenger baggage on subway to prevent terrorist attack); *In re Sealed Case*, 310 F.3d 717, 746 (FISA Ct. Rev. 2002) (finding in context of FISA that the "nature of the 'emergency,' which is simply another word for threat, takes the matter out of the realm of ordinary crime control"). Moreover, the blocking order in this case, unlike the tax liens in *G.M. Leasing*, restricted the defendants' privacy rights in their premises. We find *G.M. Leasing* to be inapposite.

basis for probable cause to search. The warrant affidavit stated only that the investigating officer had reviewed an inventory from the initial seizure and noted that various materials had been seized, such as "desks, files, books, binders, computers, telephones, fax machines, miscellaneous documents, and other items that HLF used to facilitate its activities." Nothing in the record suggests that the investigating officer misled the magistrate judge when applying for the warrant, and we believe the Government properly relied on the warrant for purposes of the search. *See, e.g., United States v. Leon*, 468 U.S. 897, 922–23 (1984); *United States v. Sibley*, 448 F.3d 754, 757 (5th Cir. 2006) (police may not rely on a warrant if the affiant misled the magistrate judge with information he knew was false); *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997) ("'evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible'") (citation omitted).

In sum, the Government's broad control over the defendants' premises and property afforded by the blocking order and IEEPA—control which has not been challenged by the defendants—greatly reduced the defendants' possessory and privacy interests. In light of the Government's strong interest in combating terrorism, and the minimal intrusion here to the defendants' diminished interests, we conclude that the Government's movement of HLF's property from the HLF offices into a storage facility until it obtained a judicial warrant to search the materials did not infringe the defendants' Fourth Amendment rights. We therefore affirm the district court's denial of the suppression motion.

**J. Defendant Elashi's double jeopardy issue**

We next address a double jeopardy claim by Defendant Elashi, who argues that his conspiracy convictions in the instant case violate the Double Jeopardy Clause of the Fifth Amendment because he was convicted of conspiracy in a separate case in 2006. In the 2006 case, Elashi was convicted in the Northern

No. 09-10560

District of Texas for, *inter alia*, conspiracy to deal in property of a specially designated terrorist, in violation of IEEPA, 50 U.S.C. §§ 1701–1707, and Executive Order 12947; substantive violations of that prohibition; and conspiracy and substantive money laundering offenses related to the SDT violations. *See United States v. Elashyi*, 554 F.3d 480, 491 & n.3 (5th Cir. 2008). The defendants in that case were Elashi; four of Elashi's brothers; his cousin, Nadia Elashi; Nadia's husband, Mousa Abu Marzook; and Elashi's Texas-based computer company, Infocom Corporation.

Elashi's 2006 conviction stemmed from financial transactions between Marzook and Infocom. In the early 1990s, Marzook made investments in Infocom of several hundred thousand dollars that were designated as loans, and he received interest payments in return. *See id.* at 490. Infocom later changed its books to reflect that the loans came from Nadia, and interest payments were made to her but deposited in Nadia and Marzook's joint bank account. *Id.* After Marzook was identified in a newspaper article as a Hamas leader, Infocom recorded a $50,000 check from Marzook as a loan from Nadia. Marzook was subsequently arrested while trying to enter the United States in July 1995, and he was designated as a SDT in August 1995. Thereafter, the interest payments to Nadia and Marzook's joint account stopped for a while but then resumed as deposits in an account solely in Nadia's name. *Id.* at 491. The payments continued until 2001 when OFAC issued a blocking order instructing Infocom to freeze funds in which OFAC determined that Marzook had an interest. *Id.*

Elashi argues in the instant appeal that his convictions in this case for conspiracy to provide material support to Hamas (count 1), conspiracy to violate IEEPA (count 11), and conspiracy to commit money laundering (count 22) violate the Double Jeopardy Clause because the conspiracies substantially overlap with his conspiracy convictions from the 2006 case. Whether a prosecution violates

the Double Jeopardy Clause is a question of law that we review *de novo*. *United States v. Delgado*, 256 F.3d 264, 270 (5th Cir. 2001).

The Fifth Amendment's Double Jeopardy Clause "protects against a second prosecution for the same offense after conviction." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (internal quotation marks and citation omitted); *United States v. Levy*, 803 F.2d 1390, 1393 (5th Cir. 1986). In a conspiracy case, the central issue for double jeopardy purposes is whether there was one agreement and one conspiracy or more than one agreement and more than one conspiracy. *United States v. Rabhan*, 628 F.3d 200, 204 (5th Cir. 2010).

"The defendant carries the initial burden of establishing 'a prima facie nonfrivolous double jeopardy claim' that the two conspiracies charged are in fact a single conspiracy and therefore charge a single offense." *Id.* (citation omitted). "If a defendant comes forward with a prima facie nonfrivolous double jeopardy claim, then the burden of establishing that the indictments charge separate crimes is on the government." *Delgado*, 256 F.3d at 270. "To determine whether the alleged conspirators entered into more than one agreement, we evaluate five factors: 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offense charged that indicates the nature and scope of the activity that the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place." *Id.* at 272. Because no single factor is determinative, we must consider all of them. *Id.*

### 1. Time

The time period for the conspiracies charged in the 2006 case (August 1995 to July 2001) was wholly contained within the time period charged in the instant case for the IEEPA and money laundering conspiracies (January 1995 to July 2004) and the material support conspiracy (October 1997 to July 2004). "An overlap in time periods between two alleged conspiracies favors a finding of a

No. 09-10560

single conspiracy, especially when that overlap is substantial." *Rabhan*, 628 F.3d at 205 (finding that an overlap of twenty-one months was substantial and favored a finding of a single conspiracy). The overlap of nearly four and six years in the two cases is substantial and favors a finding of a single conspiracy.

### 2. Co-conspirators

In the 2006 case, Elashi was charged with conspiring with his brothers, his cousin Nadia, Marzook, and Infocom. Those co-conspirators were also named as co-conspirators in the instant case. The Government concedes the overlap but argues that the instant case involves many more conspirators, and that the common co-conspirators played different roles in the conspiracies.

An overlap in personnel participating in conspiracies tends to indicate a single conspiracy. *Id.* at 205. Nevertheless, we agree with the Government that the key co-conspirators—most notably the co-defendants, Baker, El-Mezain, Abdulqader, Odeh, and the corporation, HLF—did not participate in Elashi's first conspiracy. The nature of the overlapping co-conspirators' participation is relevant to finding a single conspiracy, especially when the co-conspirators are the "central characters," *Levy*, 803 F.2d at 1395, or the "key personnel" in both cases. *Rabhan*, 628 F.3d at 205. If the central figures of the cases are different, or if they serve different functions for purposes of the conspiracies, it is less likely that there is a single agreement. *See United States v. Guzman*, 852 F.2d 1117, 1120–21 (9th Cir. 1988) (finding that "the roles performed by Guzman and Serrano in the two conspiracies were quite different" and therefore "do[] not compel a finding that a single conspiracy existed").

In the first case, the central characters were Infocom, Nadia Elashi, and Marzook insofar as the conspiracy involved payments from Infocom to Nadia in which the real party in interest was Marzook. Elashi was implicated in the conspiracy in his role at Infocom. Marzook was the designated terrorist whose property made the defendants' actions illegal. In the instant case, the key

114

characters in the conspiracy were those connected to HLF who were involved in raising donations in support of Hamas. Elashi was implicated in the conspiracy for his role as an HLF founder and officer, and Hamas was the designated terrorist. In the 2006 case, there were a limited number of participants in the conspiracy and the purpose of the agreement was confined to dealing in the property of Marzook, whereas the instant conspiracy involved different key participants with the much broader purpose of aiding all of Hamas through HLF. The central characters of the conspiracy in this case are not the same as those in the 2006 case. *See Rabhan*, 628 F.3d at 207 ("[T]he overlap of central characters" is "more important than the number of overlapping characters."). We conclude that the presence of some overlap in co-conspirators does not weigh in favor of finding a single conspiracy.

### 3. Statutory offenses

Next, in both prosecutions Elashi was charged with money laundering offenses in violation of 18 U.S.C. § 1956. He was also charged in both cases with conspiracy to violate IEEPA. The Government contends that the IEEPA conspiracies were different because the indictment in the 2006 case charged a general conspiracy under 18 U.S.C. § 371,[35] while the IEEPA conspiracy in the instant case was charged under IEEPA's specific conspiracy provision in 50 U.S.C. § 1705. We agree with Elashi, however, that the IEEPA conspiracy in the instant case necessarily relied on the general conspiracy statute of § 371 because the specific IEEPA conspiracy provision of § 1705 did not become effective until 2007, after the indictment was returned in this case. *See* Pub. L. No. 110-96, § 2(a), 121 Stat. 1011, 1011 (Oct. 16, 2007).

---

[35] "If two or more persons conspire . . . to commit any offense against the United States . . . or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371.

No. 09-10560

The Government nevertheless argues that there were two conspiracies because the instant case also charged Elashi with conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, which was not an offense charged in the 2006 case. "Additional charges in one case may still lead to a finding that there is only one conspiracy, particularly when 'the statutes that do not overlap are related.'" *Rabhan*, 628 F.3d at 207 (quoting *Levy*, 803 F.2d at 1392). The conspiracies charged under IEEPA, 50 U.S.C. § 1705, and the material support statute, 18 U.S.C. § 2339B, are related insofar as they both prohibit support for designated terrorist organizations. The statutory offenses charged in both the instant case and the 2006 case are therefore the same or similar.

While this would militate toward finding a single conspiracy, we must be mindful that "[i]t is possible to have two different conspiracies to commit exactly the same type of crime." *United States v. Thomas*, 759 F.2d 659, 666 (8th Cir. 1985). We think that is the case here. Elashi was essentially charged in both cases with two similar crimes of aiding a designated terrorist, but the designated terrorist and the purpose of each offense were not the same. *See Guzman*, 852 F.2d at 1121 (finding two separate conspiracies despite identical statutory charges where "[t]he goals of the two conspiracies . . . were not identical"); *see also United States v. Coscarelli*, No. 98-21120, 2000 WL 284044, at *3 (5th Cir. 2000) ("[W]here the second conspiracy has a different goal than the first, a second prosecution is *not* barred by double jeopardy.").

The 2006 conspiracy involved Marzook as the designated terrorist, and the goal of the conspiracy was to make payments to him from Infocom as a result of his investment in the company. The payments varied in amount between $1,000 and $15,000. *Elashyi*, 554 F.3d at 490. In the instant case, the designated terrorist was Hamas, and the goal was to provide material support for Hamas by raising funds through HLF's charitable network and by funneling money to

Hamas organizations, like the zakat committees. The jury found that as a result of the conspiracy the defendants provided approximately $12.4 million in support of Hamas. To be sure, Marzook was present in both cases, and evidence of Elashi's transactions in the 2006 case also served as evidence of his intent in the instant case. However, Elashi was convicted of dealing in the property of Marzook in the 2006 case, while he was convicted of the offense of providing support for Hamas in the instant case. We conclude that because the goals of the two offenses differed, the similarity in statutory charges does not compel a finding that there was a single conspiracy.

### 4. Overt acts

Elashi concedes that the overt acts charged in the two cases were different, but he argues that a single conspiracy may be found because the overt acts in both cases span similar time periods and are similar in character. Although he is correct that a single conspiracy may be found even without overlapping acts, the "nature and scope of the allegedly separate conspiracies" must permit a finding that there was a single objective and a single agreement. *Rabhan*, 628 F.3d at 207 (internal quotation marks and citation omitted). For example, in *Rabhan* we held that there was a single conspiracy even though the Government charged different overt acts because the defendant had engaged in the multiple acts as part of a course of conduct with a single objective. *See id.* at 207–08 (holding that defendant's "overall strategy to form a comprehensive integrated catfish growing and processing operation" showed that the fraudulent loans in both Georgia and Mississippi were interrelated and favored a finding of a single conspiracy); *see also Levy*, 803 F.2d at 1395–96 (finding a single conspiracy where a series of fraudulent loans were obtained in order to hide the fact of another series of fraudulently obtained loans). We disagree with Elashi that the overt acts charged against him in both cases were sufficiently similar in nature to show that there was a single conspiracy.

117

In the 2006 case, the indictment charged Elashi with, *inter alia*, ten separate check and wire transfers from Infocom's bank accounts to bank accounts held in Nadia's name.  In the instant case, the overt acts included specific wire transfers from HLF bank accounts to the seven zakat committees alleged to be operated on behalf, or under the control, of Hamas.  The indictment in this case also charged that funds were wired from HLF bank accounts in Texas to the HLF office in the West Bank and Gaza, and then re-distributed to the zakat committees and to the family members of individuals who had been either "martyred" or jailed for terrorist activities.  As noted above, the objective in the first case was to deal in the property of the specially designated terrorist Marzook because of his investment in Infocom, whereas the agreement in the instant case was to raise funds through HLF and funnel the money to Hamas, a different designated terrorist, in support of Hamas's social wing.  Although Marzook was a Hamas leader, the two conspiracies alleged *direct* benefits to two different designated terrorists.  *Cf. United States v. Cihak*, 137 F.3d 252, 258 (5th Cir. 1998) (finding two separate conspiracies where, *inter alia*, "the overt acts alleged in the two cases are different and . . . the actions of the separate conspiracies alleged in the other case did not advance the conspiracy alleged in this case and vice versa") (internal quotation marks and citation omitted).

Elashi argues that because the same evidence of financial transactions between Infocom and Marzook was introduced at both the first and second trials, the conspiracies were the same.  We are not persuaded.  The evidence was admitted in this case solely to show Elashi's intent or state of mind under Federal Rule of Evidence 404(b), and the district court gave a proper limiting instruction.  *See* FED. R. EVID. 404(b) (Evidence of prior acts is admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."); *cf. United States v. Felix*, 503 U.S. 378, 386

No. 09-10560

(1992) ("[A] mere overlap in proof between two prosecutions does not establish a double jeopardy violation.").

Relying on our decision in *Levy*, Elashi argues that the introduction, under Rule 404(b), of evidence of acts underlying one conspiracy at the trial for a second conspiracy proves the existence of a single conspiracy. This may be true under some circumstances, but Elashi's statement of the law is too broad. *See United States v. Deshaw*, 974 F.2d 667, 675 & n.47 (5th Cir. 1992) (recognizing that evidence may be introduced under Rule 404(b) under circumstances that do not implicate double jeopardy). In *Levy,* 803 F.2d at 1392, the defendants were acquitted in the first trial of conspiracy to misapply funds and to make false statements in connection with loans. They were then prosecuted at a second trial for conspiracy to make false statements to a bank and to defraud the United States and the FDIC. *Id.* Evidence concerning the overt acts underlying the second trial had previously been offered in the first trial. *Id.* at 1395. The transactions involved in the two cases were part of a continuing course of fraudulent conduct and were designed to hide the larger scheme. *See id.* at 1396. For this reason, we held that the Government's prior introduction of the same evidence under Rule 404(b) at the first trial supported a single conspiracy. *Id.* We found that the transactions from both cases "are related" and that "the record reveals that the acts involved in both alleged conspiracies are the same." *Id.*; *see also United States v. Nichols*, 741 F.2d 767, 772 (5th Cir. 1984) (series of nearly identical drug shipments forming basis of three separate conspiracy indictments offered under Rule 404(b) in prosecution for fourth conspiracy to import drugs showed a single conspiracy to commit multiple violations of the drug control law). As explained above, we do not see a similar relationship here indicating a single agreement and a common objective because the transactions in the instant case—wire transfers to zakat committees in support of Hamas's social wing—do not further or advance the conspiracy in the first case to transfer

119

funds to Marzook.  Moreover, the acts involved in both cases were not the same. We conclude that this factor does not support a finding of a single conspiracy.[36]

### 5.  Place

Finally, both conspiracies were alleged to have occurred in the Dallas Division of the Northern District of Texas.  Elashi also points out that the principals of both cases—Infocom and HLF—were located across the street from each other in Richardson, Texas, where all the transactions originated. Although there is a clear overlap of the conspiracies in Texas, the Government argues that the place of the two conspiracies is different because the overt acts in the first case were domestic transfers from Infocom's account to Nadia's account, whereas the instant case is broader geographically and involved international transfers from HLF to the zakat committees in the West Bank. When conspiracies "overlap geographically, it is appropriate to consider where they are based as an indicator of whether the geographic overlap is significant." *Rabhan*, 628 F.3d at 208.  The Government has not shown that the "base of operations" for both conspiracies was anywhere other than Texas, where both corporate entities and most of the defendants were located.  Therefore, the place of decision making in both cases was the same, which militates in favor of finding a single conspiracy.[37]

---

[36] Elashi also asserts that the Government's argument on appeal that there were two conspiracies conflicts with its position in the district court that the transactions from the first case were intrinsic to the instant case.  We disagree.  In response to Elashi's double jeopardy objection and alternative request for a limiting instruction in this case, the Government initially argued to the district court that Rule 404(b) was inapplicable, but it abandoned that position after the district court requested further briefing from the parties.  After further research, the Government agreed in the district court that the defendants were entitled to a limiting instruction.  The Government therefore has not taken an inconsistent position on appeal.

[37] HLF also had offices in New Jersey, Illinois, and California, and defendant Odeh was in the New Jersey office.  The Government has not argued, however, that decisions of HLF came from anywhere other than its headquarters in Texas.

Based on our review of the two cases and our consideration of the five relevant factors, we conclude that the indictments charged separate offenses. The time period, place of the conspiracies, and the statutory charges were the same or similar in the two cases, but the goals of the offenses were not the same. There was also some similarity in the co-conspirators, but the key figures in the conspiracies and the roles of those who overlapped were different. The conspiracies also involved two separately designated terrorists, Marzook and Hamas. The five factors are "for the guidance of the court," and the Government need not "show that each of the factors demonstrates the existence of more than one conspiracy." *United States v. Tammaro*, 636 F.2d 100, 104 (5th Cir. 1981). We conclude that, on balance, there were two separate agreements, and therefore two conspiracies, to achieve different objectives. Elashi's double jeopardy argument is therefore unavailing.[38]

### K.  Defendant El-Mezain's collateal estoppel issue

Defendant El-Mezain next raises a collateral estoppel challenge to his conviction on the single conspiracy count for which he was re-tried in this case. He makes two related arguments. First, he contends that because the jury acquitted him of all other charges at the first trial, collateral estoppel precluded the instant conviction. Second, he argues that the district court failed to exclude evidence in the instant trial that was related to the acquitted counts at the first trial. We consider each point separately, applying *de novo* review. *See United States v. Brown*, 571 F.3d 492, 497 (5th Cir. 2009) ("Whether a prosecution violates the Double Jeopardy Clause or is precluded by collateral estoppel are issues of law that we review *de novo*.").

---

[38] Because we find no double jeopardy violation, we need not address Elashi's argument that such a violation would also require dismissal of the substantive counts against him in light of the district court's *Pinkerton* instruction and the jury's general verdict.

**1. Collateral estoppel as a bar to the instant conviction**

In the first trial in this case, count 1 of the indictment charged El-Mezain with conspiracy to provide material support to a Foreign Terrorist Organization ("FTO") (i.e., Hamas), in violation of 18 U.S.C. § 2339B ("the count 1 conspiracy" or "§ 2339B conspiracy"). The jury failed to reach a verdict on that count, but it acquitted El-Mezain on thirty-one remaining counts. Those counts charged El-Mezain with substantive offenses for providing material support to a FTO (counts 2–10); conspiracy to provide funds, goods, and services to a Specially Designated Terrorist ("SDT"), in violation of IEEPA (count 11) ("the IEEPA conspiracy" or "count 11 conspiracy"); substantive offenses for providing funds, goods, and services to a SDT (counts 12–21); and conspiracy and substantive money laundering offenses (counts 22–32). At the second trial, El-Mezain was re-tried on only the count 1 conspiracy.

A re-trial following a hung jury generally does not violate the Double Jeopardy Clause because the jury's failure to reach a verdict does not terminate the original jeopardy. *See Yeager v. United States*, 129 S. Ct. 2360, 2366 (2009); *Richardson v. United States*, 468 U.S. 317, 323–26 (1984). However, the Double Jeopardy Clause also incorporates the collateral estoppel doctrine, which provides that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Collateral estoppel may therefore affect successive criminal prosecutions based on what the jury decided in the first prosecution. *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997). A subsequent prosecution will be completely barred "if one of the facts necessarily determined in the former trial is an essential element of the subsequent prosecution." *Id.*

For example, in *Ashe* the defendant was charged with but acquitted of armed robbery of one of six participants in a poker game. *Ashe*, 397 U.S. at

437–38. The only contested issue at trial was whether the defendant had been one of the robbers. *Id.* at 438. The state re-tried the defendant at a second trial for robbing one of the other poker players, and the jury convicted him. *Id.* at 439–40. The Supreme Court held that the conviction was impermissible under the collateral estoppel doctrine because the first jury had necessarily found that the defendant had not been one of the robbers, a fact that the state was precluded from relitigating. *Id.* at 445. The collateral estoppel doctrine "bars relitigation only of those facts necessarily determined in the first trial." *Brackett*, 113 F.3d at 1398 (internal quotation marks and citation omitted). Because the first jury in *Ashe* could not have acquitted the defendant without finding that he was not involved in the robbery, the second prosecution was barred.

When the jury returns a general verdict of acquittal, the facts that it necessarily found are not always obvious. Therefore, to determine what the jury "necessarily decided" following an acquittal by a general verdict, the court must consider "the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Yeager*, 129 S. Ct. at 2367 (internal quotation marks and citation omitted); *see also Brackett*, 113 F.3d at 1399. This is a practical inquiry made "with an eye to all the circumstances of the proceedings." *Yeager*, 129 S. Ct. at 2367 (internal quotation marks and citation omitted). In making this determination, the court may not consider the jury's failure to reach a verdict on some counts alleged in the indictment. *See id.* at 2367–68. The defendant bears the burden of demonstrating that "'the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.'" *United States v. Whitfield*, 590 F.3d 325, 371 (5th Cir. 2009) (quoting *Dowling v. United States*, 493 U.S. 342, 350 (1990)).

Based on the above principles, the key to the collateral estoppel analysis is whether an acquittal in a prior trial necessarily determined a fact that the Government sought to prove in the second trial.  As relevant to the instant case, collateral estoppel would bar El-Mezain's conviction of the § 2339B conspiracy if, when the jury acquitted him in the first trial of the count 11 IEEPA conspiracy and the other offenses, the jury *necessarily* decided a fact that was also a required element of the § 2339B conspiracy.  *See Brackett*, 113 F.3d at 1398–99.  Put another way, we must "determine whether the jury in the [first] trial rationally could have acquitted [El-Mezain] without determining in his favor the issues crucial to the [§ 2339B] charges."  *United States v. Leach*, 632 F.2d 1337, 1340 (5th Cir. 1980).

At the time of the indictment in this case, IEEPA provided: "Whoever *willfully* violates any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who *knowingly* participates in such violation may be punished by a like fine, imprisonment, or both."  50 U.S.C. § 1705(b) (emphasis added) (1996).  For purposes of this case,  a conviction of the IEEPA conspiracy turns on both willful and knowing conduct.  The material support statute, however, does not contain the same willfulness element and requires only that the defendant's conduct be performed "knowingly."  *See* 18 U.S.C. § 2339B ("Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both.").

Focusing on the different levels of intent required under the above provisions, the district court held in this case that the two statutes required the establishment of different facts.  It concluded therefore that El-Mezain's acquittal of the IEEPA conspiracy in count 11 did not bar a re-trial of the

§ 2339B conspiracy in count 1 because the two conspiracies are not functionally equivalent. The district court reasoned that the jury's acquittal did not necessarily establish a fact that was an element of the conspiracy at the second trial because the jury could have found that El-Mezain did not act "willfully" for purposes of count 11 (the acquitted count) but deadlocked on whether he acted "knowingly" for purposes of count 1 (the hung count).

El-Mezain argues that the district court erred because the indictment and the Government's theory of prosecution at the first trial did not distinguish between the count 1 and the count 11 offenses, which he argues were identical in nature and relied upon the same factual predicate and overt acts. El-Mezain reasons that "all essential facts" of the count 1 conspiracy upon which the Government sought to re-try him were therefore decided against the Government because the acquittals on all the other counts necessarily established that he neither knew nor intended that donations by HLF to the zakat committees were for the benefit of Hamas. We disagree.

At the first trial, the jury was instructed that a guilty verdict on the count 1 conspiracy required it to find the following:

First: that two or more persons agreed to provide material support or resources to a foreign terrorist organization, in his case, Hamas;

Second: that the defendant under consideration *knowingly* became a member of the conspiracy with the intent to further its unlawful purpose;

Third: that one of the conspirators knowingly committed at least one overt act for the purpose of furthering the conspiracy charged in Count 1;

Fourth: that the charged conspiracy existed on or after October 8, 1997, the date that Hamas was designated a Foreign Terrorist Organization, and that the defendant under consideration was a member of the conspiracy on or after that date; and

No. 09-10560

<u>Fifth</u>: that this court has jurisdiction over the offense.

(Emphasis added). The above elements are the "essential facts" that El-Mezain sought to foreclose from re-litigation in the second trial, and he must show that the jury's acquittal actually decided them in the first trial. *See Whitfield*, 590 F.3d at 371. A review of the record and the acquitted counts, however, shows that the jury did not *necessarily* resolve the above facts against the Government in reaching its verdict. The jury could have acquitted El-Mezain of the count 11 conspiracy by finding only an absence of willfulness, which is not one of the above essential facts for a conviction of the count 1 conspiracy.

On the acquitted IEEPA conspiracy charged in count 11, the jury was instructed that to find El-Mezain guilty it had to find the following:

> <u>First</u>: that two or more persons agreed to violate Executive Order 12947 by contributing funds, goods, and services to, or for the benefit of, a Specially Designated Terrorist, namely, Hamas;
>
> <u>Second</u>: that the defendant under consideration ***knowingly and willfully*** became a member of the conspiracy with the intent to further its unlawful purpose;
>
> <u>Third</u>: that one or more of the conspirators knowingly committed at least one overt act for the purpose of furthering the conspiracy charged in Count 11; and
>
> <u>Fourth</u>: that the charged conspiracy existed on or after January 23, 1995 -- the date Hamas was designated a Specially Designated Terrorist -- and that the defendant under consideration was a member of the conspiracy on or after that date.

(Emphasis added). Although the jury's general verdict of acquittal "does not specify the facts 'necessarily decided,'" *Brackett*, 113 F.3d at 1399, the record and the jury charge demonstrate that a rational jury could have based its verdict of acquittal on count 11 on a fact that was not an essential element of the count 1 conspiracy. *See Yeager*, 129 S. Ct. at 2367 (the court must decide "'whether a

126

rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration"") (quoting *Ashe*, 397 U.S. at 444).

The jury was instructed that "knowingly" means "that the act to which it refers was done voluntarily and intentionally, and not because of mistake or accident." The district court further instructed the jury that "willfully" means "that the act to which it refers was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law."

As part of their defense, the defendants seized on this concept of willfulness by positing that they did not believe it was illegal to support the zakat committees because the committees were never designated as terrorist organizations and they were never told the committees could not receive donations. On cross-examination of Levitt, the defense elicited testimony that a person wanting to know if an organization had been determined to be a SDT would consult the designation list compiled by the Secretary of the Treasury. The defense pointed out at trial that the zakat committees were not on the list. The defense also called as a witness a former congressman, whom HLF had hired purportedly to meet with the Treasury Department on its behalf in order to ensure that HLF's actions complied with the law. The defendants argued that the Government never told the congressman that it considered the zakat committees to be part of Hamas. As further evidence that the defendants had not acted willfully, the defendants pointed out intercepted telephone calls where Baker had said that he needed to see the designation list so that he would know to whom donations were prohibited. The defendants also emphasized this theme of non-willful conduct in closing argument. El-Mezain's counsel asked the jury to think about what HLF "did to make sure it was on the right side of the law." He specifically argued to the jury that the defendants did not "provide aid to any

designated organizations once the law was in effect" and that the Government "didn't tell them" not to deal with the zakat committees.

We agree with the Government, therefore, that in light of El-Mezain's defense and how the jury was instructed, the jury could have rationally acquitted El-Mezain on count 11 because it thought he participated in an agreement to support Hamas but did not do so willfully because he was under the belief that donations to the zakat committees were not prohibited, and thus he did not act with the specific intent to willfully disregard the law. This means that the jury's acquittal on count 11 did not *necessarily* find the essential facts against the Government that comprise the elements of the § 2339B conspiracy in count 1, i.e., whether El-Mezain knowingly became a member of that conspiracy.[39] *See United States v. Sarabia*, __ F.3d __, No. 10-40125, 2011 WL 4977839, at *5 (5th Cir. Oct. 20, 2011) (holding that retrial for possession of marijuana was not barred by acquittal of conspiracy "[g]iven the evidence presented at trial and the instructions the jury received" because the jury could have found that one element—the existence of an agreement—was not proved but still found that defendant "was the driver of the RV" containing the drugs); *Whitfield*, 590 F.3d at 372 (finding after review of jury charge and counsel's closing argument that issues sought to be foreclosed were not necessarily found in the first trial); *see also Leach*, 632 F.2d at 1341 (holding that, although collateral estoppel barred prosecution for receiving illegal campaign contributions following acquittal for "vote buying," the "case would [have been] resolved differently" had the defendant "presented a defense that he thought the

---

[39] Similarly, we also agree with the Government that El-Mezain's acquittal on the substantive counts in the indictment did not bar the retrial on the conspiracy count because the jury could have rationally found that El-Mezain did not personally participate in the substantive counts. *See also Brackett*, 113 F.3d at 1400 (holding that a general verdict of acquittal "merely indicates that the government has failed to convince the jury, beyond a reasonable doubt, of at least one essential element of the substantive offense; it does not 'necessarily determine' any facts at issue in the conspiracy trial").

money he paid out was going for legitimate campaign expenditures rather than for vote buying"). Because the first jury could have rationally based its verdict on the count 11 conspiracy on an issue apart from the facts necessary for a determination of guilt on count 1, the retrial was not barred by collateral estoppel. *See United States v. Lee*, 622 F.2d 787, 790 (5th Cir. 1980) ("The doctrine of collateral estoppel precludes the subsequent prosecution only if the jury could not rationally have based its verdict on an issue other than the one the defendant seeks to foreclose.").

Of course, it is possible that, as El-Mezain posits, the jury could have acquitted him of the count 11 conspiracy for other reasons, such as that El-Mezain did not intend to provide support for Hamas or that the entities to which HLF provided assistance were not controlled by Hamas. But the fact that it is *possible* that the jury could have based its verdict on any number of facts is insufficient to apply the collateral estoppel doctrine. *See Sarabia*, 2011 WL 4977839, at *5; *Brackett*, 113 F.3d at 1398–99; *Lee*, 622 F.2d at 790 ("When a fact is not necessarily determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue.") (internal quotation marks and citation omitted).

El-Mezain argues that the above analysis improperly looks at the elements of the offenses as if this were a traditional double jeopardy issue instead of determining what facts were necessarily decided in the first trial. Contrary to El-Mezain's argument, examination of the different intent levels does not inject an improper elements analysis into the issue. Instead, it is consistent with Supreme Court precedent instructing that we decide whether the jury could have based its verdict on an issue *other than* the issues the defendant seeks to foreclose. *See Yeager*, 129 S. Ct. at 2367; *Ashe*, 397 U.S. at 444; *see also Sarabia*, 2011 WL 4977839, at *4 ("In order to determine what the jury necessarily decided based upon the evidence presented, we must consider the elements of a

drug-related conspiracy."); *Bolden v. Warden, W. Tenn. High Sec. Facility*, 194 F.3d 579, 584 (5th Cir. 1999) ("To determine the facts necessarily decided in [a defendant's] first trial under the first step of the collateral estoppel analysis, [a court] must examine the elements of the statutes under which [the defendant] was charged."). In this case, we hold that because El-Mezain has not met his burden to show that the jury *necessarily* decided any of the issues related to the § 2339B conspiracy, including the "knowing" requirement of that statute, the retrial was not barred by collateral estoppel.[40]

El-Mezain further argues that even if the above analysis is correct, the district court gave a general instruction on conspiracy that incorporated proof of willfulness into *all* the conspiracy counts. The district court explained in the charge that "[b]efore I instruct you in detail on the specific elements of the crimes charged in the indictment, I first want to instruct you on general principles of conspiracy law." The court then explained that one element of a conspiracy is "[t]hat the defendant under consideration knew the unlawful

---

[40] In support of his argument that this is an improper "elements" analysis, El-Mezain relies on *United States v. Ohayon*, 483 F.3d 1281, 1293 (11th Cir. 2007). In that case, the court held that the collateral estoppel analysis focuses on whether a fact, rather than a legal element, was shared by the offenses in successive prosecutions. *Id.* The court there was addressing retrial for conspiracy after acquittal of a substantive offense and found that it was improper merely to compare the legal elements of the two offenses there because, if that were the test, the court would never reach the question whether there was any factual identity. We see no conflict with *Ohayon* in light of our interpretation of Supreme Court precedent in *Yeager* and *Ashe*, as we agree that collateral estoppel requires more than a mere difference in the elements of the offenses. But rather than mechanically compare the offense elements here, we examine the entire record, including the charges and the jury instructions on those charges, to decide whether the jury in the first trial could have founded its verdict on a ground other than the ground to be foreclosed in the second trial. A defendant's specific intent is a ground that may or may not have been necessarily determined by a previous jury. *See, e.g., United States v. Romeo*, 114 F.3d 141, 143 (9th Cir. 1997) (examining elements of the acquitted count for knowing possession with intent to distribute drugs and finding that jury could not have acquitted without necessarily deciding the "knowing" element); *United States v. Vaughn*, 80 F.3d 549, 551–53 (D.C. Cir. 1996) (holding that jury's acquittal on two counts of selling crack on different dates based on entrapment defense did not necessarily determine defendant's criminal intent to make sales on two other occasions).

purpose of the agreement and joined in it willfully, that is with the intent to further the unlawful purpose." We do not agree that the district court's reference to the general principles of conspiracy law incorporated a willfulness element into each conspiracy count.

Although the court's first instruction gave the *general* principles of conspiracy law, its second instruction gave the *specific* definition to be applied to the elements of each of the charged conspiracies. As charged, the § 2339B conspiracy required only knowing conduct, while the IEEPA conspiracy required conduct that was both knowing and willful. The district court specifically instructed the jury to refer to the definitions of knowing and willful that it had previously given for those counts, and we presume that the jury followed those instructions. *See Zafiro*, 506 U.S. at 540. Furthermore, when the district court gives general instructions but then gives conflicting specific instructions, we have found, reading the charge as a whole, that the specific instructions adequately guide the jury. *See, e.g., Jordan v. Watkins*, 681 F.2d 1067, 1076 (5th Cir. 1982) ("[A]ny prejudice that the general definition could have caused was eviscerated by the specific instruction that immediately followed.").

Finally, El-Mezain raises numerous arguments in his reply brief for why the district court's analysis of his collateral estoppel argument was erroneous, most notably that it improperly relied on the deadlocked count 1 to determine what the jury decided. It is true that consideration of hung counts has no place in the collateral estoppel analysis when determining what the jury necessarily decided at the first trial. *See Yeager*, 129 S. Ct. at 2368. But we need not rely on the deadlocked count 1, or any inconsistency between the jury's hanging on that count and its conviction on other counts, which *Yeager* forbids. *See id.* As already discussed, the defense, the jury charge, and the closing argument, along with the acquittal in count 11, show that the jury's verdict on the acquitted count in the first trial could have been based *solely* on an issue that was not an

element of the re-tried count.  This is consistent with *Yeager*.[41]  *Id.* at 2367.

Most of El-Mezain's arguments overlook the fact that it is his burden to establish that the issue he seeks to foreclose was actually decided at the first trial. *Dowling*, 493 U.S. at 350; *Brackett*, 113 F.3d at 1398.  Because we conclude that he has not met that burden, we reject El-Mezain's collateral estoppel argument.

### 2. Collateral estoppel and the exclusion of evidence

El-Mezain next argues that the district court erroneously admitted evidence that related to the counts on which he was acquitted at the first trial and also failed to give a limiting instruction.  El-Mezain reasons that the § 2339B conspiracy charged in count 1 allegedly began in 1997, whereas the IEEPA conspiracy charged in count 11 began in January 1995 when Hamas was designated as a SDT.  According to El-Mezain, because the jury acquitted him on count 11 but failed to reach a verdict on count 1, he could not have been a member of any conspiracy prior to 1997 because the acquittal absolved him of the only conspiracy that could have existed up to that time.  Furthermore, the IEEPA conspiracy was alleged to have run until the time of the indictment in 2004.  El-Mezain argues, therefore, that collateral estoppel should have precluded evidence against him that concerned actions before 1997, as well as any other evidence relevant to the IEEPA counts.  The challenged evidence at issue included El-Mezain's intercepted telephone calls, videotapes in which he appeared, documentation of his personal financial transactions, and the Elbarasse and Ashqar documents.

"Even when a subsequent prosecution is not completely barred, this court has held that collateral estoppel may bar the admission or argumentation of

---

[41] Similarly, although El-Mezain is correct that the district court denied his collateral estoppel motion based in part on the Fifth Circuit panel decision that the Supreme Court reversed in *Yeager*, the district court also specifically held that El-Mezain failed to establish that the facts necessarily established at the first trial precluded the second trial, a principle which is in line with *Yeager*. *See* 129 S. Ct. at 2367.

132

*facts* necessarily decided in the first trial." *Brackett*, 113 F.3d at 1400. Because, as discussed above in the previous section, the IEEPA conspiracy charged in count 11 required the Government to prove that El-Mezain acted both knowingly and willfully, the jury could have acquitted solely on the willfulness element without *necessarily* determining that El-Mezain was not a member of a conspiratorial agreement prior to 1997. Thus, evidence of facts related to El-Mezain's participation in an agreement to support Hamas was not precluded by collateral estoppel because the jury did not necessarily determine those facts against the Government in the first trial.

Furthermore, collateral estoppel does not bar the introduction of "evidence of an alleged criminal act, notwithstanding the fact that the defendant previously has been acquitted of the substantive offense, to prove participation in a conspiracy to commit the substantive offense." *Id.* This is because "[o]vert acts in furtherance of a conspiracy need not be criminal; therefore, acquittal for the substantive offense does not bar admission of the same evidence in a subsequent conspiracy trial." *Id.*; *United States v. Garza*, 754 F.2d 1202, 1209–10 (5th Cir. 1985). In *Brackett*, we held that the Government was able to introduce evidence of the defendant's possession of marijuana, for which he had been acquitted, as part of the prosecution for conspiracy. *Brackett*, 113 F.3d at 1400–01. We reasoned that the evidence of possession was not barred because it was relevant to establish the defendant's voluntary participation in the conspiracy, but it was not required to prove the essential elements of the conspiracy offense. *Id.* at 1401.

The same is true here with respect to the substantive counts. Even though the jury acquitted El-Mezain of being in the IEEPA conspiracy charged in count 11 that began in 1995, and of substantive counts related to both the count 1 and count 11 conspiracies, evidence of substantive acts in furtherance of those conspiracies, including acts from 1995 to 1997 (or earlier), was still relevant to

whether he joined in the count 1 conspiracy beginning in 1997. That evidence was not necessarily required as an essential element of the count 1 conspiracy. *See id.* at 1400 ("'Merely because appellants were acquitted of the substantive . . . charges does not mean that the facts upon which the charges were based cannot later be used as non-criminal overt acts in furtherance of the conspiracy to commit the substantive offenses.'") (citation omitted). The count 1 conspiracy also listed overt acts different from the specific transactions making up the substantive counts of the indictment. Therefore, evidence concerning substantive acts on which El-Mezain was acquitted was not barred by collateral estoppel as long as it was otherwise admissible. *See Dowling*, 493 U.S. at 348 (declining to extend collateral estoppel "to exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted"). El-Mezain does not argue that the challenged evidence was not relevant or probative; he argues only that it was inadmissible because it predated or coincided with the time frame of the conspiracy for which he was acquitted. This argument fails to establish that collateral estoppel barred the evidence.

## L.  Mistrial and double jeopardy

The defendants next claim that the district court erroneously denied their motion to dismiss the instant prosecution on double jeopardy grounds because there was no manifest necessity for a mistrial in the first case. The defendants reason that the Government induced the mistrial through prosecutorial misconduct by improperly submitting non-admitted exhibits to the first jury. We hold that the record shows that all defendants validly agreed to the mistrial and that there has been no showing that the Government engaged in intentional misconduct either to induce the defendants' consent to the mistrial or to avoid an acquittal that it believed was likely.

134

No. 09-10560

Our review of the denial of a double jeopardy claim following declaration of a mistrial is plenary. *United States v. Campbell*, 544 F.3d 577, 581 (5th Cir. 2008). "We review all factual findings underpinning the district court's determination for clear error." *Id.*

Although the Double Jeopardy Clause prohibits a second prosecution following an acquittal, a "'retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused.'" *Id.* at 580 (quoting *Arizona v. Washington*, 434 U.S. 497, 503 (1978)). The Double Jeopardy Clause will not preclude a defendant from being retried after the district court declares a mistrial over defense objection if the mistrial was justified by a "manifest necessity." *Id.* at 580–81; *United States v. Palmer*, 122 F.3d 215, 218 (5th Cir. 1997). If a defendant consents to a mistrial, however, the "manifest necessity" standard is inapplicable and double jeopardy ordinarily will not bar a reprosecution. *See Oregon v. Kennedy*, 456 U.S. 667, 672 (1982); *Palmer*, 122 F.3d at 218.

The defendant's consent to a mistrial may be express or implied through a failure to object. *Palmer*, 122 F.3d at 218. "If a defendant does not timely and explicitly object to a trial court's *sua sponte* declaration of mistrial, that defendant will be held to have impliedly consented to the mistrial and may be retried in a later proceeding." *Id.* The determination of whether a defendant objected to a mistrial is made on a case-by-case basis, and the critical factor is whether a defendant's objection gave the court sufficient notice and opportunity to resolve the defendant's concern. *United States v. Fisher*, 624 F.3d 713, 717 (5th Cir. 2010).

In the instant case, the record shows that all defense counsel consented to the mistrial either expressly or impliedly. The jury in the first trial of this case clearly struggled to come to a decision. The jurors had deliberated for nineteen days and had been given an *Allen* charge by the district court when they

indicated that they had reached a partial verdict. The jury acquitted defendant Abdulqader on all counts; acquitted defendant Odeh on all counts except for three conspiracy charges, on which it failed to reach a verdict; acquitted El-Mezain on all counts except for the count 1 conspiracy, on which the jury also hung; and failed to reach a verdict for the other defendants. The district court polled the jury on the court's own motion, and three jurors indicated that they did not agree with the verdict. After being sent back to continue deliberating, the jury indicated that further deliberations would not be helpful.

Faced with a partial verdict acquitting some defendants on some counts and one defendant on all counts, and hoping to preserve the acquittals, defense counsel for Abdulqader and El-Mezain requested that the district court poll the jurors a second time to discern whether the jury's disagreement was over the acquitted counts or only the undecided counts. The district court agreed to poll the jurors again about the individual defendants for whom partial verdicts had been reached. The district judge indicated that he intended to declare a mistrial as to the defendants for whom no verdict had been reached, and counsel for Defendants Baker and Elashi expressly agreed to the district court's procedure. On re-polling of the jury, one juror again indicated that he did not agree with the verdict of acquittal as to Abdulqader, and two jurors stated that they did not agree with the acquittal of Odeh. All jurors agreed with the verdict of acquittal of El-Mezain except for count 1.

The district court declared a mistrial on all counts for the defendants for whom the jury was unable to return a valid verdict, i.e., HLF, Baker, Elashi, Abdulqader, and Odeh. As to El-Mezain, the court declared a mistrial as to count 1 but accepted the acquittal as to all other counts. The court stated that the Government had the option of bringing the case again on the mistried counts. No one lodged any objection.

136

No. 09-10560

We think it clear from the above circumstances that all defendants consented to the district court's action.  The defendants argue that counsel for Abdulqader did not consent to a mistrial because she "suggested an alternative course" after the first jury poll.  But the alternative course was the request for a second poll, which the district court granted.  The court declared a mistrial when the jury indicated its continued disagreement with the verdict, and counsel for Abdulqader said nothing more.  Because there was no objection, and several defense counsel had already stated their agreement to the mistrial, the consent of all counsel was either express or implied by their silence.  *See Palmer*, 122 F.3d at 218–19; *see also United States v. Nichols*, 977 F.2d 972, 974 (5th Cir. 1992) (consent to a mistrial may be implied from the totality of circumstances surrounding the declaration of the mistrial).  The district court so found, and we see no clear error in that finding.

The defendants contend, nevertheless, that even if they consented to the mistrial, the consent was invalid because it was induced by Government misconduct, which they contend was the only reason the mistrial occurred.[42]  In order to resolve this issue, some additional facts are necessary.  When the case was submitted to the jury at the first trial, the Government, unbeknownst to the defendants, included demonstrative and non-admitted exhibits along with the evidence that was sent to the jury room.  This unintended submission included nineteen exhibits comprised of approximately 100 pages and three videotapes.  During the course of deliberations, the jury sent out a note asking about the demonstrative exhibits.  Unaware that the jury had been inadvertently given

---

[42] We note that the defendants did not properly raise their inducement argument in the district court, which denied the defendants' request to file a reply brief in which the argument was raised for the first time.  We would ordinarily review an issue not properly raised in the district court for plain error only.  *See United States v. Cooks*, 589 F.3d 173, 184 (5th Cir. 2009).  Because the district court ruled on the merits of the issue in the alternative, however, and because we conclude that the defendants' arguments fail even under the usual clearly erroneous standard of review, we discuss the issue in full.

demonstrative exhibits, the district court instructed that all the exhibits that were in evidence were in the jury room.[43] The defense learned of the error only prior to the second trial while interviewing jurors from the first trial.

Upon discovering this error, the defense moved to dismiss the superseding indictment on double jeopardy grounds. They submitted an affidavit from the first jury's foreperson indicating that there had been disagreement among the jurors about the demonstrative exhibits and whether the exhibits could be considered. The defendants argued that had the Government not given those exhibits to the jury, the jury likely would have acquitted them. They also argued that the Government acted intentionally to avoid an acquittal, and that the prosecutors had misrepresented to the court and counsel that it had not sent improper evidence to the jury. The district court denied the motion, and the defendants renew their arguments on appeal.

A retrial caused by prosecutorial misconduct may violate double jeopardy only if "the governmental conduct in question [was] intended to 'goad' the defendant into moving for a mistrial . . . ." *Kennedy*, 456 U.S. at 676. Gross negligence by the prosecutor, or even intentional conduct that seriously prejudices the defense, is insufficient to apply the double jeopardy bar. *United States v. Wharton*, 320 F.3d 526, 531–32 (5th Cir. 2003); *United States v. Singleterry*, 683 F.2d 122, 123 & n.1 (5th Cir. 1982). Instead, there must be "'intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.'" *Wharton*, 320 F.3d at 531–32 (emphasis removed) (quoting *Kennedy*, 456 U.S. at 675–76); *see also Martinez v. Caldwell*, 644 F.3d 238, 243 (5th Cir. 2011) ("A prosecutor . . . must specifically act in 'bad faith' or

---

[43] The jury's note stated, in relevant part, "a jury member wants to know if the demonstrative exhibits are in the jury room. He does not believe that the power points and some other exhibits are demonstrative and not actual evidence." With the assent of counsel, the district court instructed the jury: "The demonstrative exhibits are not in the jury room. All of the exhibits in evidence are in the jury room."

No. 09-10560

must intend to goad the defendant 'into requesting a mistrial or to prejudice the defendant's prospects for an acquittal.'") (citation omitted). Under this narrow standard, the court must examine the "objective facts and circumstances" to determine the prosecutor's intent. *Kennedy*, 456 U.S. at 675.

The defendants contend that the Government's intent to induce the mistrial is evident from the prosecution's silence in the face of the jury's note asking about demonstrative exhibits. They posit that the Government was put on notice that there was a problem with the evidence in the jury room but assured defense counsel that it had not sent improper exhibits to the jury room. They contend that had the Government informed the court and counsel that it had improperly provided non-admitted exhibits to the jury, the court could have removed those exhibits and given a curative instruction. We are not persuaded. The defendants do not point to any evidence in the record showing that the Government affirmatively knew at the time of the juror's note that improper exhibits had been submitted. As the district court held, it is just as likely that the Government believed it had not submitted anything improper to the jury. Nor do we think that the prosecutor's silence in the face of the jury's note proves the Government's bad intent. As the district court observed, the same note failed to cause the court or any of the eight defense counsel to register a concern on the record.

We may not disturb the district court's factual finding that the prosecution did not deliberately submit the non-admitted exhibits to the jury unless that finding was clearly erroneous. *See Singleterry*, 683 F.2d at 124–25. The exhibits that were properly admitted in this case were extensive, comprising thousands of pages of material in a complicated trial lasting several weeks. It is entirely plausible that the Government could have mistakenly or negligently, rather than intentionally, included 100 pages of non-admitted and demonstrative exhibits in the voluminous matter and then failed to discover the

139

No. 09-10560

fact. *See id.* at 123 n.1 (holding that even "'gross negligence' is clearly not enough to bar retrial"); *United States v. Barcelona*, 814 F.2d 165, 168 (5th Cir. 1987) (holding that district court did not clearly err by finding prosecutor's failure to disclose information about evidence, resulting in mistrial, was due to inadvertence). The district court's finding was not clearly erroneous.

The defendants contend that other circumstances, combined with the juror's note, further demonstrated the bad faith of the prosecution. An individual juror sent a note asking to be removed from the jury. When questioned by the district court, he expressed frustration with the deliberations and also made vague references to the evidence.[44] The defendants argue that the Government must have known from the juror's comments that some jury

---

[44] When interviewed by the district court, the juror stated, in part:

I know the case is based on evidence and testimony. So in the deliberating -- And when somebody give they opinion, facts, it's just like evidence -- okay. The things we have in the jury room is evidence. And when you bring up the evidence, they talk it down. They got their own opinion. It's like HAMAS. This is not HAMAS. Show where [sic] me where this is stated it's HAMAS, and I'm just going on recollecting of the trial. That's all I'm going on, and if I need to go to some evidence, I do it. But it's like they already got their opinion. They already got their opinion made up, and I don't feel like I could give the defendant justice on that.

He continued:

And you know when the court reporter come in there and that's when I asked her again, is this all of this evidence. Yeah. You can't do this. This is not evidence. Everything in the boxes, the first day that she came, is all of this evidence. We had a problem over just that.

\* \* \* \*

But then it started getting personal. When you go in there and try to make a point and they sit up there and say no, where you going to show that up. They don't even have a clue where HAMAS started from, because they don't even want to hear it. They want to hear nothing about terrorism. They don't want to hear that. But when you got three or four that already has their mind made up, it's not served.

members believed they had demonstrative exhibits, and also that there was a bloc of jurors who favored acquittal. They contend that the Government therefore knew that an acquittal was likely. We disagree.

The defendants have to show that the Government acted improperly with the purpose and intent of causing the defense to agree to a mistrial. *See Kennedy*, 456 U.S. at 676; *see also United States v. Catton*, 130 F.3d 805, 807 (7th Cir. 1997) (holding that "a defendant who wants . . . to block a retrial on the basis of prosecutorial error must show that the prosecutor committed the error *because* he thought that otherwise the jury would acquit and he would therefore be barred from retrying the defendant"). At the time the Government submitted the case to the jury along with the improper evidence, it could not have known that there would be an acquittal, and the defendants present no such argument. Instead, they rely on the Government's silence after deliberations began and a juror asked to be dismissed. But that argument is premised on the unsupported belief that the Government *knew* the improper exhibits had been sent to the jury room. Even if we assume that the jury's notes and comments should have prompted the Government to investigate the matter further, its failure to do so was at most negligent. *See Singleterry*, 683 F.2d at 123 & n.1. There is no evidence that the Government knew that the jury had improper exhibits in its possession, and speculation about the prosecutor's knowledge and intent will not support a double jeopardy argument. *See Nichols*, 977 F.2d at 975 ("Because there is no evidence that the prosecutor intended to terminate the first trial, there is no double jeopardy bar to Nichols' retrial."); *see also United States v. Doyle*, 121 F.3d 1078, 1087 (7th Cir. 1997) (holding that defendant's belief about the prosecution's intent was, "at best, mere conjecture and speculation" because "[t]here is simply no record evidence that unearths the inner-thoughts of the prosecutors").

Moreover, the dismissed juror's comments, read as a whole, do not unequivocally show that the Government must have known an acquittal was likely and that the only way to avoid that result was to remain silent about submitting the demonstrative exhibits to the jury. During its questioning of the juror, the district court expressed concern about substituting an alternate juror, thereby requiring the jury to begin deliberations anew. The dismissed juror indicated his belief that the deliberations had not progressed very far. He also indicated that opinions, including his own, were subject to change. When read as a whole, the juror's comments do not show that the prosecution necessarily must have apprehended an acquittal. The district court's conclusion that the comments showed, at most, a hung jury and conflict among the jurors was not clearly erroneous.

The defendants' double jeopardy argument is based on speculation rather than objective facts showing that the Government deliberately acted to provoke a mistrial with the goal of avoiding an acquittal. We therefore affirm the district court's denial of the motion to dismiss.

**M. Challenge to FISA applications and intercepts**

As noted above, the Government conducted widespread surveillance of the defendants that was authorized by court orders issued pursuant to FISA, 50 U.S.C. § 1801 *et seq.* At trial, the prosecution relied on recorded evidence captured during the surveillance. The Government's FISA applications, affidavits related to the warrant applications, the court orders regarding the applications, and much of the information obtained from the surveillance have been classified.[45] The defendants raise two challenges relating to FISA, arguing that the district court erred by (1) refusing to compel the production of the FISA

---

[45] Because of the classified and sensitive nature of the materials at issue, this court has conducted an *in camera* review of the relevant materials, but the opinion does not reveal the classified contents of those documents.

warrant applications and court orders, and (2) refusing to suppress the FISA intercepts.  We find no merit in either argument.

### 1.  Disclosure of FISA applications and orders

FISA establishes procedures for the Government, acting through the Attorney General, to obtain a judicial warrant for electronic surveillance in the United States "to acquire foreign intelligence information."   50 U.S.C. § 1802(a)(1).  Foreign intelligence information includes, *inter alia*, information relating to "the ability of the United States to protect against . . . sabotage, international terrorism, or . . . clandestine intelligence activities by . . . a foreign power or by an agent of a foreign power[.]"[46]  § 1801(e).  With limited exceptions not relevant here, the Government may not conduct electronic surveillance without a court-authorized warrant.  Application for a FISA warrant is made *ex parte* to the Foreign Intelligence Surveillance Court ("FISC"), which is currently comprised of eleven district court judges designated by the Chief Justice of the

---

[46] The full text of the statute defines "foreign intelligence information" to mean:

(1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against–

(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

(B) sabotage, international terrorism, or the international proliferation of weapons of mass destruction by a foreign power or an agent of a foreign power; or

(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

(2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to–

(A) the national defense or the security of the United States; or

(B) the conduct of the foreign affairs of the United States.

50 U.S.C. § 1801(e).

United States.[47]  § 1803(a)(1).  The FISC's rulings are subject to review by the Foreign Intelligence Surveillance Court of Review ("FISCR"), which consists of three judges also designated by the Chief Justice.  § 1803(b).

To obtain FISC approval for surveillance, the Government must show, *inter alia*, probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power" and that the place of surveillance "is being used, or is about to be used, by a foreign power or an agent of a foreign power."  § 1805(a)(2)(A), (B).  This probable cause standard is different from the standard in the typical criminal case because, rather than focusing on probable cause to believe that a person has committed a crime, the FISA standard focuses on the status of the target as a foreign power or an agent of a foreign power.  A "foreign power" includes "a group engaged in international terrorism or activities in preparation therefor."[48]  § 1801(a)(4); *see also United*

---

[47] Prior to amendments to FISA in 2001, the FISC was comprised of seven judges.

[48] The statute fully defines a "foreign power" to be:

(1) a foreign government or any component thereof, whether or not recognized by the United States;

(2) a faction of a foreign nation or nations, not substantially composed of United States persons;

(3) an entity that is openly acknowledged by a foreign government or governments to be directed and controlled by such foreign government or governments;

(4) a group engaged in international terrorism or activities in preparation therefor;

(5) a foreign-based political organization, not substantially composed of United States persons;

(6) an entity that is directed and controlled by a foreign government or governments; or

(7) an entity not substantially composed of United States persons that is

*States v. Marzook*, 435 F. Supp. 2d 778, 780 (N.D. Ill. 2006) (noting that Hamas is a foreign power). An "agent of a foreign power" includes any person who "knowingly aids or abets any person" engaged in specified activity, including intelligence gathering, sabotage, or international terrorism.[49] § 1801(b)(2)(E).

When the Government intends to use information obtained from electronic surveillance authorized under FISA, it must give notice to the person against whom it intends to use that information and to the court where the information will be used. § 1806(c). The aggrieved person[50] may seek discovery of the "applications or orders or other materials relating to electronic surveillance," and

---

engaged in the international proliferation of weapons of mass destruction.

50 U.S.C. § 1801(a).

[49] An "agent of a foreign power" is defined to include any person who:

(A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;

(B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States;

(C) knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power;

(D) knowingly enters the United States under a false or fraudulent identity for or on behalf of a foreign power or, while in the United States, knowingly assumes a false or fraudulent identity for or on behalf of a foreign power; or

(E) knowingly aids or abets any person in the conduct of activities described in subparagraph (A), (B), or (C) or knowingly conspires with any person to engage in activities described in subparagraph (A), (B), or (C).

50 U.S.C. § 1801(b)(2).

[50] "'Aggrieved person' means a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k).

he may also seek to suppress evidence obtained from the surveillance if "the information was unlawfully acquired" or if "the surveillance was not made in conformity with an order of authorization or approval." § 1806(e), (f). If, however, "the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States," the district court must "review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." § 1806(f).

In the instant case, the Government gave the defendants notice that it intended to use at trial information obtained from surveillance approved under FISA. During the course of discovery in the first trial, the Government inadvertently disclosed some of the FISA materials to the defendants. The district court, upon motion by the Government, ordered the defendants to return the non-discoverable material to the prosecution.

The defendants subsequently moved to compel production of the FISA applications and to suppress the evidence obtained from the surveillance, and the Attorney General filed the requisite national security notice to maintain the confidentiality of the FISA materials. The district court refused to order disclosure and denied the suppression motion after conducting an *in camera* and *ex parte* review of the documents. Prior to the second trial, the defendants renewed their request for disclosure, which was denied.

On appeal, the defendants argue that the district court erred by denying their motion for production of the FISA materials. They contend that, pursuant to the FISA statute and due process, disclosure and the participation of defense counsel were necessary in order for the district court to make an accurate determination of the lawfulness of the surveillance. The defendants specifically contest whether the FISA warrant applications established probable cause to

believe that the targets of the investigation were "agents of a foreign power." They assert their belief that the applications did not meet the probable cause standard because of material misstatements and omissions in the applications. We review for an abuse of discretion the district court's order denying disclosure of applications and other materials related to FISA surveillance. *See United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005).

In the course of an *in camera* review of FISA materials, the district court has discretion to disclose the information to the aggrieved person but "only where such disclosure is *necessary* to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f) (emphasis added). When the district court "determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure." § 1806(g).

In a very well-reasoned opinion, the district court here closely considered the defendants' arguments for disclosure and determined that it was capable of reviewing the lawfulness of the FISA surveillance without assistance from defense counsel. The court concluded after an extensive *in camera* review that the FISA surveillance was lawful. The court reasoned as follows:

> After thoroughly reviewing each of the FISA applications at issue in this prosecution, accompanying affidavits, the FISC's orders and additional materials submitted by the government, the court finds that it does not need the assistance of defense counsel to make an accurate determination of the legality of the surveillance. This conclusion is not unusual among courts that have faced this situation; indeed, the parties agree that no court has ever ordered that FISA materials be disclosed or that an adversarial hearing be conducted to assist the court in determining the legality of FISA surveillance. . . .
>
> Although the defendants argue fervently that this is a unique case because the government made widespread intentional and reckless misrepresentations to obtain FISA warrants from the FISC,

No. 09-10560

. . . evidence from the government has shown that the alleged irregularities have been greatly exaggerated by the defendants[.] . . . The errors in the FISA applications identified by the defendants and documented by the government are not pervasive; nor did the errors materially alter the evidence supporting the FISA warrants involving the defendants. . . .

The court reviewed each of the identified errors and found them to be typographical or clerical in nature. Although the government should have exercised greater care in drafting and editing its applications for FISA warrants before presenting those applications to the FISC, the government acknowledged the errors it made and provided corrected information to the FISC more than six years ago when it discovered the errors. . . . In addition, the FBI conducted an internal investigation of the special agent whom the defendants allege "was guilty of numerous and repeated falsehoods and inaccuracies in the FISA applications in this case," . . . and found that allegations of "investigative dereliction" were meritless[.] . . . The court reaches the same conclusion.

Because the errors identified by the defendants did not materially alter the evidence outlined in the FISA applications and because the errors were not pervasive enough to confuse the court as to the quantity or quality of the evidence described in the applications, the court does not believe that disclosing the applications and related materials to defense counsel would assist the court in making an accurate determination of the legality of the surveillance. Consequently, it would be inappropriate for the court to provide defense counsel with access to the documents under the terms of 50 U.S.C. § 1806(f).

We have undertaken our own independent *in camera* review of the FISA materials and conclude that the district court was correct. We agree fully with the district court's reasoning and adopt it as our own. "[D]isclosure of FISA materials is the exception and *ex parte, in camera* determination is the rule." *United States v. Abu-Jihaad*, 630 F.3d 102, 129 (2d Cir. 2010) (internal quotation marks and citation omitted). We see no abuse of discretion by the

148

district court's refusal to order disclosure of the FISA applications and other material pursuant to § 1806(f).

Relying on the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the defendants also argue that due process required disclosure because their interest in obtaining the FISA materials outweighed the Government's interest in maintaining its secrecy. Assuming without deciding that the *Mathews* balancing test is applicable here, *but see Damrah*, 412 F.3d at 624 (stating that defendant's "reliance on *Mathews* is misplaced . . . because FISA's requirement that the district court conduct an ex parte, in camera review of FISA materials does not deprive a defendant of due process"), we conclude that there was no due process violation.

The *Mathews* balancing test requires the court to consider (1) the defendants' private interest in disclosure of the FISA materials; (2) the risk that defendants will be erroneously deprived of their right to the materials, and the value of additional or substitute procedural safeguards; and (3) the Government's interest in preventing disclosure. *See Mathews*, 424 U.S. at 335. The defendants argue that they have a substantial interest in an accurate determination of their claim that the Government's surveillance violated their rights, and that the district court's *in camera* review of the materials without counsel's input carried a high risk of an erroneous decision. We agree with the district court's assessment of this issue, however, that the *in camera* and *ex parte* review by the district court adequately ensured that the defendants' statutory and constitutional rights were not violated. *See United States v. Belfield*, 692 F.2d 141, 149 n.38 (D.C. Cir. 1982) (disclosure of FISA materials "will not be required when the task is such that *in camera* procedures will adequately safeguard the 'aggrieved party's' constitutional rights"). Numerous courts have held that FISA's *in camera* and *ex parte* procedures are adequate and withstand constitutional scrutiny. *See, e.g., Damrah*, 412 F.3d at 624–25; *United States v.*

*Isa*, 923 F.2d 1300, 1306–07 (8th Cir. 1991); *United States v. Ott*, 827 F.2d 473, 476–77 (9th Cir. 1987); *Belfield*, 692 F.2d at 148–49.

Furthermore, we also agree with the district court that, as a matter of national security, the Government has a substantial interest in maintaining the secrecy of the materials. This interest extends not only to the contents of the materials but also to the appearance of confidentiality in the operation of the intelligence services. *See, e.g., C.I.A. v. Sims*, 471 U.S. 159, 175 (1985) ("If potentially valuable intelligence sources come to think that the Agency will be unable to maintain the confidentiality of its relationship to them, many could well refuse to supply information to the Agency in the first place."). We are unpersuaded by the defendants' argument that the Government's interest is diminished because defense counsel possess security clearance to review classified material. "Congress has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to *anyone* not involved in the surveillance operation in question, whether or not she happens for unrelated reasons to enjoy security clearance." *Ott*, 827 F.2d at 477. Furthermore, as noted by the district court, defense counsel do not possess the security clearance to review all of the FISA materials in this case, some of which is classified above counsel's clearance level.

Our conclusion that the defendants' due process rights have not been violated is also buttressed by our own *in camera* consideration of the FISA materials. Based on that review, we are convinced that the district court properly weighed the respective interests of the defendants and the Government along with the sensitivity of the materials. We conclude, therefore, that due process did not require disclosure of the FISA materials, and that the district court properly denied the defendants' motion to compel disclosure.

## 2.  Suppression of FISA intercepts

The defendants further argue that the district court erroneously denied their motion to suppress the evidence obtained from the FISA surveillance. First, the defendants argue that the FISA surveillance was improper because the "primary purpose" of the intercepts was a criminal investigation rather than the gathering of foreign intelligence.  Second, they contend that the Government failed to establish probable cause that the target of the FISA warrant was "a foreign power or an agent of a foreign power."  Finally, the defendants contend that the district court should  have granted them an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), at which they could challenge the veracity of the information in the FISA warrant applications.  We are unpersuaded by these arguments.

We review *de novo* the district court's ruling on the propriety of orders from the FISA court.  *United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005).  "In considering challenges to FISA Court orders, however, 'the representations and certifications submitted in support of an application for FISA surveillance should be presumed valid' by a reviewing court absent a showing sufficient to trigger a *Franks* hearing."  *Abu-Jihaad*, 630 F.3d at 130 (citation omitted).

The defendants' argument that the surveillance was unlawful because the "primary purpose" was a criminal investigation rather than foreign intelligence is misplaced because the test that they advocate is inapplicable.  The FISA surveillance in this case began approximately in 1994 and was therefore governed by the pre-amended version of FISA.  "As originally enacted [in 1978], FISA required a high-ranking member of the executive branch to certify that 'the purpose' for which a warrant was being sought was to obtain 'foreign intelligence information.'"  *Id.* at 119 (quoting 50 U.S.C. § 1804(a)(7)(B) (Supp. V 1981)).  Some courts interpreted this provision of FISA as requiring "that foreign

intelligence information be 'the *primary* objective of the surveillance.'" *Id.* (quoting *United States v. Duggan*, 743 F.2d 59, 77 (2d Cir. 1984)); *see also United States v. Johnson*, 952 F.2d 565, 572 (1st Cir. 1991) ("Although evidence obtained under FISA subsequently may be used in criminal prosecutions, . . . the investigation of criminal activity cannot be the primary purpose of the surveillance.  The act is not to be used as an end-run around the Fourth Amendment's prohibition of warrantless searches.") (citations omitted).  Those courts reasoned that the "primary purpose" certification distinguished foreign intelligence gathering from ordinary criminal cases, where unlike FISA, the Fourth Amendment requires probable cause to believe a crime has been committed before the Government may invade individual privacy interests.  *See United States v. Truong Dinh Hung*, 629 F.2d 908, 915 (4th Cir. 1980).

In 2001, Congress amended FISA when it passed the PATRIOT Act.  *See* Pub. L. No. 107-56, 115 Stat. 271 (2001).  Among other things, the amendments authorized FISA surveillance when the Government certifies that foreign intelligence gathering is "a significant purpose" rather than "the purpose."  *Id.* § 218, 115 Stat. at 291. By these amendments "Congress indicated that it did not, in fact, require foreign intelligence gathering to be the *primary* purpose of the requested surveillance to obtain a FISA warrant." *Abu-Jihaad*, 630 F.3d at 119.

The precise question at issue here, whether the pre-amended version of FISA required that the primary purpose of surveillance be gathering foreign intelligence rather than gathering information for a criminal investigation, has been thoroughly addressed by the Foreign Intelligence Surveillance Court of Review. *See In re Sealed Case*, 310 F.3d 717 (FISCR 2002).  After an exhaustive analysis of the statutory text and legislative history, as well as circuit court opinions that had construed FISA to require a primary purpose test, the FISCR held in *In re Sealed Case* that there had never been a primary purpose

requirement. *Id.* at 723–27. The court reasoned that, because the statute's definition of "foreign intelligence information" necessarily included evidence of *crimes*, such as espionage, sabotage, and terrorism, it was "virtually impossible to read the 1978 FISA to exclude from its purpose the prosecution of foreign intelligence crimes, most importantly because, as we have noted, the definition of an agent of a foreign power—if he or she is a U.S. person—is grounded on criminal conduct." *Id.* at 723. As originally enacted, the court held, FISA had not "even contemplated that the FISA court would inquire into the government's purpose in seeking foreign intelligence information." *Id.* The court therefore concluded that "the FISA as passed by Congress in 1978 clearly did *not* preclude or limit the government's use or proposed use of foreign intelligence information, which included evidence of certain kinds of criminal activity, in a criminal prosecution." *Id.* at 727.

In light of the above, the defendants' argument that the FISA surveillance was subject to suppression because its primary purpose was a criminal investigation, is unavailing. Like the district court, we need not, and do not, decide that the primary purpose of the surveillance here was a criminal investigation. Instead, we hold that the defendants' argument for application of a primary purpose test is incorrect.

Similarly, we reject the defendants' argument that the FISA warrant applications did not establish the requisite probable cause in this case. Upon careful *in camera* review of the challenged FISA orders and applications, and the classified materials in support of the applications, we conclude that the Government demonstrated the requirements for probable cause, including the belief that the targets of the surveillance were agents of a foreign power and that the place of surveillance was being used, or was about to be used, by an agent of a foreign power. *See* 50 U.S.C. § 1804(a)(3).

For the same reasons, the defendants have also failed to show a basis for a *Franks* hearing. A defendant, upon a proper preliminary showing, may obtain an evidentiary hearing to challenge the truthfulness of statements made in an affidavit supporting a warrant. *Franks*, 438 U.S. at 155–56. A defendant is entitled to a *Franks* hearing if he shows "that (1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause." *United States v. Brown*, 298 F.3d 392, 395 (5th Cir. 2002). We find no basis to conclude that the statements relied upon by the defendants were made with reckless disregard for the truth. Nor do we find that the statements were necessary to the finding of probable cause. We agree with the district court's conclusion that probable cause was satisfied even absent the erroneous statements. We therefore affirm the district court's denial of the suppression motion.

## N. Sentencing

Next, we consider two sentencing issues. The defendants contend that (1) the district court erroneously calculated their offense levels under the Sentencing Guidelines by applying an enhancement under U.S.S.G. § 3A1.4 because their crimes involved terrorism, and (2) the district court erroneously calculated the value of funds involved in the money laundering offenses.

We review the district court's interpretation and application of the Sentencing Guidelines *de novo* and its factual findings for clear error. *United States v. Lige*, 635 F.3d 668, 670 (5th Cir. 2011). A factual finding will be upheld "if it is plausible in the light of the entire record." *United States v. Rubio*, 629 F.3d 490, 492 (5th Cir. 2010).

### 1. Terrorism adjustment

The presentence report ("PSR") for each of the individual defendants in this case applied a 12-level sentencing enhancement pursuant to § 3A1.4 of the

2002 version of the Sentencing Guidelines. Section 3A1.4 provides for an offense level enhancement and an automatic increase to criminal history category VI "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." § 3A1.4(a). The application notes cross-reference 18 U.S.C. § 2332b(g)(5) for the definition of a "federal crime of terrorism." *Id.*, cmt. (n.1). A "federal crime of terrorism" is defined as an offense that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and "(B) is a violation of [any of a list of specific statutes]." § 2332b(g)(5).

On appeal, the defendants do not contest that they were convicted of offenses for which the enhancement is applicable, as required by the second prong of the definition of a federal crime of terrorism. The defendants challenge only the application of the first prong of the definition, which requires that their offenses were "calculated to influence or affect the conduct of government by intimidation or coercion." They argue that there was no evidence that they acted with the requisite intent.

The probation department applied the terrorism enhancement in the PSRs because "HLF was involved in sending material support to a SDT in order to rid Palestine of the Jewish people through violent jihad, HAMAS' mission. Since the offense is a felony that was intended to promote a federal crime of terrorism 12 levels are applied." The defendants objected in the district court that the enhancement did not apply because the Government failed to prove that they acted with the intent to influence or affect the conduct of government. In overruling the objection, the district court found that the evidence established that HLF's purpose was to support Hamas as a fundraising arm, and that videotapes, wiretaps, and seized documents interlinked the defendants, HLF, and Hamas, and demonstrated the defendants' support of Hamas's mission of terrorism. We conclude that the district court did not clearly err. *See United*

*States v. Harris*, 434 F.3d 767, 772–73 (5th Cir. 2005) (reviewing the "influencing government" prong of § 3A1.4 for clear error).

As pointed out by the Government, the trial was replete with evidence to satisfy application of the terrorism enhancement because of the defendants' intent to support Hamas. The Hamas charter clearly delineated the goal of meeting the Palestinian/Israeli conflict with violent jihad and the rejection of peace efforts and compromise solutions. The defendants knew that they were supporting Hamas, as there was voluminous evidence showing their close ties to the Hamas movement. The evidence of statements made by the defendants at the Philadelphia meeting and in wire intercepts throughout the course of the investigation demonstrated the defendants' support for Hamas's goal of disrupting the Oslo accords and the peace process, as well as their agreement with Hamas's goals of fighting Israel. To the extent that the defendants knowingly assisted Hamas, their actions benefitted Hamas's terrorist goals and were calculated to promote a terrorist crime that influenced government. *See United States v. Jayyousi*, __ F.3d __, No. 08-10494, 2011 WL 4346322, at *26–27 (11th Cir. 2011) (holding that terrorism enhancement under § 3A1.4 applies when purpose of defendants' activity is calculated to promote a terrorism crime regardless of defendants' personal motivations); *United States v. Awan*, 607 F.3d 306, 316–18 (2d Cir. 2010) (holding that for § 3A1.4 enhancement the Government need not show that the defendant was personally motivated to influence government if it shows that he intended to promote a crime calculated to have such an effect).

The defendants' reliance on *United States v. Chandia*, 514 F.3d 365, 375–76 (4th Cir. 2008), in support of their argument against the terrorism enhancement is unavailing. In that case, the Fourth Circuit reversed a § 3A1.4 enhancement for a defendant convicted of providing material support to a terrorist organization because the PSR provided no explanation for the

adjustment, the district court made no factual findings to justify its application, and the acts underlying the conviction were not violent terrorist acts. *See id.* In the instant case, although the defendants were not convicted of underlying terrorist acts, the PSRs adequately explained the basis for the enhancement and the district court made explicit factual findings. In light of the evidence showing the ties between the defendants and Hamas and their support of Hamas through HLF, the district court's finding that the defendants intended to influence government through their actions was plausible and not clearly erroneous.

### 2. **Value of laundered funds**

The individual defendants' PSRs calculated the total amount of the funds laundered from the money laundering offenses to be approximately \$16.6 million. The defendants argue on appeal that this determination was incorrect because that amount "represents every penny HLF wired out of the country between 1995 and 2001, regardless of the destination and purpose." The defendants assert that some portion of the funds was sent to places other than the West Bank and Gaza and served legitimate charitable needs. According to the defendants, the amount of funds laundered should have included, at most, funds sent only to the West Bank and Gaza and the zakat committees that were alleged in the indictment as being controlled by Hamas. We find no merit in this argument.

First, in their one-paragraph discussion, the defendants cite no authority and do not explain how the allegedly erroneous calculation of the laundered funds affected their guidelines ranges or sentences. The issue is therefore deemed abandoned due to inadequate briefing. *See United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (failure to offer further argument or explanation is a failure to brief and constitutes a waiver).

Second, even if we consider the issue, it is clear from the PSRs that the amount of laundered funds was not used to calculate the defendants' offense

levels and did not factor into the guidelines computations. The guideline for money laundering directs the probation office to apply the base offense level for the underlying offense. *See* U.S.S.G. § 2S1.1(a)(1). As so directed, the PSRs in this case applied the offense level for the offense of providing material support to a foreign terrorist organization under § 2M5.3. The PSRs made no adjustments to the offense level based on the amount of money laundered. The probation officer noted in response to the defendants' objection in the district court that the only impact that a specific dollar amount of laundered funds could have is on the maximum guideline fine range. However, any potential error is harmless because the district court did not impose a fine on any of the defendants.[51] *See, e.g., United States v. Johnson*, 467 F.3d 559, 564 (6th Cir. 2006) (holding that an error is harmless if the Government shows with certainty that an error at sentencing did not cause the defendant to receive a more severe sentence).

Finally, the PSR determined that HLF's provision of some funds to legitimate charitable organizations helped to hide its true agenda of supporting Hamas. The district court agreed with the PSR that even if some of the money sent out of the country was for some legitimate purpose, the sole purpose of HLF was to provide financial support for Hamas, and therefore the entire amount was properly included as laundered funds. The district court was entitled to rely on the PSR, see *United States v. Rodriguez*, 602 F.3d 346, 363 (5th Cir. 2010) (holding that the district court may rely on the PSR where it is contradicted only

---

[51] The district court did order that the defendants were subject to a forfeiture of approximately $12 million, but no defendant has briefed the forfeiture order or explained how it is related to the calculation of the laundered funds or to the district court's alleged error in applying the sentencing guidelines. In any event, the forfeiture order was based on the charge in the indictment and the corresponding finding by the jury's special verdict that the defendants were subject to a forfeiture of that amount, which represents a portion of the monies that the jury found the defendants sent outside the United States for the purpose of assisting a designated terrorist organization.

by the defendant's objections), and its finding was not clearly erroneous. The defendants' challenge to their sentences is therefore rejected.

## O. Appeals of HLF and Nancy Hollander

We next address the separate appeals of HLF and Nancy Hollander. HLF contends that its Sixth Amendment right to counsel was violated because it was convicted without representation at trial. Hollander contends that the district court, in deciding issues related to HLF's representation, improperly sanctioned her for professional misconduct. Because the issues in each appeal derive from a common factual background, we first set forth additional facts necessary for our decision before turning to each argument. As we explain, we dismiss both appeals because we conclude that we lack appellate jurisdiction.

### 1. Background

As noted above, the case against HLF began with an indictment of all defendants in July 2004. On September 7, 2004, Attorney Nancy Hollander, of the law firm Freedman Boyd Daniels Hollander Goldberg & Cline, P.A. ("Freedman Boyd"),[52] wrote a letter to OFAC, inquiring whether Freedman Boyd could represent HLF pro bono in the criminal case. In the letter, Hollander stated, "A corporation cannot appear *pro se*; it must appear only through counsel. HLF clearly has a Sixth Amendment right to counsel; therefore, any conviction against it, including any forfeiture of the frozen funds, will likely be reversed if it is forced to trial without counsel." (Citations omitted). Hollander sent copies of the letter to the district court, government counsel, and defense counsel. OFAC responded that Freedman Boyd was authorized to represent HLF pro bono, but that no blocked funds could be used to pay for the representation. Freedman Boyd agreed to represent HLF pro bono and entered an appearance

---

[52] The current name of the law firm is Freedman Boyd Hollander Goldberg Ives & Duncan, P.A.

on HLF's behalf.  Freedman Boyd also filed an entry of appearance on behalf of individual Defendant Baker in September 2004.

At a July 2006 status conference, the district court and the parties discussed the potential conflict of interest arising from Freedman Boyd's joint representation of HLF and Baker.  Hollander stated that she would obtain conflict waivers from both parties.  She also stated, "The other possibility is that we will stop representing [HLF] and it simply won't have a representative in this lawsuit.  But I think we can resolve this."  On September 29, 2006, Freedman Boyd filed with the court Baker's and HLF's written waivers of any potential or actual conflict of interest.  Defendant Elashi, who was the HLF Board Chairman, signed the conflict waiver on behalf of HLF.

The issue of Freedman Boyd's conflict of interest was brought up again just before the start of the first trial.  At a hearing on July 13, 2007, Teresa Duncan, another attorney at Freedman Boyd, stated that she represented both Baker and HLF.  The district court became concerned about the potential conflict of interest and asked whether, pursuant to Federal Rule of Criminal Procedure 44, the defendants understood the risks to joint representation.  Duncan replied that Baker and HLF had signed conflict waivers and that she was satisfied that the defendants understood the hazards involved in joint representation.

On July 17, 2007, the second day of voir dire, the issue of Freedman Boyd's conflict of interest arose yet again.  The Government noted that the court had not yet conducted a Rule 44 oral colloquy with the defendants regarding their waiver of a conflict.  District Judge Fish agreed that he should examine each of the defendants pursuant to Rule 44, but he noted that he was not sure whether HLF had a "natural person representative" able to speak on HLF's behalf.  The Government told the court that Elashi had signed the conflict waiver, but the Government also noted that this waiver might not be valid because Elashi is also a defendant in the case.  Elashi's counsel, John Cline, asked the court for a night

to think about the matter, and the court agreed to discuss the issue the following morning.

The next day, Cline told the court that "we don't know either of the current status of [HLF], whether it exists even as an entity or Mr. Elashi's status, if it does exist." Therefore, Cline stated that Elashi "cannot speak for the Holy Land Foundation" regarding a waiver of conflict. The court responded, "I thought we had [HLF] as a represented defendant in this case; that is, represented by counsel. But I'm inferring from what has been said that there is no natural person as the representative of [HLF] who would be the client for the attorney who's representing [HLF]." The court then stated that it would consider the issue further.

On July 20, 2007, the fifth day of voir dire, the court again addressed the issue of Freedman Boyd's representation of HLF. Hollander stated that "if there is no one here to represent Holy Land[, and] since we don't know exactly what its status is[,] [Freedman Boyd] can't represent Holy Land." Hollander explained that Freedman Boyd shared the Government's concern about the validity of the HLF conflict waiver and that there was no HLF representative to answer the court's questions during a Rule 44 colloquy. Therefore, she concluded that Freedman Boyd "can't represent Holy Land under those circumstances." The Government responded that "[w]ith regard to Holy Land Foundation, I don't know what we do. Maybe remain unrepresented for the trial." Hollander then stated that Freedman Boyd "will withdraw from representing Holy Land at this time. Ms. Duncan and I will continue to represent Mr. Baker." The Government did not object to Freedman Boyd's withdrawal, and the court implicitly accepted Hollander's withdrawal. The court moved on to discussing how to introduce the various defense attorneys to the jury and stated, "So I guess on Holy Land, I can simply say that it is

161

unrepresented." The trial proceeded with HLF being unrepresented by counsel, and the trial ended in a mistrial.

On September 22, 2008, the first day of the second trial before District Judge Solis, the issue of HLF's representation arose again. The Government told the court "that the Holy Land Foundation Corporation is a Defendant and that there will be evidence in that regard." The Government went on to state that HLF "has no employees and no officers and so there is no one to represent it, but it is an essential part of this lawsuit because of the forfeiture provisions and the funds that are being held subject to being forfeited." Judge Solis entered a plea of not guilty on behalf of HLF. During the second trial, no counsel for HLF made an opening statement, examined witnesses, or gave a closing statement.

The jury found HLF guilty on all counts. On May 27, 2009, HLF was sentenced without defense counsel. The court ordered that HLF "be placed on a one-year supervised release" and that all of HLF's frozen assets, including its bank accounts, were forfeited. The court also entered a money judgment in the amount of $12,400,000.

On June 5, 2009, Attorney Ranjana Natarajan, Director of the National Security Clinic at the University of Texas School of Law, filed a notice of appearance and a notice of appeal on behalf of HLF. Natarajan had no prior connection to the case. The Government filed a motion to strike both the notice of appearance and the notice of appeal on the ground that HLF had not authorized Natarajan to represent HLF. Natarajan responded in part that the district court had been divested of jurisdiction. The Government then filed with this court a motion for a limited remand so that the district court could make findings regarding Natarajan's authority to represent HLF on appeal. We entered a limited remand order for the district court to address "Ms. Natarajan's

authority to represent HLF, whether HLF was represented at trial, and the corporate status of HLF at relevant times."

On January 12, 2010, the district court conducted an evidentiary hearing, in which the court heard argument from Natarajan and the Government and took testimony from Hollander and Cline, among others. The district court subsequently issued an Order (the "Order"), in which the court made its determinations regarding the questions presented in the remand.

Regarding the issue of HLF's representation, the district court found that Freedman Boyd represented Baker and HLF from September 2004 until July 20, 2007, and that this joint representation did not violate the defendants' Sixth Amendment right to conflict-free counsel. The court explained that there was no potential or actual conflict of interest, because the defendants' "merger of interests and identities was so clear and pronounced" that "[t]heir defenses had to be one and the same." Next, the court held that Freedman Boyd effectively withdrew from representing HLF on July 20, 2007, when Hollander stated to Judge Fish that "[w]e will withdraw from representing Holy Land at this time." The court explained that "[t]he Government acquiesced," "[n]o one objected to the withdrawal," and "[t]he Court implicitly accepted the withdrawal."

However, the district court went on to explain in the Order that, during the second trial, "[n]o one informed this Court that Freedman Boyd no longer represented HLF," and "[n]othing said or done during the second trial alerted the Court to the fact that HLF did not have legal representation." The court stated, "The only party with certain knowledge of the likely effect of this withdrawal was Ms. Hollander." The Order then stated:

> This Court requires attorneys in criminal cases to abide by certain standards of conduct, including owing duties of candor and clarity to the judiciary. . . . Ms. Hollander's failure to disclose to Judge Fish the potential effect of her firm's withdrawal before the first trial and her failure to disclose to the undersigned the potential effect of HLF

being unrepresented during the second trial showed a complete lack of candor and a failure to diligently inform the Court of a material fact.

The court next found that HLF, although an unrepresented corporation, was "de facto" represented by the counsel of its co-defendants at trial. The court explained that "these seven attorneys, representing the three individual co-defendants [El-Mezain, Baker, and Elashi] – all with the same defense and defense strategy – are deemed to have adequately represented the interests of the unrepresented corporate entity that was operated by those individual co-defendants."

Next, the court addressed the issue of Natarajan's authority to represent HLF on appeal. The Order stated, "The evidence is undisputed that no HLF representative authorized or directed Ms. Natarajan to file a notice of appeal on HLF's behalf. No one has identified any natural person (other than Co-Defendants) with the necessary authority to direct HLF's appellate representation." The court noted that "Ms. Natarajan proposes that the Court appoint a third-party 'trustee' who can speak and act for HLF and direct Ms. Natarajan as HLF's counsel." The court concluded that "[t]he unique circumstances of this case require the Court to find a *sui generis* solution. . . . Therefore, in the interests of fairness and ensuring justice for HLF, the Court hereby exercises its inherent authority to appoint Ms. Natarajan as HLF's pro bono counsel." The court explained that "Ms. Natarajan's authority to represent HLF hereby relates back to the date of her initial appearance and notice of appeal – June 5, 2009." The Order lastly discussed HLF's corporate status, finding that on March 3, 2003, California suspended HLF's powers, rights, and privileges due to nonpayment of franchise taxes.[53]

---

[53] Natarajan argues on appeal that as of July 2007, due to nonpayment of franchise taxes, HLF was a "defunct" corporation and had no directors or officers bound by fiduciary

No. 09-10560

## 2. HLF's appeal

HLF[54] appeals its conviction and sentence as well as certain findings in the Order. It argues that it was denied its Sixth Amendment right to counsel when it was tried, convicted, and sentenced without the benefit of counsel. To the extent that HLF was "de facto" represented by the counsel of its co-defendants, as the district court found, HLF argues that its Sixth Amendment rights to conflict-free counsel and to effective assistance of counsel were denied. HLF also asserts that its rights under the Confrontation Clause, the Due Process Clause of the Fifth Amendment, and Federal Rule of Criminal Procedure 43 were violated when it was tried, convicted, and sentenced without counsel. HLF contends that, due to these violations, we should vacate its conviction and sentence and remand the case to the district court for further proceedings.

Before we can address the merits of HLF's appeal, we must first decide whether we have jurisdiction over the appeal. The Government argues that we lack appellate jurisdiction because (1) the district court erred in appointing

---

duty to act on its behalf. She is incorrect. Under California law, a California corporation's failure to pay franchise taxes does not result in the dissolution of the corporation, but merely results in a suspended status. *See* CAL. REV. & TAX. CODE § 23301; *see also* MARSH'S CAL. CORP. L. § 21.18 ("Where the rights and privileges of a corporation are suspended for failure to pay franchise taxes, it is no longer treated as having been dissolved or its corporate franchise 'forfeited,' but it is merely subjected to certain disabilities unless and until it is 'revived' by the payment of the back taxes and penalties."). During suspension, the corporation is prohibited from exercising certain rights, including, *inter alia*, the right to prosecute or defend against a civil lawsuit and the right to enter into a contract. *See* MARSH'S CAL. CORP. L. § 21.18. Although a suspended corporation is subject to these limitations, the corporation continues to exist as an entity. Furthermore, the corporation can be "revived" to its full powers by the payment of delinquent taxes and penalties and the issuance of a certificate of revivor. *See* CAL. REV. & TAX. CODE § 23305. A majority of the directors or an officer, among others, can apply for a certificate of revivor on behalf of the corporation. *Id.* Although we need not decide the issue, this at least suggests that the directors and officers of such a corporation continue in office.

[54] Natarajan, as appointed appellate counsel for HLF, made the following arguments in her briefs, purportedly on behalf of HLF. In this section of the opinion, for the sake of clarity, we attribute to HLF all of the arguments made in Natarajan's appellate briefs.

No. 09-10560

Natarajan as appellate counsel and (2) Natarajan had no authority to file a notice of appeal on HLF's behalf.[55] The Government contends that HLF's notice of appeal was defective and that we must therefore dismiss the appeal. HLF argues that we have jurisdiction because the district court had the inherent authority to appoint Natarajan as appellate counsel and there was sufficient authorization under the circumstances. For the following reasons, we agree with the Government that HLF's notice of appeal was unauthorized and thus invalid, thereby depriving us of jurisdiction.

We review the district court's legal conclusions *de novo. See, e.g., United States v. Gomez*, 623 F.3d 265, 268 (5th Cir. 2010); *Magallon v. Livingston*, 453 F.3d 268, 271 (5th Cir. 2006). The district court's factual findings are reviewed for clear error. *Gomez*, 623 F.3d at 268. "We review *de novo* a district court's invocation of its inherent power . . . ." *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 590 (5th Cir. 2008); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010). "[W]hen these inherent powers are invoked, they must be exercised with 'restraint and discretion.'" *Gonzalez v. Trinity Marine Group, Inc.*, 117 F.3d 894, 898 (5th Cir. 1997) (citation omitted). A district court's inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *F.D.I.C.*, 523 F.3d at 591.

In the Order, the district court decided from the unusual circumstances of the case "to find a *sui generis* solution" and appoint Natarajan as HLF's pro bono counsel, with her representation relating back to the date of her notice of appeal. HLF argues that the district court can exercise its inherent authority to appoint

---

[55] The Government presents these arguments on cross-appeal from the district court's appointment of Natarajan, but the Government's arguments are more akin to a jurisdictional challenge to HLF's appeal. Therefore, although we do not consider the Government's arguments in the form of a cross-appeal, we consider them in determining whether we have appellate jurisdiction.

counsel when necessary, and therefore Natarajan's appointment was proper. In support of its argument, though, HLF cites only cases involving a trial court appointing counsel at the trial stage of the proceeding.[56] *See, e.g., United States v. Bertoli*, 994 F.2d 1002, 1016–18 (3d Cir. 1993); *United States v. Accetturo*, 842 F.2d 1408, 1412–15 (3d Cir. 1988); *United States v. Rivera*, 912 F. Supp. 634, 639–40 (D.P.R. 1996); *United States v. Crosby*, 24 F.R.D. 15, 16 (S.D.N.Y. 1959). In the instant case, the district court exercised its inherent authority to appoint appellate counsel. We need not address whether it was within the district court's inherent authority to appoint appellate counsel because, even assuming the appointment of Natarajan was within the district court's inherent authority, there remains the issue whether Natarajan had the necessary authorization to file and pursue the appeal on behalf of HLF.

It is undisputed that no HLF representative authorized Natarajan to file a notice of appeal on HLF's behalf. Instead, the district court itself appointed Natarajan as HLF's counsel and retroactively authorized HLF's notice of appeal under its inherent authority. It is well established, however, that "the decision to appeal rests with the *defendant*." *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000) (emphasis added); *see also* LEGAL ETHICS, LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY § 1.2–2(a) (2011–12 ed.) ("On these significant and central issues, such as the question of . . . whether to appeal, the client should have the final say."); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 22(1) (2000) ("[T]he following and comparable decisions are reserved to the client[:] . . . whether to appeal in a civil proceeding or criminal prosecution."). A defendant is not required to pursue an appeal at all. Because the decision to appeal belongs exclusively to the defendant, the defendant's counsel may not prosecute an appeal—even if counsel believes it to be in the defendant's best

---

[56] We express no opinion on the district court's inherent power to appoint trial counsel for an unrepresented corporation.

No. 09-10560

interest—if the defendant chooses to forgo an appeal. For example, in *Smith v. Armontrout*, 857 F.2d 1228, 1230 (8th Cir. 1988), the Eighth Circuit held that a notice of appeal filed by court-appointed counsel on behalf of a capital murder defendant sentenced to death was unauthorized where the defendant indicated that he wanted the appeal dismissed. The court found that the notice of appeal was therefore ineffective and dismissed the appeal. *Id.*

Here, because the important decision whether to appeal is the province of the defendant, not of the district court or of defense counsel, we conclude that the district court erred in assuming that it could authorize the appeal on behalf of HLF. Natarajan lacked authorization from HLF to file an appeal. As an academic with no connection to HLF, Natarajan took it upon herself to file a notice of appeal on HLF's behalf. The district court's decision to appoint Natarajan with purported authority to appeal, although laudable in its intent, does not overcome the deficiency. The notice of appeal was unauthorized and thus invalid. We hold, therefore, that HLF's appeal must be dismissed in light of the defective notice of appeal.[57]

Our foregoing analysis regarding a district court's authority to authorize a notice of appeal is expressly confined to the facts of this case. We hold only that the district court could not authorize a notice of appeal filed on behalf of an

---

[57] Natarajan contends that, if we find that the notice of appeal was unauthorized, we should order an equitable remedy to allow HLF to appeal its conviction and sentence. Natarajan posits that we could equitably excuse the insufficient authorization or appoint a third party to serve as HLF's representative to authorize and direct the appeal. The Government responds that HLF is not without procedural avenues to challenge its conviction and sentence, as HLF may collaterally attack its conviction through a petition for a writ of error *coram nobis*. *See United States v. Rad-O-Lite of Philadelphia, Inc.*, 612 F.2d 740, 744 (3d Cir. 1979) (holding that a writ of *coram nobis* is the mechanism through which "persons not held in custody can attack a conviction for fundamental defects, such as ineffective assistance of counsel" and that "[c]ourts regularly have allowed corporations to petition for coram nobis"). We need not decide this question on appeal, and we therefore decline to impose the equitable remedy urged by Natarajan.

No. 09-10560

unrepresented defendant corporation by an attorney with no connection to the defendant and where no corporate representative authorized the appeal.

For the foregoing reasons, we dismiss HLF's appeal for lack of jurisdiction.

### 3. Hollander's appeal

Hollander separately appeals the Order. Specifically, she argues that we should vacate the following portion of the Order: "Ms. Hollander's failure to disclose to Judge Fish the potential effect of her firm's withdrawal before the first trial and her failure to disclose to the undersigned the potential effect of HLF being unrepresented during the second trial showed a complete lack of candor and a failure to diligently inform the Court of a material fact." Hollander asserts that the district court erred in finding that she committed professional misconduct. Although Hollander may well be correct that the district court's criticism was undeserved in light of the numerous discussions about HLF's representation by all parties during both trial proceedings, we do not reach the merits of her appeal. We conclude that Hollander's appeal does not present a justiciable case or controversy, and we therefore dismiss the appeal for lack of jurisdiction.

Hollander correctly notes that in *Walker v. City of Mesquite*, 129 F.3d 831 (5th Cir. 1997), we set out this circuit's rule as to whether a trial court's sanction of attorney conduct is a reviewable appellate issue. In *Walker*, we held that "the importance of an attorney's professional reputation, and the imperative to defend it when necessary, obviates the need for a finding of monetary liability or other punishment as a requisite for the appeal of a court order *finding professional misconduct*." *Id.* at 832–33 (emphasis added). Therefore, under *Walker*, if the Order had contained a finding that Hollander had committed professional misconduct, we would have jurisdiction to review her appeal.

We find, however, that the contested language in the Order may have questioned counsel's performance, but it stopped short of an actual finding of

169

professional misconduct. *Cf. Walker*, 129 F.3d at 832–33 (holding that the trial court's finding that the attorney was "guilty of blatant misconduct" constituted "a blot on [the attorney's] professional record" and presented a reviewable appellate issue). The district court was not engaged in a disciplinary hearing, nor did the court expressly conclude that Hollander violated a legal or ethical duty or rule. Its off-the-cuff remark did not constitute the imposition of a sanction. We think the court's statement is more akin to a "'negative comment or observation from a judge's pen about an attorney's conduct or performance,'" which, unlike a finding of professional misconduct, does not present an appealable issue. *See Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163, 1168 (10th Cir. 2003) (quoting *United States v. Gonzales*, 344 F.3d 1036, 1047 (10th Cir. 2003)) (internal quotation marks omitted); *see also Keach v. Cnty. of Schenectady*, 593 F.3d 218, 225 (2d Cir. 2010) ("An appellate court can reverse an order imposing a sanction or making a finding that an attorney has violated a rule of professional conduct; it has no power to reverse a judge's poor opinion of the skill or trustworthiness of a lawyer who has appeared before him or her."). Therefore, because the Order did not impose a sanction or make a finding of professional misconduct, we have no jurisdiction over Hollander's appeal, and the appeal is dismissed.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgments of conviction and sentences for the individual defendants, Mohammad El-Mezain, Ghassan Elashi, Shukri Abu Baker, Abdulrahman Odeh, and Mufid Abdulqader. We DISMISS for lack of appellate jurisdiction the separate appeal filed by the Holy Land Foundation for Relief and Development, and we DISMISS for lack of appellate jurisdiction the appeal filed by Nancy Hollander.